**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

_____
                                                    )
GIOVANI DEPIANTI, et al.,                )
and all others similarly situated,          )
                                                    )
              Plaintiffs,                          )
                                                    )        Civil Action No. 08-10663-MLW
v.                                                  )
                                                    )
JAN-PRO FRANCHISING                    )
INTERNATIONAL, INC.,                      )
                                                    )
              Defendant.                         )
_____ )

<u>**PLAINTIFFS' SUR-REPLY IN FURTHER OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

Jan-Pro's reply in support of its motion for summary judgment seeks to wash away the numerous factual disputes that are apparent from the memoranda, exhibits, and depositions in this matter until only a pristine, but false, summary judgment record appears.  This matter is highly fact-intensive.  Jan-Pro's emphatic assertions that facts are undisputed or not "genuinely or materially" disputed must be closely scrutinized.  In fact, as set forth below, there are genuine issues of material fact as to all of the factual points discussed in Jan-Pro's reply brief.

Moreover, as set forth below, Jan-Pro has incorrectly stated the legal standard to be applied here in several ways.  For example, Jan-Pro inaccurately states that its purported lack of day-to-day control over the cleaning "franchises" shields it from having an agency relationship with the so-called "master franchisors."  Jan-Pro has complete control, however, over "the instrumentality which caused the harm" – *i.e.*, the franchise structure itself.  <u>Coworx Staffing Services, LLC v. Coleman</u>, 2007 WL 738913, *5 (Mass.

Super. Feb. 7, 2007).  It is this specific domain of control that caused injury to the

Plaintiffs.

Finally, especially in light of the fact-sensitive nature of the inquiry here, Jan-

Pro's attempts to rely on the recent order by the Honorable William G. Young in <u>Awuah</u>

<u>v. Coverall of North America, Inc.</u>, Civil Action No. 07-102787, granting Coverall's

motion for summary judgment on claims against so-called "master franchisors," should

be rejected.  As discussed below, that order can have little to no precedential

significance in this case as it was issued without any analysis whatsoever by the court

and on an entirely different factual record.

For the reasons explained herein and in the Plaintiffs' opposition to the

Defendant's motion for summary judgment (Docket No. 75), Jan-Pro's motion for

summary judgment should be denied.

**ARGUMENT**

**I.     THE PLAINTIFFS' LEGAL THEORIES ARE SUPPORTED BY THE FACTUAL RECORD.**

Jan-Pro has spent the majority of its brief citing to portions of the factual record

that it claims establishes that Plaintiffs have not proven the allegations in the complaint.

The factual disputes glossed over by Jan-Pro are substantial.  For example, Jan-Pro

inaccurately or misleadingly represents that:  (1) the Plaintiffs' "accounts were near their

homes or within areas they knew they would be offered business"; (2) The Plaintiffs

testified that "the time estimated to service their accounts was accurate,"; (3) The

Plaintiffs' accounts were not taken away without fault or neutral reasons; (4) The

Plaintiffs were not promised an hourly rate of pay; and (5) The Plaintiffs understood the

documents and the fees they would be charged.  Def. Reply at 1-2.  Not one of these

purported undisputed facts is in fact undisputed.  The Plaintiffs have offered substantial evidence creating a question of material fact regarding each issue, as set forth below.

Moreover, though Jan-Pro has claimed that "all plaintiffs agreed their Master Owners offered (and they accepted) the amount of business promised, and nearly all received much more than that," Def. Reply at 1, this statement is highly misleading and ignores the totality of the facts at issue here.  Jan-Pro's counsel managed to elicit through targeted deposition questioning that Jan-Pro technically offered accounts up to a certain amount to each plaintiff.  However, what Jan-Pro has ignored (both in its summary judgment briefing and in its deposition questioning) is that many of the plaintiffs had accounts taken away from them after a short period of time, many accounts were priced so low that it was impossible to earn any money, and the offers of how much workers would earn from accounts did not factor in the excessive fees deducted by Jan-Pro from the workers' earnings.  See, e.g., Pls.' S.J. Opp. Fact Stmt. (Docket No. 76), ¶¶ 51-85.  The common practices by Jan-Pro described in Plaintiffs' complaint, further fleshed out in Plaintiffs' summary judgment briefing, and also described on a systematic basis in Steven Cumbow's expert report, all contributed to the end result that Jan-Pro's cleaning workers such as Plaintiffs are unable to make a real profit from their Jan-Pro cleaning "franchise," and that it is simply not the business opportunity that Jan-Pro claims it to be.

