1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3                              No. 1:08-cv-10663-MLW

4

5
   GIOVANI DEPIANTI, and all others similarly situated,
6             Plaintiffs

7
   vs.
8

9
   JAN-PRO FRANCHISING INTERNATIONAL, INC.,
10            Defendant

11

12                         * * * * * * * * *

13

14                       For Hearing Before:
                        Chief Judge Mark L. Wolf
15

16                        Summary Judgment

17
                         United States District Court
18                       District of Massachusetts (Boston)
                         One Courthouse Way
19                       Boston, Massachusetts 02210
                         Friday, April 16, 2010
20

21                         * * * * * * * *

22              REPORTER: RICHARD H. ROMANOW, RPR
                         Official Court Reporter
23                 United States District Court
           One Courthouse Way, Room 5200, Boston, MA 02210
24                 bulldog@richromanow.com

25

```
 1                    A P P E A R A N C E S

 2

 3    SHANNON E. LISS-RIORDAN, ESQ.
      HILLARY A. SCHWAB, ESQ.
 4    JOSEPH SULMAN, ESQ.
          Pyle, Rome, Lichten, Ehrenberg & Liss-Riordan, P.C.
 5        18 Tremont Street, Suite 500
          Boston, Massachusetts 02108
 6        (617) 367-7200
          Email: Sliss@llrlaw.com
 7        For the plaintiffs

 8
      JEFFREY M. ROSIN, ESQ.
 9        Foley & Lardner, LLP (Bos)
          111 Huntington Avenue
10        Boston, Massachusetts 02199
          (617) 342-4976
11        Email: Jrosin@foley.com
    and
12    CHRISTOPHER M. PARDO, ESQ.
          Constangy, Brooks & Smith, LLP
13        535 Boylston Street, Suite 902
          Boston, Massachusetts 02116
14        (617) 849-7880
          Email: Cpardo@constangy.com
15        For the Defendant

16

17

18

19

20

21

22

23

24

25
```

1              P R O C E E D I N G S

2         (Begins, 9:50 a.m.)

3         THE CLERK:  Civil Action 08-10663, Giovani

4  Depianti versus Jan-Pro Franchising.  The Court is in

5  session.  You may be seated.

6         THE COURT:  Good morning.  Would counsel

7  please identify themselves for the Court and for the

8  record.

9         MS. LISS-RIORDAN:  Good morning, your Honor.

10  For the plaintiff, I'm Shannon Liss-Riordan, and with me

11  are Hillary Schwab and Joseph Sulman.

12         MR. ROSIN:  Good morning, your Honor.  I'm

13  Jeffrey Rosin for Jan-Pro International.  And with me is

14  Christopher Pardo.

15         THE COURT:  Okay.  When I saw you last fall,

16  you were in agreement in requesting that I reverse the

17  usual order and permit you to file motions for summary

18  judgment before deciding class certification.  The

19  presumption in favor of class certification is primarily

20  intended to benefit defendants and since in my

21  experience it's so unusual that the parties agree on

22  anything in a case like this, perhaps too quickly, I

23  agreed.

24         It was represented to me that judicial economy

25  would be served by taking this approach, but in response

1    to an order seeking clarification, I learned that the

2    parties, on this motion for summary judgment, were

3    asking that I apply the law of seven different states to

4    the personal circumstances of ten different plaintiffs.

5    That would not serve judicial economy and indeed it's

6    not manageable, particularly in a case like this one

7    where I have, now that I'm more deeply into it, some

8    real questions about whether the putative class, even

9    with subclasses, would be properly certified.

10        So I issued an order on April 13 telling you how I

11    was going to proceed in focusing this matter in a way

12    that I hope will be helpful to getting the case resolved

13    by decision by me or perhaps by agreement with the

14    parties.  As you know, from that order, the hearing

15    today will focus on the Depianti claims, which are based

16    on Massachusetts law, law that generally was relied on

17    with regard to plaintiffs in all seven states.  So

18    essentially I think we'll view this Depianti matter as a

19    kind of test case and then we'll see where we are and

20    where we're going.

21        I think if I focus on Jan-Pro, Inc.'s -- Jan-Pro

22    Franchising International's motion for summary judgment,

23    part of which is mirrored, as I understand it, by the

24    plaintiffs' motion for partial summary judgment, then I

25    believe we'll end up covering everything.

1        I've delved reasonably deeply into this.  I think
2   this would be best organized if I first have you each
3   address Counts 1 and 4, the -- essentially the Chapter
4   93A claims that raise the issues of vicarious
5   liability.  Then we'll move to the misclassification and
6   wage law violation claims, which are Counts 2 and 3.
7   And then we'll move to Counts 5 and 6, which are the
8   unjust enrichment and quantum meruit claims.
9        I hope to be able to give you at least a bottom-
10  line decision today.  It may be wise to issue a written
11  decision, given the number of the issues, but I think
12  I'm also going to want to talk to you about -- as I said
13  in the April 13th order, whether we should move next to
14  class certification.
15       Does anybody have any concerns about proceeding
16  with the argument organized as I just described?
17              MR. ROSIN:  No, your Honor.
18              MS. LISS-RIORDAN:  Um, no, your Honor.
19              THE COURT:  All right.  Here, let me, as
20  usual, try to be as transparent as possible so you can
21  address my present tentative thinking.
22       With regard to Counts 1 and 4, I'm inclined to
23  grant JPI's motion for summary judgment in part and deny
24  it in part.  I've tried to parse out the particular
25  claims that the plaintiff, Mr. Depianti, is making.  I

1  think that the **Kerl-Coworx** test is the test that the

2  Massachusetts courts would apply, although I know

3  there's an older Third Circuit case that's more

4  favorable to the plaintiff.

5       If I apply that test, it seems to me, at the

6  moment, that JPI could be vicariously liable to the

7  extent that the terms and content of the unit franchise

8  agreements are -- what you call "UFOC/FDDS," are

9  inherently unlawful and harmful because the master

10  franchise agreement could be reasonably interpreted as

11  giving JPI an explicit right to control the content and

12  terms of those documents.  In addition, JPI could be

13  directly liable to the extent that it imposes a

14  requirement that the master of franchisees sells certain

15  numbers of unit franchisees -- or franchises, since

16  imposing such a requirement is JPI's own conduct.

17       However, my present view is that the evidence is

18  insufficient, even when viewed in the light most

19  favorable to the plaintiff, to hold JPI vicariously

20  liable for individual harms caused by BME, the

21  underbidding of a particular account, often a particular

22  unit franchise, i.e., a particular account that's too

23  far away, as I don't perceive there to be any admissible

24  evidence to dispute that JPI does not exert day-to-day

25  control over the people who perform the relative

1    functions at BME and the franchise agreement does not

2    explicitly regulate the day-to-day performance of such

3    functions or explicitly give JPI a right to do so.

4    There also doesn't appear to me to be sufficient

5    evidence to permit a finding of liability under the

6    doctrines of apparent authority and joint employment.

7        So, if you want, you can talk about the test, you

8    can talk about the how the proper test applies to the

9    particular contentions, but that's essentially my

10   present view.

11       Um -- all right.  You both popped up.  You do have

12   cross motions.  I'm leaning against the plaintiff, for

13   the most part, on this one, so why don't I hear from

14   Miss Liss-Riordan first and then you can respond.

15           MS. LISS-RIORDAN:  Thank you, your Honor.

16       What we would submit to the Court is that the

17   evidence we've presented reasonably leads to a factual

18   question on the issue we've identified and there's one

19   document in particular that I want to highlight for the

20   Court's attention, um, and it's Exhibit 9 to the

21   plaintiffs' statement of material facts, which I think

22   is very telling about the degree of control that Jan-Pro

23   Franchising International has over the day-to-day

24   activities of the masters.  This is a so-called --

25           THE COURT:  Hold on a second.  Let me get it.

```
 1              MS. LISS-RIORDAN:  Sure.

 2              THE COURT:  Since there are about 6 feet worth

 3    of documents here, it may take a minute.

 4              (Pause.)

 5              THE COURT:  Is this the EZ-Bid instruction?

 6              MS. LISS-RIORDAN:  No, this is the Master

 7    Franchise Training Test.

 8              THE COURT:  All right.  Because the way it

 9    came to us, the exhibits aren't numbered.

10              MR. ROSIN:  76-10.

11              MS. LISS-RIORDAN:  76-10.

12              THE COURT:  Is that the Bates stamp number?

13              MS. LISS-RIORDAN:  That's what listed on the

14    ECF filing on the top, "Document 76-10."

15              THE COURT:  What was it an exhibit to?

16              MS. LISS-RIORDAN:  This is an exhibit to the

17    plaintiffs' statement of facts.

18              THE COURT:  All right.  In support of your own

19    motion for summary judgment?

20              MS. LISS-RIORDAN:  No, in opposition to the

21    defendant's motion for summary judgment.

22              (Pause.)

23              THE COURT:  All right.  I'm looking at 76-9.

24    But did you say you wanted me to look at 76-10?

25              MS. LISS-RIORDAN:  It's 76-10, yeah.
```

```
 1                 (Pause.)
 2                 THE COURT:  I don't think I have 76-10.  Where
 3       is it?
 4                 (Pause.)
 5                 THE COURT:  Okay.  It says "EZ-Bid Capability
 6       Instructions"?
 7                 MS. LISS-RIORDAN:  It's the exhibit just
 8       before that.  It's "The Master of Franchise Training
 9       Test."
10                 THE COURT:  "The Master of Franchise Training
11       Test."
12                 MS. LISS-RIORDAN:  Yes.
13                 THE COURT:  Okay.
14                 MS. LISS-RIORDAN:  It's just before the
15       EZ-Bid.
16                 THE COURT:  Okay.  Does it say, on the bottom,
17       "JP-1002857"?
18                 MS. LISS-RIORDAN:  Well, my first page says
19       "2858."  So -- well, it's labeled as a 30(b)(6)
20       deposition exhibit.  It says "Master Franchise Training
21       Test," at the top, "Jan-Pro."
22                 THE COURT:  Okay.  I have that.
23                 MS. LISS-RIORDAN:  Okay.
24                 THE COURT:  Go ahead.
25                 MS. LISS-RIORDAN:  So what I wanted to point
```

1    out about this document is that this is the test that

2    Jan-Pro uses -- it identifies itself as "Jan-Pro," uses

3    with its master franchises and it shows the -- um, the

4    detailed type of control that Jan-Pro had over the

5    master franchises to the extreme detail that, in

6    question 30, it dictates that "Jeans are not acceptable

7    attire for the offices of the master franchises."  Um,

8    it specifies, in Question 29, "What is the minimum

9    amount of days of week you are required to run your

10   franchise ad in a major newspaper?"  Um, if you look

11   through this document, this is showing a much higher

12   degree of control than I think you may have been

13   recognizing in your original statement.  So that's why I

14   just wanted to highlight this document straight out.

15            THE COURT:  Okay.  Well, let me tell you what

16   my thinking was, to some degree, on this.  Well -- all

17   right.  Let me ask you this.  What particular alleged

18   wrong does this test relate to?  Because you have to --

19   well, maybe we ought to take a step back.

20            My understanding of *Kerl,* or *Kirk*, and *Coworx* is:

21   "The franchisor must control or have the right to

22   control the daily conduct or operation of a particular

23   instrumentality or aspect of the franchisee's business

24   that is alleged to have caused the harm before vicarious

25   liability may be imposed on the franchisor or the

 1  franchisee's tortious conduct."  So -- and I articulate

 2  this so you can address it if I misunderstand anything,

 3  but my present sense is that I don't look at the overall

 4  influence that JPI would have on BME, for example, I

 5  look at what caused the harm and does JPI, um, have

 6  either control or the right to control, um, whoever

 7  caused that harm.  So that's why the cases, as I read

 8  them, reason that the fact that you can control the logo

 9  or maybe the way that people dress is not alone

10  sufficient to prove that you have either the right to

11  control or the actual control, say, over the assignment

12  of franchises.

13      So what does the test relate to?

14          MS. LISS-RIORDAN:  Well, your Honor, we

15  focused for several minutes on this document and this is

16  one example of several that I wanted to point out.  But

17  this document shows the pervasive control that JPI has

18  over the masters in its daily activity.

19      Now, I believe we've created a sufficient issue of

20  fact for a jury, on the question as articulated in

21  *Coworx*, of whether or not the franchisor controls,

22  through the franchise agreement, the instrumentality

23  which caused real harm?  The allegations that are raised

24  here, in Counts 1 and 4, as you're focusing on, is that

25  Jan-Pro, Jan-Pro Franchising International, created this

1    system whereby so-called "entrepreneurial opportunities"

2    were sold to people, to unsuspecting victims, and they

3    were told that this was a business opportunity.  Based

4    on what Jan-Pro established, they were charged thousands

5    of dollars for what was really a low-paying job.