As to the specifics cited in Jan-Pro's summary judgment reply, the record before the Court demonstrates the existence of at least the following disputes of fact:

- *Accounts far from home.*  As the evidence shows, at least some of the named Plaintiffs had to *reject* accounts because they were too far from their homes.

Pls.' S.J. Opp. Fact Stmt. (Docket No. 76), ¶73; Harris Dep., 67:17-22.  It is thus wholly inaccurate to assert that plaintiffs' "accounts were near their homes or within areas they knew they would be offered business." Def. Reply at 1.  The accounts that these Plaintiffs *accepted* do not respond to the Plaintiffs' specific complaint that they were *offered* numerous accounts far from their home areas, and thus forced to choose between rejecting and accepting such accounts, and risking not getting more accounts. See Vazquez Dep., 65:2-7, 77:3-22; Pl. Opp. to Def. Mtn. to Strike at 15 (Docket No. 86).  Moreover, Plaintiff Vazquez's testimony demonstrates his understanding that he believed he had to accept accounts, even those that were inconveniently located, or he would not be offered any more accounts:

> Q.    Did you have an understanding as to whether you could accept or reject accounts?
>  A.    They mentioned if you reject them, you do not get any more accounts.
> Q.    Who said that?
> A.    Carmen [Garcia, the general manager]

Id., 65:2-7.

> Q.    And you accepted the account.  Did you understand that you had the right to reject the account?
> A.    No, 'cause Carmen had said if you reject them, you won't get no more offers.
> Q.    But you had the right to reject it.  You might not have gotten any more offers, but you knew you had the right to reject it, right?
> A.    No, 'cause if you reject, that's it.

Id., 77:3-11.[1]

---

[1]    Jan-Pro's response to the complaint that franchisees could not reject accounts if they wanted future accounts exemplifies the cavalier attitude that Jan-Pro has assumed regarding the entirety of the Plaintiffs' claims.

> Q.    Okay.  But you had a choice.  You could reject it and lose your money and get no more work, or you could accept it, right?"  Id., 78:8-10.
> A.     I disagree with that.
> Q.    Well, you just said it.  You had the choice to reject it.
> A.    Uh-huh.

- *Time estimated for accounts not accurate.* The named Plaintiffs *did not testify* that "the time estimated to service their accounts was accurate." Def. Reply at 2. In fact, numerous Plaintiffs testified the exact opposite, that the accounts were underbid. See Harris Dep. 76:8-77:5, 143:9-14; Rhodes Dep. 131:16-10; Depianti Dep. 164:12-165:17; Vazquez Dep., 175:8-20.  In fact, Harris testified that a representative of Jan-Pro told her, without any prompting, that Jan-Pro does not underbid. See Harris Dep., 26:3-20.  Harris testified explicitly that she had one account that took one hour longer to clean than estimated, and another account that took three additional hours:

> Q.      And the Village at Tucsan account was about an extra hour than what [Jan-Pro representative] said?
> A.      Yes.
> Q.      Paris Open MRI was about three more hours to clean than what he had said?
> A.      Yes.

Harris Dep., 143:9-14.  In light of this unequivocal testimony, Jan-Pro's assertion that "the time estimated to service their accounts was accurate" is a clear misstatement of the record.

- *Accounts taken away for pretextual reasons.* The named Plaintiffs offered substantial evidence that they had accounts taken away for pretextual reasons. See Def. Reply at 2; Pls.' S.J. Opp. Fact Stmt. (Docket No. 76), ¶¶76-79. E.g., Aguilar Dep., 143:4:145:21 (account taken away purportedly because he only had one worker, not two, available to clean account, even though he was previously assured that one worker was sufficient); Depianti Dep., 124:1-128:11 (discussing confusion caused by bringing

---

> Q.      You -- you're saying you wouldn't have gotten any more work, and you might have lost your money, but you could have made that choice, right?
> A.      And then you go out of business.  I mean –

Id., 78:11-19.

supplies from one account to another causing him to lose account).  In fact, Jan-Pro

itself acknowledges this in its reply memorandum.  <u>See</u> Def. Reply at 10 (stating that

named Plaintiff Roh "claims to have resolved all issues [at certain account] and that it

was unfairly taken away."), <u>id.</u> n. 14.