6             THE COURT:  See you --

7             MS. LISS-RIORDAN:  And we believe --

8             THE COURT:  You keep calling it "Jan-Pro."  I

9    mean, this is --

10            MS. LISS-RIORDAN:  Well, this is what Jan-Pro

11   called itself.  I understand that they --

12            THE COURT:  Here, let me finish.

13            MS. LISS-RIORDAN:  Yes.

14            THE COURT:  This case is different than some

15   other cases because you have an intermediate company,

16   BME.  Well, let me see if I understand it right.  You

17   didn't sue BME -- Mr. Depianti didn't sue BME, in this

18   case, because there was an arbitration provision in his

19   contract with BME, right?

20            MS. LISS-RIORDAN:  Yes.

21            THE COURT:  And, in fact, it had an

22   arbitration, is that correct?

23            MS. LISS-RIORDAN:  Yes.

24            THE COURT:  And Depianti lost it and then

25   settled?

1          MS. LISS-RIORDAN:  Well, the arbitration did

2     not go very far, it was not going to go very far because

3     of the costliness of it, and so it abandoned it,

4     essentially.  It settled.

5          THE COURT:  That's good to know.

6          MS. LISS-RIORDAN:  Yes.

7          THE COURT:  All right.  So that's why BME is

8     not here?

9          MS. LISS-RIORDAN:  That's not the only reason

10    BME is not here.  Yes, we did begin by pursuing these

11    arbitrations against these so-called "master

12    franchises," but once we got into the case we realized

13    that they weren't really the responsible party here, it

14    was the overarching Jan-Pro company, Jan-Pro

15    International, which it depicts throughout the documents

16    we have displayed that it calls itself "Jan-Pro."

17         It has, on its website, statements that Jan-Pro --

18    not its master franchisees, but that Jan-Pro has 7,000

19    franchisees nationally.  That's on the front of the

20    materials we've submitted for its website.  Jan-Pro, not

21    the masters, but Jan-Pro says, through the deposition of

22    its CEO, the 30(b)(6) deponent, Richard Cusane, that in

23    2008, it had $250 million of revenue.  So Jan-Pro itself

24    is stating, as its own, all of the activities, all of

25    the revenue that is taken in through these locations.

1    And if you look at the way it displays this up to the

2    world on its website, it doesn't talk about these

3    "master of franchise separate corporate entities," it

4    lists its locations, it calls them "its locations" and

5    it says "These 7,000 franchisees are performing cleaning

6    service for Jan-Pro."

7            Now, what the mountains and mountains of paper

8    that you have before you in the record of this case is

9    that Jan-Pro, i.e., Jan-Pro Franchising International,

10   is trying to create a distinction between itself and its

11   competitors, like Coverall and Jani-King, by saying that

12   it has this intermediary product -- this intermediary

13   structure, and what we are trying to show here is that

14   we have at least sufficient evidence to get to a jury to

15   show that that so-called "legalistic," buried in some

16   corporate documents, intermediary structure is of no

17   moment with respect to the claims that the plaintiffs

18   have brought here.

19            THE COURT:  But I think I have to put this

20   under a microscope because it -- you know, as I've told

21   you, I've -- on this one, I think, tentatively you win

22   in part and you lose in part, but I can't properly

23   decide it at sort of the macro level you're asking, I

24   have to look at the particular alleged harm and then who

25   -- if, you know, BME, um, caused that harm and then

1   whether that person or that activity, um, Jan-Pro -- um,

2   JPI, as I call it, has the right to control or actually

3   does exercise control.  And, again, I'm using the

4   summary judgment standard.  So I'd have to know what

5   particular harm and what contractual provision or what

6   evidence do you rely on to show the necessary right to

7   control or the degree of the control could be found.

8           MS. LISS-RIORDAN:  Okay.  The instrumentality

9   that Jan-Pro Franchising International is responsible

10  for is that it set up a system by which people pay

11  thousands of dollars for what they are told is an

12  entrepreneurial opportunity, but it's not.  That's the

13  basis of our allegation in Counts 1 and 4, is that

14  people are told something that isn't what they're told

15  it is.  And that Jan-Pro International is responsible

16  for it.

17          THE COURT:  Okay.  But that's what -- I have

18  this under the misclassification analysis, but it

19  relates somewhat here.

20      Is there any evidence in the record that JPI, um,

21  created BME?

22          MS. LISS-RIORDAN:  There's no evidence that

23  JPI created BME, but I don't believe that is the

24  standard.

25      If we look at *My Bread Baking Company*, which is

1   the SJC statement on agency relationship and piercing

2   the corporate veil, that is not the standard.  The two

3   issues you should look at --

4          THE COURT:  Here, I'll tell you why -- I

5   thought that's why you gave me the Attorney General's

6   opinion with regard to misclassification.  It says that,

7   you know, sometimes, like the franchise, like BME, could

8   be a legitimate intermediary, but sometimes -- but an

9   organization like a Subchapter S corporation or a

10   limited liability corporation can't be set up to evade

11   the requirements of the particular laws that I think

12   we're focused on on a misclassification, and that's why

13   I asked you to create.  But okay.

14          MS. LISS-RIORDAN:  If -- well, do you want me

15   to address misclassification?  I actually --

16          THE COURT:  No, I don't want you to address

17   misclassification now, but I think that -- I

18   understand -- I understand that BME, for certain

19   purposes, can be the agent of JPI and, in fact, I think

20   because, as I read it, the contract gives JPI, um, you

21   know, the right to review the disclosure statements and

22   to veto any changes in their form disclosure statements,

23   that you win on that.  But, you know, with regard to

24   what -- you know, with regard to say under -- well,

25   let's focus on the underbidding of particular accounts.

1        One of your contentions is that, with regard to

2    Mr. Depianti, and you would say "others similarly

3    situated," BME tells clients, customers, that it's just

4    going to take a few hours to clean their establishment

5    and therefore, you know, they say, "This is what it's

6    going to cost you."  And is that -- is that what the

7    underbidding is?  Well, what's "underbidding"?

8             MS. LISS-RIORDAN:  It's one little snippet of

9    it.  But if I can just try to put it into the broader

10   perspective here that we're trying to explain here.

11        Jan-Pro has set up this system.  It -- in its

12   contract with the master franchises, it retains

13   substantial control over the implementations of its

14   policies.  It has a right to terminate the contract if

15   the master is not implementing its policies as it

16   directs.  It has the right to review the terminations of

17   the individual unit franchisees.

18        And a significant distinction between this case

19   and the, um, the so-called "masters of Coverall," which,

20   as you know, Judge Young granted summary judgment

21   without a written decision with respect to the masters,

22   because most of the Coverall -- not to get all unhinged,

23   but most of the Coverall offices are directly in the

24   same corporate structure with Coverall, North America,

25   but there were a few or there were some master offices

1   which really were more distinct from the company as to

2   what we have presented here.  Jan-Pro International only

3   uses these so-called "master structures," but a

4   significant difference between the Jan-Pro master

5   structure and those Coverall master structures is that,

6   in the franchise agreements between the masters and the

7   franchisees for Jan-Pro, Jan-Pro International is

8   explicitly a third-party beneficiary of the contracts

9   with its franchisees.  Coverall masters don't have that

10  language.  So Coverall, North America was not as

11  involved in the actual, um, contract --

12              THE COURT:  Where are these third-party

13  beneficiaries?  What makes them third-party

14  beneficiaries?

15              MS. LISS-RIORDAN:  It's in the contract.  And

16  if you give my co-counsel a minute, she could pull that

17  out.  It's an important distinction.

18       But without even getting into the details of the

19  underbidding and the churning of the accounts that we've

20  alleged -- that we allege the masters are the agents of

21  Jan-Pro International right now --

22              THE COURT:  I know you've alleged it, but

23  you're going to have to, at some point -- I want to give

24  you a chance to give me the global perspective, but at

25  some point you're going to have to get to the

1    underbidding, because the fundamental problem I find is

2    that you talk about Jan-Pro, these voluminous papers,

3    and the defendants talk about JPI and BME, and I have to

4    go essentially claim by claim, which you don't sort

5    out.  So at some point, and it doesn't have to be right

6    this minute, and I really want to hear you, but you're

7    going to have to show me, under *Kirk* -- *Kerl* and *Coworx*,

8    um, how JPI can be responsible for the alleged

9    underbidding.

10           MS. LISS-RIORDAN:  Okay, your Honor, I will

11   get to the underbidding, but the bigger picture I was

12   trying to spell out here is that even putting aside

13   specific allegations of underbidding, churning accounts,

14   offering accounts too far away from home, not

15   convenient, et cetera, Jan-Pro International has set up

16   this structure whereby there are certain cleaning

17   franchise packages that individuals can buy and it sets

18   forth the names of them that the masters then use to

19   sell to individual franchisees.  And that we have in

20   here, in our materials, a list of how much you have to

21   pay to get what package.

22        And what we're saying is that these are not

23   really -- what Jan-Pro is selling itself as -- and it's

24   throughout its website materials, it's throughout its

25   marketing materials, that it is selling a business

1   opportunity.  But even given -- even if the churning

2   were not to be happening, even if the underbidding were

3   not to be happening, these are not entrepreneurial

4   opportunities.  People cannot make a profit through

5   buying these franchises.  They're just buying a

6   low-paying job, which is really what Steve Cumbow, our

7   proposed expert, is really getting at.  That if you look

8   at the amount of time that it takes to get back your

9   investment, it's just not going to happen.

10          So Jan-Pro International is responsible for that

11   whole structure and so --

12              THE COURT:  Well, that's the link you're

13   having trouble with me on.  If BME was a defendant, you

14   know, then I think Mr. Cumbow's -- (To Ms. Schwab.)

15   well, let's see which one she's going to listen to, me

16   or you.

17              (Pause.)

18              THE COURT:  If BME were the defendant,

19   Mr. Cumbow's report, if it meets the **Daubert** standard,

20   it would be material.  The key is, in my current

21   conception of the law, is to link Jan-Pro, Inc., or

22   International, JPI, with whoever at BME is doing the

23   particular act, like the underbidding.  So you can

24   continue to give me the context, if you want, but, as I

25   said, at some point you're going to have to zero in on

1    that particular question, because I think the law

2    requires me to do that.

3                MS. LISS-RIORDAN:  Well --

4                THE COURT:  Unless you pierce the corporate

5    veil, at some point.  But I think under Massachusetts

6    law there are 11 or 12 factors and it appears to me that

7    you have evidence on only one or two of them.

8                MS. LISS-RIORDAN:  Well, your Honor, if you

9    look at the *My Bread Baking Company* case, which

10   continues to be a leading authority in this area both

11   for agency -- establishing the law of agency in

12   Massachusetts and on piercing the corporate veil, the

13   two primary factors that a court or factfinder would

14   look at is where there's "active and direct

15   participation by representatives of one corporation

16   apparently exercising some form of persuasive control in

17   the activities of another and there are some fraudulent

18   or injurious consequences to the intercorporate

19   relationship."

20               THE COURT:  So what's the evidence of that?

21   For example, do BME and JPI have any common directors?

22               MS. LISS-RIORDAN:  Well, no, what I just read

23   doesn't say anything about common directors.  It talks

24   about "direct participation by representatives of one

25   corporation apparently exercising" --

1              THE COURT:  Not too fast.  The stenographer

2      has to write that down.

3              MS. LISS-RIORDAN:  Okay.  Sorry.

4              THE COURT:  Here, start again.

5              MS. LISS-RIORDAN:  All right.

6              THE COURT:  And, actually, I want you to hold

7      off for just one second.

8              (Pause.)

9              MR. ROSIN:  Your Honor, I could direct you to

10     our sur-reply?

11             THE COURT:  No, that's -- no, I know that.

12     I'm looking at something else.

13             MR. ROSIN:  Oh, okay.

14             (Pause.)

15             THE COURT:  Okay.  I believe the first -- I

16     believe the first of the *My Bread* 11 factors is "common

17     ownership."  So is there any --

18             MS. LISS-RIORDAN:  Your Honor, if I could step

19     back?  Before we get to the 12 factors, I'm looking at

20     *My Bread Baking Company*, 353 Mass. 614 at 619, and the

21     two primary factors that the SJC looked at and the

22     courts following *My Bread* have looked at are "the active

23     and direct participation," um, "the exercise of

24     pervasive control," that's one, and, two, is "confused

25     intermingling activity of the two."  We have provided --

1          THE COURT:  The "confused intermingling of

2     business assets," what page are you on?  619?

3          MS. LISS-RIORDAN:  This is 619 of *My Bread*.

4          THE COURT:  All right.  Just a second.

5          (Pause.)

6          MS. LISS-RIORDAN:  Where it lists the (a) and

7     (b) and I can read the full sentences.

8          THE COURT:  Um, I actually have it.

9          (Pause.)