- *Plaintiffs promised hourly rate of pay.*  Various named Plaintiffs

unmistakably testified that they were promised an hourly rate of pay.  <u>See</u> Def. Reply at

2; Vazquez Dep., 204:15-205:11; Rhodes Dep., 114:14-23.[2]

- *Plaintiffs did not understand documents and/or fees.*  Various named

Plaintiffs also testified that they *did not* understand the documents and the fees they

would be charged.  <u>See</u> Def. Reply at 2; Vazquez Dep., 40:1-41:11, 42:1-20; Kim Dep.,

26:18-28:13.  Vazquez testified that he did not understand several specific provisions in

the franchise agreement, including a provision purporting to advise him that the

"franchise account cost" should not be interpreted as a predictor of actual profits.  He

testified that this directly contradicted a commitment made to him by a Jan-Pro

---

[2]      Jan-Pro's assertion that it was the "plaintiffs themselves who testified that . . . the time estimated to service their accounts was accurate and . . . they were not promised an hourly rate of pay," Def. Reply at 2, is a clear misstatement of the record as shown by the following two testimony excerpts:

> Q.      And the Village at Tucsan account was about an extra hour than what [Jan-Pro representative] said?
> A.      Yes.
> Q.      Paris Open MRI was about three more hours to clean than what he had said?
> A.      Yes.

Harris Dep., 143:9-14

> Q.      Okay.  Now, Paragraph 36, "Jan-Pro, through its master franchisee's agents, also misrepresents the workers will receive a higher hourly rate of pay for their work than Jan-Pro knows they will be able to earn." What were you told you would make for an hourly rate of pay?
> A.       The guy in Orange County told me I would make 25 to 30 an hour.
> Q.      Okay.  And you don't know that person's name?
> A.      I know he was the general manager in Orange County.

Vazquez Dep., 204:15:205:3.

representative.  See Vazquez Dep, 42:1-20, 43:21-25 (A. "Well that's not what she said. She said I would be getting that money in my pocket."); Pl. Opp. to Def. Mtn. to Strike at 16 (explaining Plaintiff's expert's opinion that franchise documents did not include critical information necessary for the plaintiffs to make an informed investment).

As these record excerpts demonstrate, there are in fact substantial, material factual disputes on the core issues identified by Jan-Pro in its reply brief.

## II.   JAN-PRO'S LEGAL ARGUMENTS ARE WITHOUT MERIT.

### A.   The evidence establishes at least a dispute of fact as to whether an agency relationship exists between Jan-Pro and its so-called master franchisors.

Jan-Pro has misstated the applicable legal standards in arguing that it is entitled to summary judgment.  First, Jan-Pro has claimed that its purported lack of day-to-day control over the cleaning "franchisees'" work insulates Jan-Pro from the establishment of an agency relationship between it and its so-called "master franchisors."  In fact, this agency relationship is established through the factual record demonstrating that Jan-Pro has control over "the instrumentality which caused the harm," Coworx Staffing Services, LLC v. Coleman,   2007 WL 738913, *5 (Mass. Super. Feb. 7, 2007), namely the franchise structure itself, as effected through Jan-Pro's own standard-form contracts and other materials.

Indeed, Jan-Pro does not even deny that it retains the right of control over the master owners.  See Def. Reply at 4 ("In the franchise context, JPI is supposed to have that right of control.").  Jan-Pro instead argues that, to be found liable under an agency theory, it must exercise "control-in-fact" over the master owners, id., a theory offered