10          THE COURT:  I guess I was looking at a more

11     recent case, **Attorney General vs. NCK**, which cites, and

12     I have a 432 Mass. 546 at 555, that it has a dozen

13     factors.

14          MS. LISS-RIORDAN:  Well --

15          THE COURT:  But go ahead.

16          MS. LISS-RIORDAN:  Okay.

17          THE COURT:  Go ahead.

18          MS. LISS-RIORDAN:  What I'm quoting from, on

19     Page 619 of **My Bread**, is, um, "Although common ownership

20     of this stock of two or more corporations together with

21     common management in" --

22          THE COURT:  Not so fast.

23          MS. LISS-RIORDAN:  Excuse me?

24          THE COURT:  Not so fast.  He has to write this

25     down.

1    MS. LISS-RIORDAN:  Okay.  "Although common

2    ownership of this stock of two or more corporations

3    together with common management, standing alone, will

4    not give rise to liability on the part of one

5    corporation for the acts of another corporation or its

6    employees.  Additional facts may be such as to permit

7    the conclusion that an agency or similar relationship

8    exists between the entities.  Particularly this is true,

9    (a), when there is active and direct participation by

10   the representatives of one corporation apparently

11   exercising some form of pervasive control in the

12   activities of another and there are some fraudulent or

13   injurious consequence of the intercorporate

14   relationship."  That's (a).  And we believe we've

15   developed substantial evidence on that.

16       THE COURT:  What's the evidence of "active and

17   direct participation" by the representatives of JPI

18   exercising pervasive control in the activities of BME?

19       MS. LISS-RIORDAN:  Jan-Pro, Jan-Pro

20   Franchising International, has created the sole system,

21   has created a detailed method, has a contract with its

22   master that retains significant control by JPI over the

23   master --

24       THE COURT:  Point me -- point me to the

25   specific provisions of the contract for the actual

1  exercise of control, because, for example, the -- I keep

2  going back to the bidding.  I didn't see evidence of a

3  right to control BME's bidding in the contract or that

4  there was that kind of direction exercised even if the

5  authority wasn't in the contract.

6        MS. LISS-RIORDAN:  Jan-Pro set standards by

7  which the masters have to sell a certain amount of

8  franchises, how they have to produce a certain amount of

9  revenue, how they have to follow Jan-Pro's --

10        THE COURT:  That's the one I think survives.

11  I think you win on that.  But aren't you complaining

12  about underbidding?

13        MS. LISS-RIORDAN:  We are complaining about

14  underbidding as an example of the type of evidence that

15  because the master is an agent of Jan-Pro International,

16  Jan-Pro International is responsible for it.  Because

17  Jan-Pro knows and has reason to know that the whole

18  structure that it's selling through its master

19  franchises are not true entrepreneurial activities.

20  Even if there weren't underbidding, a person could not

21  make a profit by buying a Jan-Pro franchise.  The

22  underbidding only heightens the unconscionability of the

23  entire system.  The churning of accounts only heightens

24  the unconscionability of the whole system.

25        THE COURT:  The churning of accounts means

1    what?

2              MS. LISS-RIORDAN:  The churning of accounts

3    means that accounts are taken away from one franchisee

4    without good cause just to be handed off to another

5    franchisee because they have to satisfy someone else's

6    package.

7              THE COURT:  Does the evidence indicate that

8    happened to Mr. Depianti?

9              MS. LISS-RIORDAN:  Well, yes, there is

10   evidence in the record.  Mr. Depianti paid $24,300, I

11   believe, to buy a franchise that he understood and

12   expected, and the contract spelled out, would provide

13   $100,000 of revenue a year.  Um, for most of the time he

14   had a relationship with Jan-Pro, he received $3,000 or

15   less.  For a one-month period in, I believe, it was

16   2005, Mr. Depianti was given an $8,000 monthly account.

17   He had it for one month.  It was then taken away from

18   him and Jan-Pro told him, "Well, we already satisfied

19   your account because we gave you this $8,000 account."

20   He does not know why it was taken away from him.  He was

21   not told there was any problem with his services.  He

22   understands what --

23              THE COURT:  Okay.  But what's the name of the

24   person who told him this?

25              MS. LISS-RIORDAN:  It was ostensibly a person

1    at Bradley Marketing.  But Mr. Dipianti, as set forth

2    through his deposition, he just knew he was dealing with

3    Jan-Pro.  That's what he knew.  So that is --

4            THE COURT:  But this is -- look.  Look, this

5    is the same as your papers and it's not going to work

6    unless you focus more finely.  It was somebody at BME.

7    And now you're sort of getting into the apparent, maybe

8    the apparent authority.

9        Did he ever testify that he even knew there was

10   anything above BME?

11           MS. LISS-RIORDAN:  No, he didn't even know --

12   he just knew Jan-Pro.  He knew that he had bought a

13   Jan-Pro account.  He knew Jan-Pro.  He did not know the

14   difference between Jan-Pro International and Bradley

15   Marketing.

16           THE COURT:  Okay.  But that Wisconsin decision

17   in **Kerl**, you know, explained why I thought, in a good

18   way, and probably more significantly, the Superior Court

19   judge in Massachusetts and judges around the country,

20   you know, how the law of agency has to be dealt with in

21   a franchise context, that the Federal law requires, to

22   keep your trademark, a certain amount of control over

23   some things.  Um, so somebody at BME did it.

24       I read **Kerl** and **Coworx** to say that I have to see

25   if you have evidence that with regard to assigning

```
 1    accounts, JPI either had a contractual right to control
 2    that or did it as a practical matter.  Is there any
 3    evidence of that or of either of those two things?
 4          MS. LISS-RIORDAN:  Well, in our opposition
 5    brief, on Pages 9 through 10, we have a list of the ways
 6    in which Jan-Pro maintains the right of control.
 7          THE COURT:  I'm talking about with regard to
 8    assigning accounts.  I -- and maybe I'm wrong on the
 9    law, and you haven't argued that yet, but you've got to
10    look at the particular action and answer if -- and see
11    whether there's evidence that the contract gave a right
12    of control, as it did with the disclosure statements, in
13    my present view, or if the contract didn't give a right
14    of control, as a practical matter, JPI exercised that
15    kind of control.
16          (Pause.)
17          THE COURT:  So now we're talking about the
18    churning of accounts.  I'm really trying to see if --
19    well, you know, if you've got it, we'll go ahead, but if
20    you don't, we'll go ahead with less.
21          MS. LISS-RIORDAN:  Well, we believe we've set
22    forth in a lot of detail here, on Pages 9 and 10 of our
23    opposition brief, we list ways in which Jan-Pro
24    maintains control over these regional master franchise
25    operations.
```

1   The right to set policies and procedures for the

2   operations.  The right to establish policies and/or

3   procedures pertaining to the business of any unit

4   franchisee.  It establishes the training regimens.  It

5   dictates the number of unit franchises that must be sold

6   and retained.  It creates the forms.  It has the right

7   to inspect the work that is done by the regions.  It has

8   the right to inspect all of the -- all of the books and

9   records.  It creates a plan for the master franchisees,

10  a scheduled plan it provides to the master franchisees

11  to sell to the unit franchisees.  It has created the

12  uniform methodology of pricing used by the masters.

13  This gets to your pricing question.  It has set up this

14  EZ-bid structure which we have provided.

15       THE COURT:  Well, let me look at that.  My

16  reading of the contract is that it's not genuinely

17  disputed that the use of EZ-bid is not mandatory.  It

18  offers it, but I thought, for example, BME -- the

19  evidence indicated that BME didn't use it except perhaps

20  to check the reasonableness of prices it says it was

21  developing on its own.

22       I mean, does the contract make using EZ-bid

23  mandatory?

24       MS. LISS-RIORDAN:  Jan-Pro provides these

25  materials, the masters use the materials, um, Jan-Pro

1  maintains the rights --

2           THE COURT:  Well, let's see.  What's the

3  specific evidence that BME -- and this is not a

4  rhetorical question.  You know, even my brilliant,

5  industrious law clerk might have missed something, and

6  if he missed it, I probably missed it, too.

7       What's the evidence that BME -- and this is why I

8  didn't want to do seven states for the ten different

9  plaintiffs.  What is the evidence concerning -- first of

10  all, let me see this contract.  I just want to see if I

11  focused on the right contractual provision.

12           (Pause.)

13           MR. ROSIN:  May I interject a small point,

14  Judge?

15           THE COURT:  Not yet.

16           MR. ROSIN:  Okay.  Thank you.

17           THE COURT:  All right.  As far as I know,

18  EZ-bid's not mentioned in the contract.

19       So what's the evidence that BME uses it, that they

20  used it -- that they used it because they were directed

21  or required by JPI to use it?

22           MS. LISS-RIORDAN:  I -- as I stand here right

23  now I can tell you that I know that we have evidence for

24  the record that various master franchises, in fact, are

25  using these systems that -- and including the EZ-bid

```
 1    system that Jan-Pro provided.  I can't point to a place
 2    in the record right now, as I stand here, about Bradley
 3    Marketing using it.  I'm looking also now at Document
 4    76-7 as another example, the franchise plans --
 5              THE COURT:  Look it, you're jumping around.
 6    It's not going to help you unless you can point me to
 7    evidence in the record --
 8              MS. LISS-RIORDAN:  Essentially, your Honor,
 9    here is -- here is our argument.  The overarching
10    unfairness of these franchises, the overarching
11    unconscionability of the system by which people are
12    paying money for supposed entrepreneurial activities
13    that -- for enterprises that don't exist, that is all
14    Jan-Pro.  To the extent that there are these specific
15    unconscionable unfair and deceptive practices that we've
16    talked about, including churning, underbidding, et
17    cetera, we believe that Jan-Pro International is
18    responsible for the master franchises, such as Bradley's
19    acts with respect to those, based on an agency
20    relationship in which there is confused intermingling
21    between these parties and which, because Jan-Pro does
22    exercise pervasive control in both its contract and the
23    master of training test that I pointed out, and other
24    materials, that it does have a lot of day-to-day -- it
25    does have a lot of control over the details and retains
```

1   the right to control how master franchises operate.

2   That is really our overarching argument here.

3          THE COURT:  And that -- okay.  I'm interested

4   in hearing from the defendant.  But thanks.

5          MR. ROSIN:  Thank you, your Honor.  I just

6   want to start with a brief point that I wanted to bring

7   up to your last question and then talk about our view of

8   the overarching situation here, um, because we've had a

9   lot of rhetoric from the beginning of this case about

10  that and I would like to be able to put on the record

11  our view as well.

12      But Paragraph 110, Subparagraph 6, says:  "The

13  master owners of defendants" --

14         THE COURT:  I'm sorry.  Let me get it.  You're

15  talking about the contract with BME?

16         MR. ROSIN:  No, I'm actually talking about our

17  statement of facts and their response to it.

18         THE COURT:  Okay.  Go ahead.

19         MR. ROSIN:  And there's a particular statement

20  of fact that's undisputed and the statement of fact is

21  in Paragraph 110 of our statement of facts in support of

22  our summary judgment.  It says:  "The master owners who

23  contracted with the plaintiffs did not use EZ-bid or any

24  JPI resources for pricing plaintiffs' cleaning accounts,

25  but priced based on their own analysis."  The response?

1    "Not disputed, however these are not material facts."

2    And then there are a number of other record citations,

3    including Jeff Bradley's affidavit in Exhibit 2 of our

4    compendium of exhibits, Paragraph 10, that he bid based

5    on his own analyses and not JPI resources.

6         With that said, if your Honor would indulge me, I

7    would like to talk about our view.  Thank you.  And at

8    some point your Honor is correct, there needs to be

9    evidence to support each plaintiff's case and here we're

10   dealing with Mr. Depianti and so we'll talk about him.

11        JPI did not set up a system that people buy into

12   that defraud them, that causes them harm, JPI set up a

13   system whereby someone like Marcello Alves, Washington

14   DeSilva, Mr. Debnam, who submitted affidavits in Exhibit

15   19 of our compendium of exhibits, talk about was a good

16   system.  And what they say is that their franchise plans

17   were fulfilled, that they understood the fees that they

18   would be charged, that those fees did not preclude them

19   from making a profit or making money, that they got the

20   accounts they wanted to get, that they expanded their

21   business, that they were profitable, and that they felt

22   like independent business owners.  Those are the same

23   people that contracted with BME here.

24        So when we're talking about the Jan-Pro system --

25   and I've heard a lot from Ms. Liss-Riordan right from

1    the get-go of this complaint, but this is not a system

2    that harms people, it's a system that allows people to

3    make a choice, to say, you know, "I don't want to punch

4    in and punch out at the beginning and the end of a day,"

5    "I don't want a supervisor cracking the whip on me," "I

6    want to make my own hours," "I want to buy my own

7    business," but "I don't know how to find accounts," "I

8    don't want to do accounting and billing," "I don't want

9    to do any of that stuff," and "If someone else could

10   deal with that, then that's great," and it sets up a

11   system where someone can have that flexibility and that

12   structure.