without any support and one that is directly contradicted by case law previously cited by the Plaintiffs.  See Pls.' S.J. Opp. (Docket No. 75), at 6-7, citing Peters v. Haymarket Leasing, Inc., 64 Mass. App. Ct. 767, 774 (2005); Dias v. Brigham Medical Assocs., 438 Mass. 317, 322-323 (2002).  "The right to control an agent's activities has been the *guiding principle* in deciding cases involving an assertion of vicarious liability against an agent's principal." Bing v. Drexler, 866 N.E.2d 996, 999 (2007) (emphasis added); Acerra v. Best Western Intern., Inc., 1992 WL 406499, *3 (D.N.J.,1992) (denying summary judgment where genuine issue of fact existed as to whether franchisor hotel exerted sufficient control over franchisee hotel); Singleton v. Dairy Queen, Inc., 332 A.2d 160 (Del. Super. 1975) (summary judgment denied when franchisor had specified the building features of franchisee's business that injured the plaintiff); Butler v. McDonald's Corp., 110 F. Supp. 2d 62, 67-68 (D.R.I. 2000) (court held franchisor vicariously liable for franchisee's negligent failure to repair premises based on indicia of general control); Miller v. McDonald's Corp., 945 P.2d 1107, 1111 (Or. Ct. App. 1997) (franchisor can be vicariously liable where patron bit into sandwich that contained stone because the franchise agreement provided "precise methods" of food handling and preparation);  Griel v. Travelodge Int'l., Inc., 541 N.E. 2d 1288, 1292-94 (Ill. App. Ct. 1989) (franchisor liable for franchisee under enterprise theory because franchisor benefitted in profits and good will from the franchise and should bear the burdens).

There has never been a ruling, and Jan-Pro cites to none, that the right of control test does not apply in the franchise context.  As Jan-Pro argues, some Massachusetts courts have recognized that the franchisor-franchisee relationship differs to some degree from the traditional master-servant relationship, and thus have focused on

whether the "franchisor exercised control over the day-to-day operations of the franchisee *or controlled through the franchise agreement the instrumentality which caused the harm*." Coworx Staffing Services, LLC v. Coleman,   2007 WL 738913, *5 (Mass. Super. Feb. 7, 2007) (emphasis added).  Though Jan-Pro has attempted to rely on Coworx, that case supports a finding of agency liability here.  Jan-Pro's master franchise agreements plainly provide such control over the "instrumentality which caused the harm."  The franchise cases inapposite to this dispute are ones where the control provided in the agreement does not relate to the actual harm. E.g., Wendy Hong Wu v. Dunkin' Donuts, Inc., 105 F.Sup.2d 83, 87-94 (E.D.N.Y.2000) (franchisor not vicariously liable for franchisee's security deficiencies because the franchise agreement did not give the franchisor "considerable control ... over the specific instrumentality at issue").  However, other franchise cases where courts have found liability involve personal injury caused to a patron when the service provided is strictly regulated by the franchisor.  See Miller v. McDonald's Corp., 945 P.2d 1107, 1111 (Or. Ct. App.1997) (court held franchisor could be vicariously liable where franchisee's patron bit into a Big Mac sandwich that contained a sapphire stone because the franchise agreement provided "precise methods" of food handling and preparation).  This matter is clearly more akin to the McDonald's decision than to the Dunkin' Donuts decision.

The record reflects that Jan-Pro has "controlled through the [master] franchise agreement the instrumentality which caused the harm" to the Plaintiffs.  Coworx Staffing Services, LLC, 2007 WL 738913 at *5.  The various types and degree of control is outlined in detail in Plaintiffs' memorandum in opposition to Jan-Pro's motion for summary judgment, at pages 9-10, and further highlighted in the catch-all provision

authorizing Jan-Pro to oversee virtually every aspect of the master owners' operations.[3]

As Plaintiffs detail, Jan-Pro created the schedule of "plans" that master owners sell to

franchise owners, and created the uniform methodology of pricing used by the masters.

See Pls.' S.J. Opp. Fact Stmt. (Docket No. 76), ¶¶ 16, 32. Jan-Pro also requires

approval of all UFOCs the master owners use, and creates many of the forms that

masters must use, including form UFOCs and franchise agreements.  Id., ¶¶ 27, 28.

The harm suffered by the Plaintiffs thus directly relates to the actual control that Jan-Pro

has the right to exercise over the master owners by virtue of the master franchise

agreements.

　　　　To be clear, the *only* precedent in this Circuit on agency applies the right of

control test in all factual contexts.  No decisions have been offered that suggest that this

Court or any court in the First Circuit has ever applied a different agency test in the

franchise context.  Still, Jan-Pro's right of control over the master owners is so

pervasive and directly related to the cause of the Plaintiffs' injury that the specific test is

not consequential.  Jan-Pro clearly retains the right of control over its master owners, as

well as specifically the right of control over "the instrumentality which caused the harm"

to the Plaintiffs.