13        And so Mr. -- the three others that contracted

14   with BME in this case that submitted affidavits are,

15   intentionally so, three times the number of people of

16   Mr. Depianti, and I think BME has perhaps a total of 50

17   franchisees.  And I would suggest to you that many more

18   of them feel that --

19             THE COURT:  Don't they have to have at least

20   50 after three years?

21             MR. ROSIN:  I want to address that.  There is,

22   in their contract, that notion of having to satisfy this

23   contractual requirement, but it's also undisputed that

24   JPI does not hold master owners to that.  And, in fact,

25   it's never been an issue with BME because, as Jeff

1    Bradley testifies, before he sells a franchise, he

2    actually looks to make sure that there's enough accounts

3    for that franchisee.  So he's not churning accounts

4    trying to meet JPI's quotas and failing to meet those

5    quotas and suffering the consequences, he's going about

6    his business and, you know, the franchisees that he

7    works for are growing their businesses and the system is

8    working in that sense.

9         So, yes, there is that provision in the contract

10   and, yes, it's there and it's supposed to be satisfied,

11   but, for all practical purposes, it's not.

12        So your Honor's frustration with this, Ms. Liss-

13   Riordan's -- or my sense is -- and I'm sorry if that's

14   not correct.

15             THE COURT:  It's not necessarily frustration,

16   I'm just trying to excavate it.

17             MR. ROSIN:  We've been doing the same and

18   we've had the good fortune of being able to sit across

19   from Mr. Depianti and other plaintiffs in the course of

20   their depositions and drill down on these issues.  And

21   when we drill down on Mr. Depianti, we realize that he

22   doesn't have a claim and, as an aside, neither does

23   anyone else.

24        But that's what we've been dealing with, we've

25   been dealing with theory and concept and rhetoric from

1   the start of this case, but a gross failure of evidence

2   and proof to support the allegations.  So I'm happy

3   we're here.  I'm happy we're here.  We're finally

4   addressing whether they have evidence to support their

5   claims.  Your Honor is absolutely correct on the way

6   that this should be looked at.

7            And I think I just want to -- I just want to

8   clarify that, um, when you say that on Counts 1 and 4,

9   our motion is denied in part, I would ask for just some

10  clarification as to what that means and then the

11  opportunity to respond.

12            THE COURT:  Well, that that's my tentative

13  view.  Essentially, um, and I've been giving this some

14  varying levels of detail, but it appears to me that the

15  agreement between JPI and BME gives JPI the right to

16  control what is in the disclosure statements.  They --

17  it writes, if I recall correctly the disclosure

18  statements and if the master franchisees, like BME, want

19  to make changes, they have to give it to JPI and JPI can

20  veto the changes.  So under the *Kirk, Coworx* standard,

21  that is a right to control and maybe -- well, that's a

22  right to control.  And to the extent that that's the

23  material fact -- well, maybe I should take a step

24  further back.  The contract could be interpreted to

25  provide that right to control and therefore the

1   plaintiff would get over the hurdle with regard to those

2   disclosure statements.

3              MR. ROSIN:  Thank you.

4              THE COURT:  And similarly, the other one, I

5   believe, would be that it appears that JPI could be

6   directly liable to the extent it imposes a requirement

7   that master franchisees sell a certain number of unit

8   franchises.  Um, that's not an issue of vicarious

9   liability, in my conception, that's something that JPI

10  does itself.  So I think *Kerl* talks about this.  But it

11  would be -- well, that's, in my view, it's not a matter

12  of vicarious liability, it's liability for JPI's own

13  conduct.

14             MR. ROSIN:  Thank you, your Honor.

15       And my last point that I direct your attention to

16  in our statement of facts in support of our summary

17  judgment motion, Paragraphs 122 and 123, which are the

18  ones where JPI talks about how, "Yes, we provide our

19  master owners with a guideline of the number of

20  franchises that they should sell per year," but as

21  Richard Cusane, CEO of Jan-Pro, testifies and it's

22  undisputed, "We have never held anybody to those

23  standards."  And that's undisputed.

24       And in the next paragraph, there's actually --

25  well, that paragraph is purported to be disputed, I

1  should say, your Honor, but it's not genuinely disputed

2  if you actually look at what they say.  They say the

3  same kind of rhetoric.  They say, "Well, these quotas

4  harm everybody."  Well, no one's helping them.  And so

5  then the next paragraph, Paragraph 123, is actually

6  specifically not disputed.  Some master owners are not

7  even aware of the guidelines or know that they exist.

8       So then I look at the contract between --

9            THE COURT:  Well, let me just see if I

10  understand this argument.  So you're arguing to me that

11  even though the quotas don't implicate an issue of

12  vicarious liability, they are JPI's own conduct,

13  personal conduct -- to the extent that corporate conduct

14  can be personal, but there's no evidence that the right

15  to hold BME to a quota has caused Mr. Depianti any harm

16  because there's no evidence that BME was held to a quota

17  or did anything, you argue, because of that quota

18  provision?

19            MR. ROSIN:  Exactly.

20            (Pause.)

21            THE COURT:  Okay.  And what about the

22  disclosure statements?

23            MR. ROSIN:  Okay.  Yes.  Thank you, your

24  Honor.

25       We get to the -- to the disclosure statement.

1    Here's how it works.  And this is also undisputed.

2          JPI provides a master owner like BME --

3                THE COURT:  Just one second.

4                (Pause.)

5                THE COURT:  We'll talk about the disclosure

6    statements and then I'll need to talk to you about the

7    unit franchise agreement.  If there's something unfair

8    about that, I think, um, JPI has a right, a contractual

9    right to control that, too.  But, okay, let's do the

10   disclosure statements.

11               MR. ROSIN:  Okay.  Thank you, your Honor.

12         JPI does provide master owners, like BME, with a

13   form, a uniform franchise offering circular now called

14   the "Franchise Disclosure Document."  That's

15   undisputed.  It's also -- and that's undisputed.

16         Do you want the paragraph numbers?  I can

17   reference them.

18               THE COURT:  No, not quite yet.

19               (Pause.)

20               THE COURT:  Okay.  Go ahead.

21               MR. ROSIN:  Well, actually, let me back up one

22   second to talk about the disclosures.

23         When a master, a regional master franchisee wants

24   to become a regional master franchisee, JPI gives them a

25   disclosure and that disclosure is JPI's and JPI is fully

1    responsible for that disclosure.  JPI is the franchisor

2    there and the master is the franchisee.

3         The next thing that happens is the master

4    franchisee says, having reviewed that disclosure and

5    signing this agreement, that, you know, "I want to get

6    into this business.  I know the disclosure says there's

7    no earnings claims, I don't know how I'll do, there's

8    certain things that need to happen, but I want to get

9    into this business."  So then they become a regional

10   franchisor, in effect, and they're responsible for their

11   own disclosures.

12        So it's undisputed that JPI provided the master

13   owners -- for example, BME, paid $125,000 for its

14   regional master franchise and one of the things they get

15   is some forms that they can start with.  They don't have

16   to start from scratch.  You don't have to know

17   everything about FTC rules and regulations.  You get a

18   form fresh, a Form UFOC/FDD from JPI, but then you have

19   to -- you're responsible on your own for complying with

20   any state laws.  JPI will say "Our document will help

21   you comply with the Federal laws," but it's up to you to

22   comply with the state laws.  So they become franchisors

23   in their own region and that's undisputed in Paragraph 8

24   and 9 of our statement of facts, and the response is

25   that those are undisputed.  So then what happens is they

1   then are responsible for doing anything they need to do
2   to comply with the state law.
3          So, for example, um, here, um -- well, before I
4   get to the example, BME then has to use that disclosure
5   to show Mr. -- people like Mr. Depianti, what it might
6   be like to buy into this franchise and, again, they make
7   the same kind of statements that the rules require, you
8   can't make an earnings claim, you can't promise a
9   certain amount of money, you have to do an independent
10  investigation and look at this carefully, "Call other
11  franchisees that have purchased and there's a list of
12  them attached hereto."  Okay?  "Look into this
13  business."  And the law requires a certain amount of
14  time that the franchisee has to have that document
15  before they sign an agreement.
16         So then you get to the agreement that they sign.
17  And actually one of the things I want to note is that
18  when a master franchisee buys its -- his franchise from
19  JPI, there are certain provisions in there that -- well,
20  you're right, it needs to comply with to keep the
21  uniformity of the system alive, but one of the things is
22  in Paragraph 4.25 of JPI's agreement with BME, that
23  says, "You, BME, will have the sole responsibility for
24  establishing the prices for and the sale of franchises
25  therein."

1          THE COURT:  But I want to go back -- I thought
2    you were going to get to it.  Here, I'll give you more
3    detail on my thinking as to why I would deny your motion
4    for summary judgment with regard to the disclosure
5    statements.
6          As I understand it, the plaintiffs' argument is
7    that these disclosure statements and the unit franchise
8    agreements are difficult to understand, they're
9    contracts of adhesion, they require an unfair refund
10   policy, and they provide for excessive fees.  As I
11   understand it, it's not disputed that the master
12   franchisees can, in fact, create their own disclosure
13   statements and franchise agreements without JPI's review
14   or approval.  I think that's in your statement of facts,
15   53.  However, it appears that a jury could conclude that
16   BME's master franchise agreement provides JPI with an
17   explicit right to control the content of the disclosure
18   agreements and unit franchise agreements.
19         Section 4.24 requires that the disclosure
20   statements be submitted to JPI prior to use so that JPI
21   may review them as to compliance with Jan-Pro policies
22   and procedures.  Section 7.2 requires master franchisees
23   to submit any changes, deletions or modifications to the
24   disclosure forms and unit franchise agreements for
25   review no less than 30 days prior to use.  Section 14.1

1    provides that all franchise agreements used by BME shall

2    be the unit franchise agreement currently used by JPI,

3    um, of the agreements which are prepared by BME and

4    approved by JPI.  Section 14.1 further provides that the

5    unit policy be in the franchise agreement.

6        But it -- you know, it seems to me there's

7    sufficient ambiguity to -- for the plaintiff to get over

8    the summary judgment hurdle, that a jury might

9    reasonably decide that JPI controls, let's say, the

10   disclosure statements or the unit franchise agreements.

11            MR. ROSIN:  I've reviewed all that language as

12   well, your Honor.  The first point is that a franchisor

13   is expected to do that and it's part of the uniformity

14   of the franchise system.  You need those controls to

15   make sure that you're protecting your trademark.

16            THE COURT:  Yeah, but under *Kirk*, if you need

17   those controls, it seems to me that then you're the

18   master, JPI -- excuse me, is the master and BME is the

19   servant, and you have control over the part of BME's

20   business that allegedly is inflicting this particular

21   harm.  So you can, on this respondeat superior theory,

22   be held responsible for that even if you can't for

23   certain other things like underbidding.  How do you

24   address that?

25            MR. ROSIN:  Well, I will first say what

1    particular harm are we talking about?  But we already, I

2    think, have gone over that issue.

3              THE COURT:  Well, I do have to think it

4    through that far to see whether Mr. Depianti has given

5    evidence that he was harmed by -- that he was harmed by

6    the disclosure statement.  And when she gets up to

7    reply, Miss Liss-Riordan will point me to that evidence.

8              MR. ROSIN:  And I think you actually -- I

9    think the issue with **Kerl** -- it's actually **Kerl,**

10   K-E-R-L.

11             THE COURT:  Oh, I'm sorry.

12             MR. ROSIN:  I think the issue with that is

13   that you actually can't find the agency relationship

14   until you find that.

15             THE COURT:  Find what?

16             MR. ROSIN:  That there is actually some harm

17   and then you link it all up like that.

18             THE COURT:  Okay.

19             MR. ROSIN:  But I also want to point you to

20   what is also undisputed in the record, that there might

21   be this language in the contract, um, but Paragraph 35,

22   JPI -- it's undisputed that "JPI maintains no records of

23   the names of franchisees, their addresses, the franchise

24   they purchase or the accounts they serviced."

25        So if JPI were reviewing every unit franchise

1    agreement that went out and JPI didn't know the name of

2    Depianti and had nothing to do with -- you know, as

3    Bradley's affidavit says throughout, that JPI never got

4    involved in the sale of anything, they never gave any

5    documents to them, they never had site visits, they

6    never audited anything, sure, you've got to have these

7    provisions in your contract, but it's undisputed that

8    JPI does not exercise those rights, and I think that is

9    critical.

10        THE COURT:  Well, let's look at the cases

11   because I read **Kerl** to be talking in the disjunctive,

12   it's "or," they believe they have a right to control or

13   do control, but the mere right to control would be

14   sufficient.  And I --

15        MR. ROSIN:  If I might, your Honor?  I think

16   it's the opposite.  I think you're expected to have a

17   right of control and if you exercise that right in a way

18   that harms a particular person, that's the issue.