---

[3]　　　The provision provides that Jan-Pro has the authority to:

> establish company policies and/or procedures pertaining to the operation of Regional
> Master Franchisee's franchised business, the terms of this Agreement, or the business of
> any unit franchisee subject to the licenses granted under this Agreement. Regional
> Master Franchisee agrees that it will be bound by said policies and/or procedures upon
> receipt of same by Regional Master Franchisee. Franchisor shall keep a current updated
> manual of all such policies and procedures at Franchisor's corporate office. In the event
> that policies and procedures kept by franchisor differ from those kept by Regional Master
> Franchisee, the policies and procedures in Franchisor's corporate office shall be
> controlling.

Pls.' S.J. Opp. (Docket No. 75), at 8-9, citing §4.28 of the Uniform Franchise Offering Circular
("UFOC").

Finally, the Plaintiffs' theory of liability can rest on apparent authority where the Plaintiffs have cited numerous instances of *Jan-Pro's* own "words or conduct" creating such an appearance.  See Def. Reply at 5, n. 7 (arguing that apparent authority only exists where principal, not agent, created appearance of agency).  The Plaintiffs do not depend on the unilateral conduct of the master owners.  The record is replete with evidence of words or conduct by Jan-Pro representing the master owners as indistinguishable from itself.  These include: Jan-Pro holds itself out as a single entity on its web site, identifying regional master franchisees as "locations," see Pls.' S.J. Opp. Fact Stmt. (Docket No. 76), ¶¶ 12, 38; the marketing material provided to the plaintiffs from the master owners were created and originated by Jan-Pro, id., ¶¶ 1, 11, 12; Jan-Pro creates the form franchise agreements and UFOCs provided to the plaintiffs and other franchisees by the master owners, id., ¶27; the master owners operate under the Jan-Pro name by order of Jan-Pro itself, id., ¶5.

**B.    Jan-Pro has misstated the applicable joint employment legal standard.**

Second, Jan-Pro improperly attempts to import a joint employment test from the FLSA to this case, which involves state statutory and common law, and incorrectly argues that judicial estoppel somehow applies.  The Plaintiffs are certainly not precluded under the doctrine of judicial estoppel from arguing that the theory of joint employment liability applies to Jan-Pro.  Jan-Pro's argument and citation in support on this point are far off the mark.  See Def. Reply at 8, citing East Cambridge Savings Bank v. Wheeler, 422 Mass. 621 (2000).[4]  Judicial estoppel, as recognized by the Supreme

---

[4]     The Plaintiffs never disavowed a joint employment theory.  Jan-Pro's reference to a brief comment made by the Plaintiffs' counsel in court, see Def. Reply at 5 (where counsel stated that the Plaintiffs did not "need to say that they are joint employers") is not evidence of such a disavowal.  It is

Judicial Court, holds that "a party who has *successfully* maintained a certain position at a trial cannot in a *subsequent trial* between the same parties be permitted to assume a position relative to the same subject that is directly contrary to that taken at the first trial." Id. at 623 (emphasis added). The Plaintiffs' position here regarding joint employment liability has not yet been "successfully maintained," nor is it being assumed "in a subsequent trial." Id. This Court can therefore disregard Jan-Pro's wholly inaccurate claim of judicial estoppel.

Joint employment is an agency theory, not a theory of direct employment. Thus, Jan-Pro errs again when arguing that the Plaintiffs have not offered any evidence on the joint employment theory, see Def. Reply at 8, as it bases such argument on a decision regarding the standard for direct employment under the Fair Labor Standards Act. See Baystate Alternative Staffing, Inc. v. Herman, 163 F.3d 688 (1st Cir. 1998). The basis for a "joint employer finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient *control of the terms and conditions of employment* of the employees who are employed by the other employer." Commodore v. Genesis Health Ventures, Inc., 63 Mass. App. Ct. 57, 62 (2005) (emphasis added). It is, again, the right of control that provides the basis for joint employment liability.