19        THE COURT:  I -- well, yeah, there has to be

20   harm because the -- you have to control the instrument

21   or have the right to control the instrumentality that

22   caused the harm.  But the right to control, even in the

23   absence of actual control, um, creates vicarious

24   liability.

25        **Kerl** talks about the public policy reasons.  And

1     if JPI has the right to control and doesn't, it's

2     negligent, it doesn't pay attention, and in an area that

3     it has the power to control, it fails to do it, then, as

4     I read *Kerl* and I'll read it again, the Wisconsin

5     Supreme Court was reasoning that it's reasonable, as a

6     matter of public policy, to hold JPI liable along with

7     BME.  But if you didn't have the right to control, it

8     was solely up to BME, and you didn't, in fact, control,

9     then, as a matter of public policy, it wouldn't be fair

10    or reasonable to hold JPI liable along with BME.

11               MR. ROSIN:  I read it as the conjunctive.  I

12    read it as the conjunctive.  You have to have the right

13    of control and exercise pervasive -- that control over

14    that issue.  And I think that's the way that the

15    majority of courts who have read *Kerl* have responded to

16    *Kerl*.

17               THE COURT:  Well, let me --

18               (Pause.)

19               MR. ROSIN:  I see the word "or" in there.

20    It's in our brief.

21               THE COURT:  Well, here it says:  "We hold a

22    franchisor may be held vicariously liable for the

23    tortious conduct of the franchisee only if the

24    franchisor has control or a right of control over the

25    daily operation of a specific aspect of the franchisee's

1   business that is alleged to have caused the harm."

2           MR. ROSIN:  You read that absolutely

3   correctly.

4           THE COURT:  So I read that to mean that you

5   have a contractual right to control it, even if you

6   don't exercise the right, and -- to control an aspect of

7   BME's business like what it puts in the disclosure

8   statements, and if you don't, you can be held liable.

9           MR. ROSIN:  Okay, your Honor.  Reading the

10  case as a whole, I view that statement as saying, in

11  effect, "You're going to have rights to control, you

12  have to have rights to control, you're, of course, a

13  franchisor," but that's not going to be enough to make

14  someone an agent.  They don't become an agent, they

15  don't rise to the level of an agent, unless there's a

16  specific instrumentality of harm that you're actually

17  controlling.  So theoretically that right of control, if

18  it is the thing that causes the harm, could create that

19  situation.

20          THE COURT:  But I think the plaintiffs'

21  stronger or clearer case may be on the unit franchise

22  agreements, if the contract can reasonably be read as

23  giving JPI the right to control the content of the unit

24  franchise agreements.  And there's evidence that the

25  terms of the unit franchise agreements have unfairly

1    injured Mr. Depianti, and I think **Kerl** would say that

2    JPI, as well as BME, can be held responsible for that.

3    Am I wrong at that general level?

4        MR. ROSIN:  I would say -- I would say -- I'm

5    not sure if you're wrong.  I think we might be saying

6    the same thing, your Honor.  But I think that -- if

7    we're talking about a contract, we're talking about a

8    breach of contract case, and is a principal responsible

9    for an agent's breach of contract here when there's a

10   contractual remedy?  For example, if Mr. Depianti didn't

11   like what he got, Paragraph 9 of his contract gave him

12   the right to get a refund and he would have been

13   contractually entitled to a refund.  And that's a breach

14   of contract case.

15       Now, just to digress to the other actions.  I

16   believe that in the **Coverall** case, there were breach of

17   contract claims against Coverall.  In Judge Young's

18   February 12th ruling, which we supplemented the record

19   with, is a case where Coverall had regional master

20   franchisees like we had and there were claims of breach

21   of contract and rescission of contract in that complaint

22   and Judge Young said, "Yeah, you know, no liability here

23   to the national entity when you contracted with a

24   separate entity."  So I don't think I disagree with your

25   analysis, but I think we're in a place where the claims

1    in this case don't fit in.

2              THE COURT:  Okay.  Ms. Liss-Riordan, would you

3    like to respond to that and then we'll move on to

4    misclassification?

5              MS. LISS-RIORDAN:  Yes.  There are not breach

6    of contract claims in this case.  We're not pursuing

7    breach of contract theory in our 93A and

8    misrepresentation claims.

9         The reason why, as we've been discussing, these

10   are claims that Jan-Pro International can be held liable

11   for is -- and I'm going to try to say this in a somewhat

12   different way from when I said it before, but I'm still

13   saying the same thing.  Jan-Pro International set up

14   this structure by which people pay fees for franchises,

15   they have fees deducted from the services, and that is

16   part of what Jan-Pro International required of its

17   masters to put in in the unit franchise agreements.  And

18   it's required because Jan-Pro International derives a

19   revenue source from that.

20        These fees -- that the $24,300 that Mr. Depianti

21   paid for this supposed entrepreneurial opportunity, part

22   of that went to Jan-Pro International, part of it stayed

23   with Bradley Marketing.  Bradley Marketing could not

24   have said to Mr. Depianti, "You know what?  We're going

25   to not charge you a fee, we're not going to deduct fees

1    from your pay," because that's part of what Jan-Pro

2    International establishes and retains the right to

3    control and, in fact, does control of its masters, that

4    these fees are charged.

5         Essentially the 93A and misrepresentation claims

6    come down to the fact that people are being charged

7    these fees, they're being sold something that doesn't

8    exist, that isn't what it says it is.  It's not an

9    entrepreneurial opportunity.  Mr. Depianti was

10   specifically harmed by the fact that he paid this

11   $24,300 and didn't get an entrepreneurial opportunity,

12   he got a low-paying job, and he didn't even get -- in

13   his dealings with Bradley Marketing, he didn't even get

14   what he thought he was going to get.

15        Now, Jan-Pro International has not provided and

16   part of what they're on the hook for is that their --

17   their whole system is, we say, unconscionable and it

18   doesn't even provide the protections against people not

19   being able to retain accounts, exactly what happened to

20   Mr. Depianti.  So through its control of its regional

21   master franchises, it doesn't -- it -- by the words of

22   the contract, it guaranteed the accounts by, I believe,

23   just one year, but we're saying that it is -- it is

24   inherently unfair to charge someone $24,000 for a

25   business when actually it's only being guaranteed for a

1    year.  That's unfair.  That's a 93A violation.  If he's

2    not an employee, that's a misrepresentation.

3             THE COURT:  Well, actually -- actually -- and

4    you haven't looked at it or addressed it, but there's a

5    whole line of cases that say that only in very limited

6    circumstances can a breach of contract constitute a

7    violation of Chapter 93A.

8             MS. LISS-RIORDAN:  But we're not saying this

9    is a breach of contract, we're saying that this is

10   unconscionable, it's unfair and deceptive, and it's a

11   misrepresentation in that it was sold as a business

12   opportunity when, in fact, it wasn't.

13            THE COURT:  Okay.  I think I understand the

14   argument that you're making.

15       Well, let's go to the misclassification claim.

16   And my tentative view, and I'll amplify it for you, is

17   as follows.

18       It seem to me that on this one the plaintiffs'

19   motion for partial summary judgment should be denied and

20   the defendant's motion should be allowed essentially

21   because there was no contract or agreement or service

22   between JPI and Mr. Depianti and because I don't see

23   evidence that's sufficient to either pierce the

24   corporate veil between JPI and BME or find that BME was

25   created to evade the relevant laws, which is the

1    language that's in the Attorney General's opinion.

2         Now, each of the cases cited by the plaintiffs, as

3    I read them, involve an agreement between the plaintiff

4    and defendant, which is absent in this case.  The

5    agreement is between BME and Mr. Depianti.

6         I've read *DiFiore*, which relates to different

7    statutes and those statutes, in I think every place but

8    one, talk about prohibitions against employers and other

9    persons doing something.  The statutes involved here,

10   Section 148B particularly, but also Section 151, start

11   by talking about employees and, as I read them, they

12   can't be construed to impose an obligation on anybody

13   other than an employer.

14        As I've indicated earlier, the Attorney General's

15   advisory indicates that, in the Attorney General's view,

16   which deserves some deference, if BME, in this case, had

17   been created and was maintained to avoid the minimum

18   wage laws, um, JPI could be held responsible, but I

19   didn't see any evidence and I asked about it earlier,

20   um, that JPI was created or maintained by -- BME was

21   created or is maintained by JPI, for any purpose, let

22   alone the purpose of evading the minimum wage law.  The

23   examples given are like Subchapter S corporations or

24   limited liability corporations.  The evidence doesn't

25   suggest, at the moment, to me that BME was created or is

1    maintained by JPI.

2         And similarly, as the laws evolve on piercing the

3    corporate veil, there are about a dozen factors to

4    consider and the plaintiff has evidence on only a couple

5    of them at most that favors the plaintiff, and piercing

6    the corporate veil is the extraordinary thing, not the

7    usual thing when corporate forms are used.

8         So that's my present sense of the

9    misclassification issue.

10              MS. LISS-RIORDAN:  Your Honor, thank you.  If

11   I can address that, please.

12        In the law -- in the employment context, there's

13   an entire body of case law -- a large body of case law

14   under the FLSA and a growing body of case law under the

15   Massachusetts wage laws --

16              THE COURT:  You told me in, I think, your

17   sur-reply brief that you're not relying on the FLSA.

18              MS. LISS-RIORDAN:  I'm not.  I'm trying to

19   explain the context here of the Massachusetts wage laws,

20   which are more protective than the FLSA.

21        Under the FLSA, there's an entire body of case law

22   regarding when a corporation can be held liable as an

23   employer of an individual and it has nothing to do with

24   who a contract was signed between.  And, in fact, the

25   cases look at -- the law looks at what the actual

1  relationship is between the parties.

2       Massachusetts law is even more protective and the

3  Massachusetts independent contractor statute does not

4  look to corporate veil piercing or any of those types of

5  principles, 148B looks at whether or not the services

6  performed by the worker are within the usual course of

7  business of the alleged putative employer.  And one

8  correction as to my note --

9            THE COURT:  But it has to be an employer.  It

10  has to be --

11            MS. LISS-RIORDAN:  Yes, but --

12            THE COURT:  Let's go right to the -- let's go

13  right to the language, because I have to be someplace at

14  1:00 and it's now 11:15.  So we're going to do statutory

15  construction and we're going to look at the statute.

16            MS. LISS-RIORDAN:  Yes.

17            THE COURT:  Because the statute uses the term

18  "contract," as I read it.  Let me just -- this is of

19  significance to me and then you can tell me why I'm

20  misguided by construing the statute by starting with the

21  words.

22       It says, I think, in pertinent part:  "An

23  individual performing any service, except as authorized

24  under this chapter, shall be considered an employee

25  under those chapters unless (1) the individual is free

1    from control and direction in connection with the

2    performance of the service both under his contract for

3    the performance of services and in fact."

4         So that communicates to me that I'm to focus on

5    the person with whom Mr. Depianti has the contract,

6    unless BME was set up to avoid these laws, by JPI, or

7    the evidence, viewed in the light most favorable to the

8    plaintiff, would permit a jury to pierce the corporate

9    veil.

10        MS. LISS-RIORDAN:  Your Honor, if I could

11   address that, please.

12        Um, when you were describing the cases that have

13   been decided under the Massachusetts independent

14   contractor statute, you say it was your understanding

15   that in all of those cases any contract was actually

16   between the worker and the alleged employer, and that's

17   not the case.

18        The first decision that we obtained under this

19   statute, which I've cited in my brief, the **Amero vs.**

20   **Townsend Oil Company** case, that was a case in which the

21   worker, who was an oil delivery driver, had incorporated

22   his business and so the actual contract for services

23   were between the business, I believe it was Hughes

24   Transportation Company, and Townsend Oil Company.  And a

25   major argument that was made by the company was that the

1   contract for services was not between these two

2   parties.  The Court disavowed and said that you look at

3   the actual relationship between the parties and not who

4   -- that contract was signed between.

5           THE COURT:  Okay.  Is there any case -- and

6   it's not a rhetorical question.  You do this all the

7   time.

8           MS. LISS-RIORDAN:  Yes.

9           THE COURT:  We've just read the cases that

10  were cited.

11          MS. LISS-RIORDAN:  Yes.

12          THE COURT:  Is there any case where somebody

13  has been held liable under the section we're talking

14  about, Section 148B -- where the defendant was held

15  liable and there was no contract with that named

16  defendant?

17          MS. LISS-RIORDAN:  Well, there are numerous

18  cases in which there is no contract, period.  I mean,

19  this is why I was talking about the law of the FLSA in

20  general and Massachusetts --

21          THE COURT:  Well, let's say there is a signed

22  contract, and then we can go step by step.  Is there

23  one?