Most egregiously, Jan-Pro points to the franchise agreements signed by the named plaintiffs as proof that no employment relationship was created. See Def. Reply at 8. Jan-Pro relies on a contractual provision purportedly defining the franchisees as independent contractors. Id. It is well settled, however, that an employer may not

---

clear from the quoted statement that Plaintiffs' counsel was not "disavowing" the joint employment theory, but merely stating that a finding of joint employment was not "necessary" for recovery.

agree to violate provisions of wage and hours by private contract.  <u>E.g.</u>, Mass. Gen. L. c. 149 § 148 ("No person shall by a special contract with an employee or by any other means exempt himself from [provisions of the Massachusetts wage laws."); Cal. Labor Code § 219 ("no provision of this article can in any way be contravened or set aside by a private agreement, whether written, oral, or implied."); <u>Colendra v. Horizon Offshore Contractors, Inc.</u>, 2005 WL 3359343, *4 (S.D. Tex. Dec. 9, 2005).

Further, "a party cannot simply rely on statements in an agreement to establish or deny agency," as such a "relationship is essentially determined by examining whether there is a right of control of one party over another."  <u>Butler v. McDonald's Corp</u>. 110 F.Supp.2d 62, 67 (D.R.I. 2000) (finding agency relationship between franchisee and defendant franchisor through right of control); <u>Fucci v. Eastern Connection Operating, Inc.</u>, Superior Court Civil Action No. MICV 2008-2659 (Middlesex Sup. Ct. September 21, 2009), attached as Ex. A to Pl. Mtn. for Partial Summary Judgment (Docket No. 68) (delivery drivers misclassified as independent contractors; summary judgment granted to plaintiffs); <u>Chaves, et al. v. King Arthur's Lounge, Inc.</u>, Superior Court Civil Action No. 07-2505 (July 30, 2009), attached as Ex. B to Pl. Mtn. for Partial Summary Judgment, (Docket No. 68) (exotic dancers misclassified as independent contractors; summary judgment granted to plaintiffs).

**C.      Jan-Pro has misconstrued the applicable legal standard for quantum meruit/unjust enrichment.**

Jan-Pro argues that the workers can only establish their quantum meruit/unjust enrichment claim if they establish the expectation of compensation from Jan-Pro.  What is required, in fact, is a finding that "one person obtains money that in equity and good conscience belongs to another."  <u>Friberg-Cooper Water Supply Corp. v. Elledge</u>, 197

S.W.3d 826, 831 (Tex. App. 2006).  Recovery is warranted when one party has "conferred a benefit on another and the circumstances are such that in-to deny recovery would be unjust."  GK Realty Services, LLC v. Stopar, 2008 WL 657126, *6 (N.J. Super.. March 13, 2008).  While a showing that the plaintiffs expected some form of compensation is required, it is the "expectation of compensation" rather than the source of the compensation that must be shown.  Starkey, Kelly, Blaney & White v. Estate of Nicolaysen, 796 A.2d 238, 243 (N.J. 2002); National Chain Co. v. Campbell, 487 A.2d 132, 135 (R.I. 1985) (plaintiff must show that the recipient would be unjustly enriched without making compensation).

Moreover, Jan-Pro assumes far too much from the Plaintiffs' not disputing Jan-Pro's factual assertion regarding compensation (that the plaintiffs did not expect to be compensated by Jan-Pro Franchising International, Inc.).  The undisputable evidence is that the Plaintiffs always thought they were doing business with Jan-Pro.  That they did not expect compensation specifically from the corporate entity named Jan-Pro Franchising International only shows that Jan-Pro successfully confused the corporate separateness between itself the master franchisors.

## III. JUDGE YOUNG'S ORDER IN AWUAH V. COVERALL SHOULD HAVE NO BEARING ON THIS COURT'S DECISION.

Though Jan-Pro characterizes Judge Young's order as an "opinion" containing "reasoning" in its Notice of Submission of Supplemental Authority (Docket No. 88), at 1, 2, in fact it is nothing more than an electronic docket entry stating:  "Electronic ORDER entered granting Motion for Summary Judgment."  Order attached as Exhibit 1.  Judge Young did not even include a statement that he issued the order for the reasons asserted in Coverall's motions; no reason for the order is provided at all.  Indeed, at the

hearing held prior to the Court's issuance of this order, Judge Young heard no argument

on this motion, simply announcing without any elaboration that the motion would be

granted.  Notably, Jan-Pro itself has not even attached the docket entry showing the

order, perhaps recognizing the lack of precedential value in such an order.  In light of

the lack of any analysis or explanation in this order, there is simply no way for it to be

applied as precedent in this case.  See, e.g., Linden Med. Pharmacy, Inc. v. State Bd. of

Pharmacy, 2005 WL 3547969, at *7 (Ohio App. 10 Dist. 2005) ("[B]ecause the

Weinstein court cited no authority and offered no analysis in support of its statement of

law, we find Weinstein to be of limited precedential value."); Condit v. National Enquirer,

Inc., 248 F. Supp. 2d 945, 962 (E.D. Cal. 2002) (holdings in other cases "of no help

here because they contain no analysis or useful discussion. . ."); Palmer v. Truck Ins.