24          MS. LISS-RIORDAN:  Is there a case in which --

25          THE COURT:  Yes, that the plaintiff has

1    recovered -- where the plaintiff had a signed contract

2    with somebody -- you know, let's say that's A, and an

3    entity other than A was held liable under 148B?

4              MS. LISS-RIORDAN:  Well, there's the *DiFiore*

5    case, which I know is under --

6              THE COURT:  That's not 148B.

7              MS. LISS-RIORDAN:  It's under --

8              THE COURT:  No, don't -- just answer my

9    question.

10             MS. LISS-RIORDAN:  Yes.

11             THE COURT:  You know this?  Because I don't

12   find that.

13             MS. LISS-RIORDAN:  No.  No.  For 148B, there's

14   not.

15             THE COURT:  Right.

16             MS. LISS-RIORDAN:  All I wanted to point out

17   is that the SJC referenced in 148, in the *DiFiore* case,

18   the provision that you can't make a contract, you can't,

19   through a contract, evade the requirements of the wage

20   law, which is what we're alleging happened here.

21        And if I can go to the next question that you've

22   asked regarding whether or not BME was created to avoid

23   the minimum wage law, another wage law, if I could just

24   address that?

25             THE COURT:  Created by JPI?

1          MS. LISS-RIORDAN:  By JPI.  Yes.

2     What we believe we have established here or what

3     we have presented here is that the system that Jan-Pro

4     has set up, that Jan-Pro International has set up, by

5     using these intermediary master franchises is

6     actually -- because -- is actually an attempt to evade

7     the Massachusetts wage laws because -- for instance, in

8     the *Coverall* decision, where there is no such

9     intermediary structure, Judge Young has found the

10    franchisor to actually be an employer.  So that way the

11    mere insertion of this intermediary, which we claim has

12    no legal force under the Massachusetts independent

13    contract law, has, in fact, been created in order to

14    avoid that result.  That's the main decision that's in

15    *Coverall*.

16          THE COURT:  Well, except then they'll get up

17    and say, in *Coverall*, to the extent that there was a

18    counterpart to BME, in his electronic order, without

19    explanation, Judge Young granted summary judgment for

20    the defendant.

21          MS. LISS-RIORDAN:  On different facts.

22          THE COURT:  What's that?

23          MS. LISS-RIORDAN:  On different facts, yes.

24          THE COURT:  It's hard for me to know, since

25    there's no decision.

1          But -- but here's the nature of the distinction

2     I'm wrestling with, and by analogy to the tax area,

3     where perhaps neither of us are experts.  But there's

4     tax evasion and there's tax avoidance and "avoidance" is

5     structuring something in a lawful way that doesn't have

6     adverse tax consequences.  "Evasion" is doing something,

7     usually deceptive, that creates the wrongful appearance

8     that you're not required to pay taxes that you really

9     owe.

10         If there's a way to legitimately insulate JPI, you

11    know, from having to deal with suits like this, so they

12    decide to structure their business different than Jani-

13    King, for example, or Coverall -- and I guess I've had

14    all three of the national companies now.  But if there's

15    a lawful way to do it and they said, you know, "We don't

16    want that aggravation, so let BME and the master

17    franchisees fight with the unit franchisees, who are

18    discontent," that's not impermissible.

19         I think what you need to do is show me evidence

20    either -- not that they went to a legitimate preexisting

21    company because they didn't want to get into these

22    controversies, but under the Attorney General's advisory

23    opinion, is there any evidence they created or

24    maintained BME?  Just answer that question.

25              MS. LISS-RIORDAN:  They created or maintained

```
 1   a system of using master franchises.

 2             THE COURT:  Okay.  But with regard to BME --

 3             MS. LISS-RIORDAN:  That's what we allege.

 4             THE COURT:  Okay.  But is there any

 5   evidence -- I think the answer is "No," that they

 6   created BME, that JPI created BME?

 7             MS. LISS-RIORDAN:  I don't believe there's

 8   evidence that JPI created BME specifically.  It created

 9   the system of the intermediaries.

10             THE COURT:  Okay.  I understand that.

11             MS. LISS-RIORDAN:  Yes.

12             THE COURT:  Then --

13             (Pause.)

14             THE COURT:  And all of this is just some

15   elaboration of *My Bread.*

16             MS. LISS-RIORDAN:  Yes.

17             THE COURT:  And you're familiar with the 12

18   factors?

19             MS. LISS-RIORDAN:  Yes.

20             THE COURT:  You've got to get through --

21   there's got to be enough evidence for a reasonable

22   factfinder to find that the corporate veil should be

23   pierced here, I believe.

24             MS. LISS-RIORDAN:  Your Honor, I respectfully

25   -- the laws, the employment laws -- the question as to
```

1    who is an employer, under the employment laws, have not

2    engaged in this veil-piercing analysis that you're

3    referring to.

4            THE COURT:  Okay.  So what makes JPI, in

5    addition to BME, an employer in this case?

6            MS. LISS-RIORDAN:  In this case because the

7    franchisees, the so-called "franchisees," are performing

8    services within the usual course of Jan-Pro Franchising

9    International's business.  And if I could just address

10   that just for a moment.

11       In this entire series of cases that we've outlined

12   for you in our summary judgment briefing in which courts

13   have granted summary judgment to the plaintiffs,

14   claiming misclassification, the fight has been -- um,

15   over the so-called "Prong 2," the fight has been --

16           THE COURT:  That's because you told me they

17   all had signed contracts with the person they were

18   suing.

19           MS. LISS-RIORDAN:  Well, they didn't in *Amero.*

20           THE COURT:  All right.

21           MS. LISS-RIORDAN:  And in *DiFiore,* an

22   analogous, yet different statute, they didn't also, and

23   that's the SJC.

24       But in this series of cases, all of the alleged

25   employers have argued that "We do something different

1     from what the workers do."  "We provide the" -- the

2     trucking companies say "We provide marketing logistics

3     support to connect delivery drivers with people who need

4     to ship things."  The exotic dancer's case, *King

5     Arthur's Lounge*, said, "We sell alcoholic beverages and

6     we happen to have some strippers over there."  In all of

7     these cases, the courts have decided on summary

8     judgment, have looked at the representations made by the

9     employer -- by the alleged employer as to what they do.

10          And so we have claimed here, as we successfully

11     did in the other cases, that Jan-Pro's own

12     representations, for example, on its website, states

13     that it is in the commercial cleaning business.  It

14     provides commercial cleaning services to customers.  It

15     has 7,000 franchisees nationwide who do this.  That is

16     the same type of evidence that led Judge Young to

17     conclude that Coverall was an employer in the *Coverall*

18     case, that led the courts in the *Eastern Connection,* and

19     that's the *King Arthur's* case, and other cases cited, to

20     find that the work performed by the worker was in the

21     usual course of business of the alleged employer.

22          So here Jan-Pro International is trying to take it

23     one step back further saying, "We don't provide cleaning

24     services, despite what it says on our website.  We don't

25     even sell franchises to new unit franchisees.  We just

1   sell these master franchises and they're the responsible

2   party."  And what we're saying is that this insertion of

3   an intermediary structure cannot itself insulate Jan-Pro

4   under this strict regimen of the Massachusetts

5   independent contractor statute which looks at whether or

6   not the work is performed in the usual course of

7   business of the alleged employer.  There's no

8   requirement either in the statute or in any case that

9   requires there to be a signed contract between the

10   alleged employee and the alleged employer.  Instead, the

11   question the courts look at, under 148B, is whether or

12   not the work is performed within the usual course of the

13   alleged employer's business.  And --

14             THE COURT:  Which of the three prongs is that?

15             MS. LISS-RIORDAN:  That's Prong 2.

16             THE COURT:  Right.  But it's Prong 1 that I

17   read you that talks about the contract.  Maybe it's an

18   oral contract.

19             MS. LISS-RIORDAN:  Right.  Right.  But under

20   148B, the alleged employer must satisfy all three

21   prongs.  If they fail to satisfy one prong --

22             THE COURT:  But it has to be the employer.

23             MS. LISS-RIORDAN:  But because we proved Prong

24   2, they are the employer.  There's no exception made for

25   because there was a separate contract.  And that's what

1    happened to all those claims in FLSA cases as well as in

2    Massachusetts -- the growing body of Massachusetts wage

3    and hour law, is that the -- is that one company says,

4    "Hey, we weren't the employer of these people," and they

5    weren't being paid minimum wage or overtime or whatever,

6    that that's a -- that's a separate company.  And then

7    there are -- um, the FLSA itself is broad and the

8    independent contractor statute in Massachusetts is even

9    broader, saying, "No, we don't look at issues of who

10   signed a contract or where -- or even where the pay stub

11   is coming from, we look at the nature of the

12   relationship to the party."

13             THE COURT:  Is there a case under 148B that

14   says "We don't look at who signed a contract"?

15             MS. LISS-RIORDAN:  There's the **Amero vs.**

16   **Townsend Oil Company** case.

17             THE COURT:  Hold on a second.  I've got it

18   right here.  I'll look at it.

19        And what is **Amero,** a case where there was no

20   written contract?

21             MS. LISS-RIORDAN:  No, this was a case where

22   there's an oil delivery driver and the contract was

23   between the incorporated business that he had set up and

24   Townsend Oil.

25             THE COURT:  I see.

 1              MS. LISS-RIORDAN:  And there were other cases

 2    in which --

 3              THE COURT:  All right.

 4              MS. LISS-RIORDAN:  Well, actually, the **Eastern**

 5    **Connection** -- the best next example that just comes to

 6    my mind is the analogous circumstance the SJC considered

 7    in the **DiFiore** case.  It was referenced that you can't

 8    contract out -- you can't, by means of contract,

 9    contract out allegations of the wage law, which is what

10    I believe Justice Gants, looking at that situation,

11    would say about this situation, is whether that, through

12    this contract, they're trying to claim that they can't

13    be liable under these statutes.

14              THE COURT:  All right.  Under the statutes in

15    **DiFiore**, as I read it before coming to court this

16    morning, in every section of the statute the statute

17    said "employer or other person."  And the SJC's

18    reasoning essentially was that it would eviscerate the

19    obvious intentions of a statute not to include other

20    persons -- I mean, that the legislature just never

21    imagined the device that American Airlines came up

22    with.  That's the only reason it didn't say "other

23    person" in that subpart.

24         But in 148B, it doesn't say "employer or other

25    person," right at the beginning.  And I want to give you

1    a chance to address this reasoning.  It says -- well, it

2    says "every person having employees in his service shall

3    pay."  So I guess your argument is -- well, it's --

4    well, then you get to the three prongs, eventually.  It

5    says:  "No person shall, by special contract with an

6    employee or by any other means" -- no, that's not it.

7    Where are the three prongs?

8            (Pause.)

9            THE COURT:  I'm sorry.  I was reading 148.  I

10   was looking at 148B.

11           (Pause.)

12           THE COURT:  Yes.  "For the purpose of this

13   chapter, individuals performing any service, except as

14   authorized under this chapter, shall be deemed to be

15   employees under this section unless it's shown that such

16   individual has been and will continue to be free from

17   control or direction in connection with the performance

18   of such service under his contract."

19           MS. LISS-RIORDAN:  That's Prong 1.

20           THE COURT:  What's that?

21           MS. LISS-RIORDAN:  That's Prong 1.  We're not

22   resting on Prong 1 here.

23           THE COURT:  All right.  So you're saying?

24           MS. LISS-RIORDAN:  Prong 2.

25           THE COURT:  Okay.  So you're saying that he's

1   performing, Mr. Depianti is performing -- the jury could

2   find that he's -- that the defendants have not shown

3   that Mr. Depianti is performing outside the usual course

4   of JPI's business.

5           MS. LISS-RIORDAN:  Exactly.  Exactly.  And

6   that is -- and the ruse that JPI is trying to set out,

7   that it isn't actually providing the cleaning services,

8   that is what has been rejected time and time again by

9   these cases, in the *Coverall* case, in the *Eastern*

10  *Connection* case, and in the *Chavez* case.  It's something

11  that the Court can determine, on summary judgment, that

12  Jan-Pro International is a commercial cleaning company

13  and that's how it holds itself out on its website.  It

14  advertises that it has 7,000 franchisees to perform its

15  cleaning services for its customers.  And that is, we

16  believe, no different from these other cases that have

17  been decided, including the *Coverall* decision.

18      At the very least, perhaps the Court might find

19  it's a jury question as to whether or not Mr. Depianti

20  is performing work within the usual course of Jan-Pro

21  International's business as opposed to in the course of

22  Bradley Marketing's business.  But we believe that

23  shouldn't even be a fact issue.  But at best perhaps you

24  could consider that to be a fact issue.

25          THE COURT:  Okay.  That's very helpful.  Why

1   don't I hear from the defendant.