Exchange, 21 Cal.4th 1109, 988 P.2d 568, 575 (Cal. 1999) (finding previous decision

not "persuasive precedent" because court "provided no analysis whatsoever").[5]

    Moreover, Judge Young's order in the Coverall case cannot be applied here in

any event, because of the differing circumstances in the two cases.  Like this case, the

Coverall case involves claims against a nationwide cleaning company, relating to the

company's business practices and, *inter alia*, arguing that the individuals who perform

the cleaning work have been misclassified as independent contractors when they are in

fact the company's low-paid janitorial employees.  Here, as set forth in Plaintiffs'

---

[5]     Perplexingly, Jan-Pro attempts to give meaning to Judge Young's unexplained order by citing to
two other Massachusetts cases concerning the application of Mass. Gen. L. c. 149 § 148B, the
Massachusetts Independent Contractor Law—Coverall North America, Inc. v. Div. of Unemployment
Assistance, 857 N.E.2d 1083 (Mass. 2006), in which the Massachusetts Supreme Judicial Court held that
a cleaning "franchisee" was in fact an employee under § 148B; and De Giovanni v. Jani-King
International, Inc., 262 F.R.D. 71 (D. Mass. 2009), in which Judge Young granted class certification on
claims brought under § 148B.  If anything, these cases only support Plaintiffs' motion for summary
judgment here, as they provide support for the proposition that individuals providing cleaning work for
cleaning franchise companies such as Jan-Pro are employees as a matter of law under the
Massachusetts Independent Contractor Law.

summary judgment briefing, all of Jan-Pro's cleaning workers contract directly with so-called master franchisees which in turn contract with Jan-Pro.  While Jan-Pro is not a direct signatory to the franchise agreements between the workers and the "master franchisees," Jan-Pro has explicitly designated itself as "a third-party beneficiary to any franchise agreement" between the "master franchisee" and the cleaning workers and has "the right to assume any of the responsibilities, duties or functions of Regional Master Franchisee in the event that this agreement is not renewed or is terminated for any reason."  Jan-Pro Regional Master Franchise Agreement, Section 14.1, attached as Exhibit 2.  In contrast, Coverall contracts directly with the majority of its cleaning workers and only utilizes "master franchisees" in some circumstances.  The contracts underlying Coverall's relationship with its "master franchisees" and the cleaning workers performing work pursuant to contracts with these "master franchisees" do not contain many of the terms in Jan-Pro's contracts, including both the "third-party beneficiary" language and many of the other contract terms identified in Plaintiffs' summary judgment briefing.  See summary judgment briefing in Awuah v. Coverall North America, Inc., D. Mass. Civil Action No. 07-10287.  After having chosen to construct its business model in such a way that it retains ultimate control over the work performed by "Jan-Pro" cleaning workers, it cannot now rely on a court order in a case involving a different corporate structure to evade its obligations under the state wage laws.

　　　　For the foregoing reasons, Judge Young's order in Awuah v. Coverall on the master franchisees in that case should have no bearing on the issues presented here.

## **CONCLUSION**

For the foregoing reasons and the reasons described in Plaintiffs' opposition to Jan-Pro's motion for summary judgment (Docket No. 75), Jan-Pro's motion for summary judgment should be denied in its entirety.

Respectfully submitted,

GIOVANI DEPIANTI, et al.,
and all others similarly situated,

By their attorneys,


 _/s/ Hillary Schwab_____
Shannon Liss-Riordan, BBO #640716
Harold L. Lichten, BBO #549689
Hillary Schwab, BBO #666029
LICHTEN & LISS-RIORDAN, P.C.
100 Cambridge Street, 20th Floor
Boston, MA 02114
(617) 994-5800

Dated:  March 22, 2010

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2010, a copy of this document was served by electronic filing on all counsel of record.


 _/s/ Hillary Schwab_____
Hillary Schwab, Esq.