2          MR. ROSIN:  Very briefly, your Honor.  I think

3   your tentative view is right on the money and it is what

4   Judge Young decided as well.

5       The *Amero* case is a case where an oil delivery

6   company contracted with an oil delivery driver and that

7   oil delivery driver was like a separate company, he had

8   his own truck, and he was deemed to be an employee of

9   the trucking company.  And so that is a case where there

10  was, again, a contract, which there isn't here.

11      Um, briefly, the -- no one prong of the

12  independent contractor statute is supposed to be read to

13  render the other superfluous.  So you're right on the

14  money, your Honor.

15          THE COURT:  What case tells me that?

16          MR. ROSIN:  It is *Athol Daily News*, 439 Mass

17  171 at 178.  And the Attorney General's advisory says

18  the same thing.

19      Um, so your Honor is right on the money when you

20  look at the test that way.

21      Otherwise, imagine the world.  You could just

22  apply this statute to anyone you wanted and call them

23  the same line of business.  It would be a foolish world

24  and it can't be what was intended.  It would be an

25  absurd result.

1          THE COURT:  Well, that's not the argument

2     they're making, that Mr. Depianti is the employee of

3     Coverall or Jani-King, he's saying he goes around with a

4     Jan-Pro insignia on his shirt and Jan-Pro gets a

5     percentage of his revenue.  So Jan-Pro -- and Jan-Pro is

6     in the business, it holds itself out as being in the

7     business of providing cleaning services.

8          MR. ROSIN:  That's what its trademark is.

9     That's what its trademark is, your Honor.  Their

10    argument, actually, is that any franchisor that had any

11    contractual relationship with anybody, you know, those

12    people can be deemed their employees.  So the simple

13    structure of a franchise relationship would be

14    eviscerated.

15         So I think your Honor is right on point when you

16    say that we need a contract to -- in order to apply this

17    statute.  Thank you.

18         THE COURT:  Well, I'm going to -- did you want

19    to respond to this?

20         MS. LISS-RIORDAN:  Well, I just wanted to

21    state that that argument that was just made is really

22    the same argument that was made over and over again in

23    these cases and the courts have uniformly, over the last

24    year, rejected those and granted the plaintiffs' motion

25    for summary judgment.

1              THE COURT:  In what cases?

2              MS. LISS-RIORDAN:  In the case of **Coverall**, in

3    the case of **Eastern Connection**, in the case of --

4              THE COURT:  Wait.  Wait.  **Coverall?**  Okay.

5    What's the name of the Coverall case, **Awuah**?

6              MS. LISS-RIORDAN:  Yes, **Awuah vs. Coverall.**

7    Yes.

8              THE COURT:  All right.  In the electronic

9    order granting summary judgment, didn't Judge Young

10   grant summary judgment for the counterpart of JPI that

11   was operating -- that had a contract with a master

12   franchisee?

13             MS. LISS-RIORDAN:  He did, but there's no

14   reasoning put in that decision.  It was just granted.

15   He gave no explanation.  There was no argument made.

16             THE COURT:  But you just argued that --

17             MS. LISS-RIORDAN:  But factually, as I said

18   before, there's a distinction.  You can't rely on his

19   unwritten order in that case.  In that case it's

20   different because, like I said, the masters there

21   operate differently than the masters here.  We've set

22   forth all this detailed control that Jan-Pro has over

23   these masters and that there really is just this

24   intermediary inserted.  That the overall operation

25   operates no differently from the Coverall structure with

```
 1    its direct affiliate.

 2         In the Coverall master situation, the contract

 3    between the masters and the unit franchisees did not

 4    name Coverall as the beneficiary of that contract.  In

 5    this case, Jan-Pro International is a beneficiary of the

 6    contracts between the masters and the unit franchisees.

 7    So factually we have a different situation.

 8         And we don't have any reasoning from Judge Young

 9    on that, in particular, and I just want to lay out here

10    that in the Jan-Pro regional master franchise agreement

11    and in Jan-Pro International's materials, and its

12    statement on its website, it said that it is "in the

13    business of operating and franchising comprehensive

14    cleaning and maintenance businesses."  So Jan-Pro says

15    it is in the business of operating cleaning businesses.

16         THE COURT:  But it says "operating and

17    franchising."  It could be some they operate themselves

18    and some they franchise out.

19         MS. LISS-RIORDAN:  But they only do it through

20    the system, and that's the exact argument that Judge

21    Young rejected in his 11 page written decision, finding

22    an alleged franchisee to be an employee under the strict

23    Massachusetts independent contractor law, is the fact

24    that despite the label "franchising," the statute says

25    you look at whether the work is performed in the usual
```

1     course of business and that's all.

2           THE COURT:  And am I correct that that 11 page

3     decision involved a relationship that didn't have any

4     intermediary master franchisor?

5           MS. LISS-RIORDAN:  Yes, but we're saying that

6     that -- the reasoning of it, there's nothing different

7     in this fact situation that would address the reasoning

8     of it.  In wage and hour cases, specifically with this

9     specific stringent statute, that the SJC has emphasized

10     how stringent it is in the case of *Sommers vs. CAI* of

11     last year, that you don't look at what is written

12     between the parties.  In fact, in these independent

13     contractor cases, the company always writes an agreement

14     that says "You are an independent contractor.  You're

15     not an employee."  But you don't look at the contract.

16     That's what all of these cases stand for.

17           THE COURT:  It's two different things.  I

18     fully understand that you don't just rely on the label

19     on a contract, but where I am is I've been focusing on

20     who the contract is with.  But I'm going to think

21     further about the argument you made.

22     All right.  Let's go to what I think is the third

23     and last set of claims, Counts 5 and 6, unjust

24     enrichment and quantum meruit.

25     The general principle, as I understand it at the

1   moment, is that Massachusetts law requires that the

2   plaintiff demonstrate that he provided the services with

3   the reasonable expectation of receiving compensation

4   from the lead defendant.  And I guess I'm interested in

5   understanding what the evidence is and how it indicates

6   there's a reasonable expectation of receiving

7   compensation from JPI and not BME?

8                  MS. LISS-RIORDAN:  Well, your Honor, as

9   Mr. Depianti testified at his deposition, he understood

10  he had a relationship with Jan-Pro.  He paid $24,300 and

11  was expecting to get more than $8,000 of cleaning

12  business a month and he didn't, and he thought that

13  Jan-Pro was going to provide that for him.  That is what

14  the unjust enrichment, quantum meruit claim essentially

15  boils down to.

16       And, again, the focus here is on the reasonable

17  expectation of the plaintiff.  That was his expectation

18  and we believe we can prove to a jury that that was a

19  reasonable expectation.  The way Jan-Pro has marketed

20  itself as providing these business opportunities, the

21  way it has held itself out on its website as itself

22  having 7,000 franchisees with 90-some-odd affiliated

23  locations, um, that Mr. Depianti was reasonable in his

24  belief that he was going to be obtaining this cleaning

25  work -- these revenues from cleaning work from Jan-Pro.

1          THE COURT:  Is there any evidence that

2    Mr. Depianti viewed the website or knew what information

3    was on it?

4          MS. LISS-RIORDAN:  I believe in his -- well,

5    let me -- in his deposition, he was asked about

6    essentially the difference between the two and he said

7    he just knew that Jan-Pro -- um, just hold on a moment.

8          MR. ROSIN:  I could point you to the pages, if

9    it helps expedite it.

10          THE COURT:  The pages of the deposition?

11          MR. ROSIN:  Yes.  It's Pages 87 and 171 to

12    172.

13          MS. LISS-RIORDAN:  In his affidavit,

14    Mr. Depianti, um, recognized John Bradley to be a

15    Jan-Pro manager.  That's what he saw.  That's what he --

16    I would submit we had evidence to get to the jury that

17    that was reasonable for him to believe that John Bradley

18    was a Jan-Pro manager, because he bought a Jan-Pro

19    franchise and that's who he dealt with at Jan-Pro.

20          THE COURT:  But I just asked you a narrow

21    question, and that is, you were talking about -- you

22    were arguing that it was reasonable because of the

23    information on the -- that he reasonably relied because

24    of the information on the website, and so I asked

25    whether there was any evidence that he had seen the

```
 1   website?
 2             MS. LISS-RIORDAN:  Well, I don't -- I don't
 3   have the full transcript before me here to see whether
 4   he was asked whether he viewed the website.  But he -- I
 5   would say that in light of the fact that there are
 6   undisputed marketing materials that we've submitted in
 7   which Jan-Pro holds itself out, um -- in fact, our
 8   Exhibit 1 to plaintiffs' statement of facts contains
 9   these marketing materials.
10        The cover page says "Welcome to Jan-Pro Cleaning
11   Systems."  It describes the benefits of being a Jan-Pro
12   franchisee.  That Jan-Pro franchisee has 7,000
13   franchisees across North America.  "Why should I choose
14   Jan-Pro for my cleaning business?"  And the fact that
15   Mr. Depianti understood that he was buying a Jan-Pro
16   franchise, I believe, is sufficient evidence to get us
17   to the jury that it was reasonable for him to believe
18   that he was going to receive his $8,000 a month from
19   Jan-Pro.
20             THE COURT:  Okay.  Thank you.
21             MS. LISS-RIORDAN:  Thank you.
22             MR. ROSIN:  Thank you, your Honor.  It's
23   actually undisputed in Paragraph 165 of our statement of
24   facts:  "Unit franchisees do not expect compensation
25   from JPI."  It's not disputed.  And Mr. Depianti clearly
```

1    testified on Pages 87 -- cited in Paragraph 238 of our

2    deposition -- no, I'm sorry, of our statement of facts,

3    from his deposition:  "Depianti first heard of JPI

4    through his lawyers and this lawsuit."

5            THE COURT:  That's JPI.  But you kindly

6    pointed me to 172 of Mr. Depianti's deposition.  He

7    says, or you ask him:  "So is it fair to say you didn't

8    know who Jan-Pro Franchising International was when you

9    signed up as a unit franchisee?"  "No."  Then he goes

10   down further and he says:  "I didn't know what it was.

11   I knew it was Jan-Pro only."

12       I mean, why couldn't a jury reasonably construe

13   that to mean that he may not have known the formal legal

14   name, but he thought he was dealing with Jan-Pro and the

15   entity known as "Jan-Pro" was not BME, but JPI?

16           (Pause.)

17           THE COURT:  Lines 16 and 17.

18           MR. ROSIN:  Well, I would look again on Page

19   87 for a more direct admission in that regard, Lines 8

20   to 10 and through 15, and then once you read that, I can

21   address your question.

22           THE COURT:  (Reads.)  I don't see that as

23   being inconsistent with the point.  He didn't know about

24   Jan-Pro Franchising International, he just knew Jan-Pro.

25           MR. ROSIN:  And then I would point to

1    Mr. Depianti's franchise agreement itself.  The Jan-Pro

2    Franchising International is mentioned on -- (Turns

3    page.) on page -- well, it's actually in Paragraph 4C.

4    It doesn't have a page number, but it's the fourth page

5    in.  It talks about the trademarks and how Bradley

6    Marketing Enterprises has these trademarks pursuant to

7    its agreement with International.

8         So -- and this is -- you know, this is part and

9    parcel to the notion that you actually have to expect

10   compensation from an entity and we all know that JPI is

11   a third-party here, it's not the entity whom Depianti

12   met, signed up with, got accounts from, and had

13   interactions with.  He testified and it's undisputed

14   that he never spoke with anyone from JPI before

15   purchasing his franchise and we know that all of the

16   billing statements and what not come from Jan-Pro of

17   Eastern, Massachusetts.  So while I understand the

18   notion that --

19             THE COURT:  What's Jan-Pro of Eastern,

20   Massachusetts?

21             MR. ROSIN:  That's Bradley.  They get the

22   right to use that trade name when they buy it.

23        So, you know, with that said, I mean, all of the

24   cases really say that if you want to sue a party for

25   unjust enrichment or quantum meruit, you need to have

1  expected compensation from that party, and it's

2  undisputed in Paragraph 65 that neither he nor anyone

3  else did.

4          THE COURT:  Okay.

5          MR. ROSIN:  Thank you, your Honor.

6          THE COURT:  All right.

7          MS. LISS-RIORDAN:  Your Honor, one last final

8  point.

9      I'm looking at the franchise agreement, um, that

10  Mr. Depianti signed, which is exhibit -- I believe it's

11  Exhibit 8 to our fact statement.  Um, there are

12  references throughout here about Jan-Pro, in capital

13  letters, and what Jan-Pro will do, what Jan-Pro's

14  obligations are.  Um, I think if anything -- even though

15  Mr. Depianti says that he didn't understand the

16  contract, it was too big and complicated, I think that

17  only supports the reasonableness of his intermingling,

18  confusing the separate entities.

19          THE COURT:  Okay.  Here, I'm going to take a

20  break.  I will come back and let you know where we are.

21  The Court is in recess.

22          (Short recess, 11:50 a.m.)

23          (Resumed, 12:05 p.m.)

24          THE COURT:  It's always my goal to decide

25  matters orally.  You know, that's why my clerks and I

1    intensively prepare for hearings like this.  I can't

2    achieve that goal in this case.  The -- whatever I

3    decide should be described with particular care, but I

4    think until I write something, I'm not going to know for

5    certain what I think.

6        But I do need clarification from the plaintiff

7    regarding the theory on the unfair practices claim,

8    because I have a somewhat different sense of it than I

9    got from reading the papers, and I'll probably address

10   both.

11       Is the plaintiff arguing that the system created

12   by the unit franchise agreements in the disclosure

13   statements, for example -- well, not for example, but

14   that the whole system is unfair and that things like

15   underbidding are evidence of the unfairness as opposed

16   to discrete actionable items?

17              MS. LISS-RIORDAN:  Yes.

18              THE COURT:  All right.

19              MS. LISS-RIORDAN:  Yes.  In the franchise

20   agreements, the system doesn't provide protection

21   against this, it only guarantees accounts for a year

22   even though someone like Mr. Depianti paid $24,000 for

23   it.  We're saying that's inherently unfair.

24              THE COURT:  The whole system?

25              MS. LISS-RIORDAN:  The whole system.

1          THE COURT:  Okay.  So -- and this is -- you

2   know, this is part of the reason I came out thinking I

3   might allow it in part and deny it in part.

4          So if I held that -- you know, for summary

5   judgment purposes, there's adequate evidence, you know,

6   to find that -- for a jury to find that the overall

7   system violates 93A, but there's not enough evidence

8   under **Kerl** to find control by JPI regarding

9   underbidding, that there could be -- if we had a trial,

10  evidence of underbidding that would come in in an effort

11  to prove the general claim that this is just

12  structurally fundamentally unfair, but that wouldn't

13  be -- underbidding wouldn't be a discrete grounds for

14  holding JPI liable.  That that would be consistent with

15  your theory?

16          MS. LISS-RIORDAN:  Yes.  Yes.

17          THE COURT:  Okay.  Well, I'm going to write

18  something on this.

19          Then with regard to the misclassification claim,

20  my thinking has evolved a little bit, and that's why we

21  have the argument.

22          Like JPI, I was focused on contract, but that's

23  only one of three elements in determining who's an

24  employee.  And I note that Section 148, which is where I

25  begin, doesn't start with the term "employer," it says

1    "every person having employees."  So you might argue to

2    me that you start with "person," like in *DiFiore,* um,

3    and then it's 148B that tells me who an "employee" is,

4    right, and the defendant has to establish three things

5    to prove that Mr. Depianti isn't an "employee."

6         So even if a contract is contemplated by Prong 1,

7    is it your argument that JPI is in the business of

8    selling janitorial services and Mr. Depianti provides

9    janitorial services in the usual course of JPI's

10   business, that that's the argument?

11              MS. LISS-RIORDAN:  Yes.

12              THE COURT:  And then if -- if -- now we're

13   having a broader focus and I might conclude that neither

14   of you are entitled to summary judgment if there's

15   evidence from which a jury could find that JPI is in the

16   business of selling franchises to master franchisees and

17   there's also, viewing the evidence in the light most

18   favorable to the plaintiff, evidence from which a jury

19   could find that JPI is in the business of selling

20   janitorial services.

21              (Pause.)

22              MR. ROSIN:  May I comment on that, your

23   Honor?

24              THE COURT:  Well, here, you can each comment

25   on it.  That this is all fluid and I probably -- that I

1    expect I will write something and it will be longer than

2    11 pages, fortunately, or unfortunately, but at the

3    moment, you're both going to lose.

4            MS. LISS-RIORDAN:  Um, two quick little points

5    I want to make on that.

6            THE COURT:  Hold on just one minute.

7            MS. LISS-RIORDAN:  Sure.

8            (Pause.)

9            MS. LISS-RIORDAN:  On the issue of Depianti

10   performing services in the usual course of Jan-Pro

11   International's business, just the fact that it has held

12   itself out as being in the business of operating

13   commercial cleaning services, providing commercial

14   cleaning businesses, is an admission, and it makes it

15   throughout its materials, and on its website, and that's

16   what the other courts have found sufficient to grant

17   plaintiff summary judgment.

18           THE COURT:  It depends on what the other

19   evidence is, though.  It is an admission, um, so it

20   definitely helps you, but if there's countervailing

21   information, it's not all of the admissible evidence.

22           MS. LISS-RIORDAN:  But it's the same type --

23   the other evidence that Jan-Pro International submits is

24   the same type of evidence the other defendants have

25   submitted in these cases.  That, for instance, Coverall

1   said it's in the business of selling franchises, not --

2           THE COURT:  All right.  I -- we've gone over

3   this and --

4           MS. LISS-RIORDAN:  Okay.  Just one little

5   addendum that I want to say related to it.

6       We talked about, before the break, is that on the

7   issue about a company not being able to evade the

8   requirements of the wage laws by written contract and in

9   our discussion of *DiFiore* you were focused on the fact

10  that that language was pulled out of the tips law,

11  Section 152A.  I just wanted to point out that I believe

12  some more language is contained in Section 150, which is

13  the statute we've actually sued under.  148B is

14  enforceable through 150 and that, I believe, provides a

15  similar prohibition on, um, evading or requiring it

16  through a special agreement to a contract.

17          THE COURT:  150?  All right.  Well, I'll look

18  at 150.  Well, I'll look at 150 again.  I didn't think

19  that 150 helped you beyond 148 and 148B, but I'll look

20  again.

21          MS. LISS-RIORDAN:  And also the Supreme Court

22  statement, this SJC statement from *DiFiore,* was really

23  speaking broadly to companies using devices, using

24  so-called "intermediary contractor companies," and the

25  SJC has strongly frowned on that.

1           THE COURT:  I would frown on it, too, but the

2     Attorney General's opinion that you gave me, the

3     advisory -- well, okay.  We've been through this.

4     There's a difference.  This isn't, in my mind, analogous

5     to tax evasion and tax avoidance and it may be that

6     neither of you are entitled to summary judgment.  I

7     think Mr. Rosin wanted to say something.

8           MR. ROSIN:  Thank you, your Honor.

9        I just want to point out that Paragraph 4 of our

10     statement of facts is undisputed.  And it says:  "For

11     its business, JPI sells regional rights to use the

12     Jan-Pro trademark to entities known as regional master

13     franchisees."  That's undisputed.

14           THE COURT:  All right.

15           MR. ROSIN:  And on the notion of, um, the

16     intent of the independent contractor law and the

17     language in the independent contractor law, is that --

18     you hit upon it right from the beginning.  That if you

19     were going to hold that JPI could be an employer of

20     someone like Depianti, you're actually saying that these

21     other areas of law, like corporate law, where you don't

22     pierce the corporate veil -- and that's your tax evasion

23     versus tax avoidance analogy, are irrelevant under 148B

24     and you're actually saying that in the franchise context

25     -- in the franchise context, that that is irrelevant as

1    well.  The nature of an entity's business really needs

2    to be scrutinized and here we have undisputed facts

3    about what it is.

4        And there are other provisions of Massachusetts

5    law, Chapter 93, for example, which talks about

6    franchisor car dealers and it recognizes that some are

7    in the manufacturing business, some are in the sales

8    business, but at the end of the day they all sell cars.

9    But it specifically recognizes that that happens.

10        Now, this statute, as you point out, is designed

11    to prevent companies from setting up corporations to

12    avoid the law, but like you pointed out, that didn't

13    happen.

14            THE COURT:  The -- I need to do some more work

15    on this.  But when I came out, I told you that I thought

16    part of Counts 1 and 4 would survive.  I now understand

17    the plaintiffs' argument, with regard to Counts 1 and 4,

18    differently.

19        Nothing can be decided now, but, um, if I deny

20    summary judgment for both of you, you know, both sides,

21    you should begin thinking about and discussing what's

22    next, because I'm inclined to go to class certification

23    next.  I have some concerns about whether this can be

24    maintained as a class action.  And just questions.

25        But, for example, there's only one plaintiff on

1    the Massachusetts claim, Mr. Depianti, and there may be

2    unique defenses concerning him, because he settled with

3    BME.  There may be issues about his adequacy.

4        Similarly, you know, in some circumstances -- to

5    the extent the case relies on an alleged oral

6    misrepresentation, unless there's a sort of a script

7    that everybody is operating off of, that this may not be

8    amenable to class treatment.

9        So while these issues are challenging and I know

10   very important to the parties, you know, whether I've

11   got a case involving seven people or a big class has

12   consequences, and my inclination, I can say with

13   particular, I hope, credibility right now, is that

14   whatever my inclinations are, or my tentative views are,

15   they are not my final views.  I want to hear from you.

16   You should start talking and thinking about this.

17   Because I don't think, at the moment, although it could

18   change as I write it, that Mr. Depianti's case is going

19   to be resolved on this motion for summary judgment.

20       All right.  I don't think I can go any further for

21   today.

22           MR. ROSIN:  I know your Honor is pressed for

23   time, but if I might?

24           THE COURT:  Go ahead.

25           MR. ROSIN:  When Miss Liss-Riordan says that

1   I'm arguing that the entire system is unfair and your

2   Honor looks at that and is that a 93A violation?  Well,

3   underlying all of that is we have to have a plaintiff

4   who is somehow harmed in the system.  It holds a very

5   heavy sword over the company's head to say anything

6   about its system being unfair without a plaintiff being

7   specifically harmed.

8           THE COURT:  And there will have to be --

9           MR. ROSIN:  And I want to cite for you a point

10  that I think you'll find useful on your concern about

11  class certification, and Ms. Liss-Riordan is aware of

12  the cite and she's opposing counsel in this case.  It's

13  from the *Mitchell vs. U.S. Airways* case and it's in

14  Docket Entry 40 of Page 9.  But there are a litany of

15  cases in "The Manual of Complex Litigation" that

16  recommend deciding summary judgment before getting to

17  class certification.

18          THE COURT:  I know that.  I can read to you

19  all the cases.  I just did this two weeks ago.

20  Remember, you came to me.  And the reason to do it is

21  fairness to the defendants, because the plaintiffs

22  shouldn't know before they have to decide whether to opt

23  out how the judge is going to rule on the merits.  If

24  you hadn't joined Ms. Liss-Riordan in asking me to do

25  summary judgment first, we would have done class

1    certification today.  So, here, I'll help you.  I'll

2    give you more cases.

3                  (Pause.)

4                  THE COURT:  Well, I won't give you several

5    cases.

6                  MR. ROSIN:  I understand, your Honor.

7                  THE COURT:  I can't lay my hands on it now.

8    But the law in the First Circuit is that usually class

9    certification should be done before deciding summary

10   judgment and the primary reason for that is to protect

11   the defendant's legitimate interests.

12        Look at *In re New Motor Vehicles Canadian Export*

13   *Antitrust Litigation*, 522 F. 3rd 6 at 26.  *Waste*

14   *Management Holdings*, 208 F. 3rd 288 at 298, Note 7.

15   *Rodriguez vs. Banco Central*, 790 F. 2nd 172 at 175.

16                  (Pause.)

17                  THE COURT:  *American Pipe and Construction*

18   *Company*, 414 U.S. 538 at 547.  *Kirkoff*, 282 F. 3rd 44 at

19   54 to 55.

20        With one exception, those are all First Circuit

21   cases.

22        So if I'm going to do class certification next,

23   because I am going to decide this motion for summary

24   judgment, I believe, then I'll deny the others without

25   prejudice.

1          This may be hopeless, but I'm also ordering that

2     you confer and by April 30th tell me whether you've

3     agreed to settle the case or wish to go to mediation.

4     And I suppose one thing that may suggest that it may not

5     be hopeless is that I think I had the first *Coverall*

6     case and I carved out all this time to try the case and

7     I was surprised, but not disappointed when the parties

8     settled.

9          You can pretty well rely on the fact that -- you

10    can rely on the fact that it's very unlikely that either

11    of you are going to win this case on summary judgment,

12    with regard to Mr. Depianti.  So now you know something

13    you didn't know three hours ago.  Talk and you'll let me

14    know, one, whether you settle the case and, two, if you

15    didn't settle the case, whether you want to go to

16    mediation.  Okay?  The Court is in recess.

17                    (Ends, 12:30 p.m.)

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4

5           I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

6     do hereby certify that the foregoing record is a true

7     and accurate transcription of my stenographic notes

8     before Chief Judge Mark L. Wolf, on Friday, April 16,

9     2010, to the best of my skill and ability.

10

11

12

13

14    /s/ Richard H. Romanow 4-22-10

15    RICHARD H. ROMANOW   Date

16

17

18

19

20

21

22

23

24

25