1               UNITED STATES DISTRICT COURT

2                 DISTRICT OF MASSACHUSETTS

3                            No. 1:08-cv-10663-MLW

4

5
   GIOVANI DEPIANTI, and all others similarly situated,
6              Plaintiffs

7
   vs.
8

9
   JAN-PRO FRANCHISING INTERNATIONAL, INC.,
10             Defendant

11

12                      * * * * * * * *

13

14                   For Hearing Before:
                   Chief Judge Mark L. Wolf
15

16                     Motion Hearing

17
                   United States District Court
18                 District of Massachusetts (Boston)
                   One Courthouse Way
19                 Boston, Massachusetts 02210
                   Tuesday, April 24, 2012
20

21                      * * * * * * * *

22            REPORTER: RICHARD H. ROMANOW, RPR
                    Official Court Reporter
23               United States District Court
         One Courthouse Way, Room 5200, Boston, MA 02210
24                 bulldog@richromanow.com

25

```
 1                  A P P E A R A N C E S

 2

 3    SHANNON E. LISS-RIORDAN, ESQ.
      STEPHEN S. CHURCHILL, ESQ.
 4        Lichten & Liss-Riordan, P.C.
          100 Cambridge Street, 20th Floor
 5        Boston, Massachusetts 02114
          (617) 994-5800
 6        Email: Sliss@llrlaw.com
          For the plaintiffs
 7

 8    JEFFREY M. ROSIN, ESQ.
          Constangy, Brooks & Smith, LLP
 9        535 Boylston Street, Suite 902
          Boston, Massachusetts 02116
10        (617) 849-7882
          Email: Jrosin@constangy.com
11        For the Defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S
 2         (Begins, 3:00 p.m.)
 3         THE CLERK:  This is 08cv10663, Giovani
 4   Depianti versus Jan-Pro Franchising International, Inc.
 5   The Court is in session.  You may be seated.
 6         THE COURT:  Good afternoon.  Would counsel
 7   please identify themselves for the Court and for the
 8   record.
 9         MS. LISS-RIORDAN:  Good afternoon, your
10   Honor.  For the plaintiffs, I'm Shannon Liss-Riordan.
11         MR. CHURCHILL:  And, your Honor, also for the
12   plaintiffs, Stephen Churchill.
13         MR. ROSIN:  Good afternoon, your Honor.
14   Jeffrey Rosin for the defendant.
15         THE COURT:  All right.
16      We're here in connection with my September --
17   September 9, 2011 order in which I expressed my
18   intention, although not asked by the parties, to certify
19   two questions to the Supreme Judicial Court because they
20   address issues the SJC haven't -- hasn't decided, the
21   guidance could determine the case, and also have a
22   substantial influence on business in Massachusetts.  So
23   I felt certification was permissible under SJC Rule 103,
24   in the standards, and in *Gage*, what I discussed last
25   year in *Turner,* and the law, as I discussed it in *Turner*
```

```
 1   at 214 is also included that a Court can certify
 2   questions even if no party asks.
 3        I don't know if the defendant is still contending
 4   that as a result of the Georgia litigation, um, certain
 5   issues have been decided and are res judicata.  As I
 6   understand it, an appeal was taken from the Georgia
 7   Appeals Court -- well, not an appeal, there was a
 8   petition for review to the Georgia Supreme Court.  My
 9   understanding is that that has the effect of suspending
10   their judgment, and since there's no final judgment,
11   there's not res judicata under Georgia law.  That's
12   discussed in part in *CS Lakeview*, 268 Georgia Appeals
13   Court 480 at 483.
14        What is the defendant's position on that?
15             MR. ROSIN:  Um, you are correct, your Honor,
16   that we do not view, in light of that stay, of res
17   judicata being an issue.  However, we would reserve on
18   this one point.  Your Honor has proposed to certify two
19   questions, one of which, we believe, was your Honor's
20   intention to go to Counts 1 and 4 and your Honor can --
21             THE COURT:  No, and actually I was just going
22   to clarify that.  The first question does relate only to
23   Counts 1 and 4, the Chapter 93A and misrepresentation
24   claims, because those are two of the vicarious liability
25   claims.  I didn't intend that Question 1 would apply to
```

```
 1    Counts 2 and 3.
 2              MR. ROSIN:  Okay.
 3              THE COURT:  So we're on the same page on that,
 4    too?
 5              MR. ROSIN:  Yes, your Honor.  Thank you.  And
 6    then I'm hopefully going to convince you today, and
 7    we'll see, as to whether you certify any questions on
 8    Counts 2 and 3, and then if you don't certify questions
 9    on Counts 2 and 3, that will impact the Georgia Supreme
10    Court's basis for staying their action and we would then
11    come back with a res judicata argument.
12         So that's what I wanted to just bring up.
13              THE COURT:  All right.  But, as I understand
14    it from your submissions, nobody wishes to try to
15    persuade me not to certify the first question I propose
16    to certify that relates to Counts 1 and 4, um, and
17    that's the question of whether JPI can be held liable to
18    Depianti under Mass. General Law, Chapter 149, Section
19    148(b)(A)(i), where JPI is not -- I'm sorry.  Excuse
20    me.
21         That's your first question?
22              MR. ROSIN:  Yes, your Honor.
23              THE COURT:  Let me -- the question's in my --
24    well, excuse me.
25         The first question I propose to certify --
```

1   although I think the defendant might like it stated

2   somewhat differently, is "Whether and how you apply the

3   right-to-control test for vicarious liability to the

4   franchisor-franchisee relationship?"  And in *Coworx,* the

5   Superior Court recognized that the appeals court and the

6   SJC hadn't addressed this.  And, say, in *Kerl,* the

7   Wisconsin Supreme Court decision discussed in *Coworx,* is

8   -- you know, there's considerable discussion about the

9   way other jurisdictions, other states, um, have departed

10  from the usual standards, the usual right-to-control

11  test to determine vicarious liability in a case

12  involving the franchisor or franchisee.

13       So, I mean, is it fair to say that both the

14  plaintiff and the defendant are agreeable to a question

15  raising that issue, putting aside, at the moment, how

16  it's phrased?

17            MR. ROSIN:  I understand that the plaintiffs

18  are, your Honor, and we are as well with one point I

19  wanted to mention, coming in today, and we've briefed

20  this as well.

21       Um, Depianti, the one Massachusetts plaintiff --

22  and the reason for asking this question, um, has

23  articulated what is the harm that he's alleging and, as

24  you know, in *Kerl*, in *Coworx*, we have to look at what

25  the instrumentality of that harm was and we have to look

1    at what the right to control the instrumentality of that

2    harm or the actual control of that instrumentality of

3    harm.  And what I wanted to say was if we are certifying

4    that question to the SJC, we should be clear about the

5    rights to control that we're talking about because we

6    have JPI's contract, the master franchisee, Bradley

7    Marketing, or BME, and then we have Bradley's contract

8    with Depianti.  And so I would simply ask for that --

9    for something in there to clarify that issue, um, to be

10   sure that we are, um, naming the right contract.

11        There has been a lot of briefing from plaintiffs

12   where they name rights to control, but they're naming

13   Bradley's rights to control Depianti.  Um, that was the

14   one point I wanted to make there.

15             THE COURT:  And is that the point addressed in

16   your proposed first question?

17             MR. ROSIN:  It's not, your Honor.  Um, we --

18   in fact, we made a submission where I said, "We don't

19   object to Questions 1 and 4 to the extent they deal

20   with" -- I'm sorry.  "To Question 1 to the extent it

21   deals with Counts 1 and 4."  So your Honor is correct

22   there.  But I would like to at least point out which

23   rights of control and which contract we're dealing with

24   here.

25             THE COURT:  It's my intention to go out of

1    here today and finally move this thing along.  If I

2    don't have the language you're proposing, I'm likely

3    just to go to the question I put to you.

4                MR. ROSIN:  Okay.  Well, I was simply --

5                THE COURT:  But I would think the SJC's going

6    to answer this.  You know, you would have an opportunity

7    to, you know, present that issue or --

8                MR. ROSIN:  We also raised summary judgment

9    defenses to whether there could even be liability under

10   Counts 1 and 4 and your Honor obviously had an

11   opportunity to read those.

12               THE COURT:  Yeah, they didn't persuade me that

13   I shouldn't certify the question.  If I could dispose of

14   this more quickly -- if I felt I could dispose of this

15   more quickly and easily, then I would.

16               MR. ROSIN:  Well, I would recommend then just

17   to raise at the end.  "Whether and how to apply the

18   right-to-control test for vicarious liability to the

19   franchisor-franchisee relationship" --

20               THE COURT:  Here, start again, slowly and

21   clearly.

22               MR. ROSIN:  Okay.  The first question you

23   propose is worded exactly as follows and then I'm going

24   to propose a phrase at the end.  Okay?  Your question,

25   your Honor, is:  "Whether and how to apply the right-to-

1   control test for vicarious liability to the franchisor-

2   franchisee relationship?"  Whereas here the rights to

3   control are in a contract between, um -- the rights to

4   control of concern are in the contract between JPI and

5   Bradley Marketing, or the master franchisor and the

6   regional master franchisee.

7            (Pause.)

8            THE COURT:  All right.  And what does the

9   plaintiff have to say about that?

10           MS. LISS-RIORDAN:  Your Honor, we don't have

11  any objection to the way you propose Question 1.  Um, it

12  may not be exactly the way I would have chosen to phrase

13  it, but I think it gets across the point that you were

14  trying to get across.

15      I think the suggestion that the defendant is

16  making is just too case-specific for a certification to

17  the SJC.  They can make the arguments there about --

18  there's a contract or that contract has a purpose, but

19  the certification is to get a ruling of law that may be

20  applicable as a more general proposition.

21      Um, so I'm fine with Question 1.  I'm not, in

22  saying that, conceding anything that I think that is --

23  that I agree that is the pivotal or the most important

24  question, I'm just fine with it in light of your

25  concerns.

1          I think the, um -- the primary issues in the case,

2     particularly regarding the Massachusetts claims here,

3     are the wage claims.  So I feel like your Question 1, if

4     you're limiting it to Counts 1 and 4, are sort of

5     peripheral, um, I see the major issue to be addressed.

6     And then if we go to Question 2, which --

7               THE COURT:  You know, you just -- the only

8     thing I want to say is I'm sure we're going to see each

9     other again and, you know, if you raise -- you know, if

10    you raise every conceivable theory and are not careful

11    about how you plead it and argue it and sort it through,

12    it delays the progress of the case.  You know, you might

13    in the future want to think about, you know, taking a

14    clearer and cleaner shot at the things you're really

15    interested in.  Go ahead.

16               MS. LISS-RIORDAN:  I agree completely, your

17    Honor.

18          When this case was originally filed, four years

19    ago, the law had not developed as -- in the direction it

20    has developed since, and we might have put it

21    differently, what we are filing today.  But back then it

22    was still wide open what our primary --

23               THE COURT:  Well, do you want to dismiss

24    Counts 1 and 4?

25               MS. LISS-RIORDAN:  No, I don't want to dismiss

1    them, I want to --

2              THE COURT:  In fact, I think this is an issue

3    that's capable of recurring.

4              MS. LISS-RIORDAN:  Yes.

5              THE COURT:  So, I mean, I think if it's in

6    this case, it's really a paradigm for certification.

7              MS. LISS-RIORDAN:  I agree.

8              THE COURT:  All right.  So --

9              MR. ROSIN:  If I might, your Honor?  Just

10   quickly.

11        We've spent a lot of pages briefing for this court

12   and I don't want to do the same at the SJC.  When they

13   start to refer to "rights to control," they're referring

14   to the wrong contract, and it's a bit maddening.

15        So I'm just hoping for that extra clarification in

16   here, not to be case specific, but to avoid having to

17   spend pages of my brief for the SJC distinguishing the

18   two contracts and directing the SJC back and forth

19   between two contracts.

20             THE COURT:  Well, part of the reason, I think

21   -- and I have to go back, I've done many things since I

22   issued the order in September, is that I stated this

23   level of generality, um, is that -- I mean, there are

24   two contracts, one between BME, I think it is, and

25   Depianti, and one between BME and Jan-Pro, right?

```
1              MR. ROSIN:  Right.  But the typical
2     franchisor-franchisee scenario where this vicarious
3     liability comes up, you've got one franchisor and one
4     franchisee and then a third party who's hurt, say a slip
5     and fall at McDonald's College, and the question is
6     whether the franchisor is vicariously liable for that,
7     like a bad hamburger or something like that?  Here we've
8     got two contracts, so it's not that typical analysis.
9          So when we're talking about a franchisee here,
10    there's two entities that fall in that definition,
11    there's the regional master franchisee, who's the
12    franchisee vis-vis JPI International, and then there's
13    the unit franchisee, who's the franchisee vis-vis the
14    master, not vis-vis JPI.
15             THE COURT:  Well, I intend to write something
16    that leads up to the questions --
17             MR. ROSIN:  Okay.
18             THE COURT:  -- and that may address your
19    concern.  It's similar to -- because this isn't the
20    issue of somebody falling down at Burger King.  But I
21    think that may help you.
22             MR. ROSIN:  Thank you, your Honor.
23             THE COURT:  Without too narrowly framing the
24    actual question that I'm certifying.
25          All right.  The second question I propose to
```

certify relates to Counts 2 and 3.  "Whether a defendant may be liable for an employee misclassification under MGL Chapter 149, Section 148(b) where there was no contract for service between the plaintiff and the defendant?"

All right.  The statute seems, on its face, to contemplate there would be a contract between the two parties, but the Attorney General's advisory seems to contemplate circumstances where there could be liability under the statute without a contract.  So I think that's what I'm trying to get guidance on.

And I suppose if the answer from the SJC was, "Yes, there can be liability under the statute in the absence of a contract between, in this case, Depianti and Jan-Pro," I would hope the SJC would tell me in what circumstances or what facts would have to be proven to establish liability.  I'm thinking of maybe adding that to the question.

I think the defendant's proposed Question 1 covers the same ground and would, at the moment, it appears to be the less neutral way.

But do you want to be heard on this?

MR. ROSIN:  Well, thank you, your Honor.  I actually want to be heard on a threshold issue first and that is the failure to exhaust administrative remedies

1    by Depianti, the failure to first file his complaint of

2    wage claims with the Attorney General's office first,

3    which is an absolute bar to him bringing a claim in

4    court.

5         We raised this on summary judgment.  It's also in

6    our -- Page 5 of our response to your Honor's proposed

7    questions.  And it's of concern because one of the first

8    things we would say to the SJC would be, you know, that

9    this case is actually -- this question, while it may be

10   helpful to the Commonwealth and other cases, it's not

11   going to be helpful here.  We have only one

12   Massachusetts plaintiff, and without having made that

13   filing, that is a fundamental flaw in him bringing a

14   wage act claim at all.

15        And so when we talk about --

16             THE COURT:  And you made this argument in your

17   summary judgment, um --

18             MR. ROSIN:  Your Honor, we -- it's on Page 13

19   of Docket Entry 66.

20             THE COURT:  And 66 was what?

21             MR. ROSIN:  That was our memorandum in support

22   of our motion for summary judgment.  It's Footnote 19, I

23   believe.

24        Um, well, your Honor, we had 20 pages for 7

25   plaintiffs and --

```
 1              THE COURT:  Well, I usually give you -- when
 2   I'm asked, I usually give --
 3              MR. ROSIN:  Well, we tried to stay brief, but
 4   we raised the argument there.
 5              THE COURT:  Well, I know, you stayed brief,
 6   but --
 7              MR. ROSIN:  We raised the argument there and
 8   it's repeated in our response to your Honor's proposed
 9   questions.
10              (Pause.)
11              MR. ROSIN:  And Depianti was silent in
12   response.  He ignored it.
13              MS. LISS-RIORDAN:  Your Honor --
14              THE COURT:  Hold on just a second.  What did
15   you say, Footnote 19?
16              MR. ROSIN:  That's correct, your Honor.  I
17   think it's Page 13, or vice-versa, Page 19, Footnote
18   13.  I forget which one is the 19 and which one is the
19   13.
20              (Pause.)
21              THE COURT:  Where is it in your response?
22              MR. ROSIN:  My feeling is that they ignored
23   it, but perhaps I'm wrong.  Perhaps your clerk can --
24              THE COURT:  No, where is it in your response?
25              MR. ROSIN:  Oh, it's on Page 5, um --
```

1          MS. LISS-RIORDAN:  I believe it's in the

2    reply.

3          MR. ROSIN:  No, it's Page 5, the second full

4    paragraph.

5          (Pause.)

6          THE COURT:  Okay, I've got it.

7          (Turns.)

8          THE COURT:  Did this come up at the argument?

9    Now it's two years ago.  I don't remember it.

10          MR. ROSIN:  We spent a lot of time addressing

11    whether Depianti met the three prongs of the test and my

12    sister focused on the second prong.  We spent a lot of

13    discussion time on that.

14          THE COURT:  Well, Ms. Liss-Riordan, what do

15    you say about this?

16          MS. LISS-RIORDAN:  Your Honor, this is

17    something that has -- it's four years after the case was

18    filed.  It's two years after that argument.  It was not

19    talked about in that argument.  They mention it in a

20    footnote in summary judgment, which I believe has

21    something like 60 pages of facts, and it was about this

22    thick of briefing.  It didn't come in the argument.  It

23    wasn't something they're pressing.  They brought it up

24    now, they're pressing it now, but four years later.

25          But they never actually -- they never raised it

1 back then in a document request.  They never actually

2 put on proof that we didn't exhaust the remedies.  They

3 never even requested in discovery proof of the Attorney

4 General's right to -- well, they just put it in a

5 footnote in summary judgment.  I believe you, yourself,

6 have ruled that arguments in a footnote are not properly

7 before the Court.

8     THE COURT:  Oh, remind me of where I've done

9 that.

10     MS. LISS-RIORDAN:  ***Strahan vs. Roughead***, 2010

11 Westlaw 4827880.

12     THE COURT:  What's the date of that one?

13     MS. LISS-RIORDAN:  Um, November 22nd, 2010.

14     THE COURT:  And what page?

15     MS. LISS-RIORDAN:  5.  Footnote 5.  Page 5,

16 Footnote 5.

17     (Pause.)

18     MS. LISS-RIORDAN:  And this is after, "Having

19 consulted, it's a little late to be raising this issue."

20   Had they raised it two years ago, we might have

21 been in a better position to respond to it.  We'd had an

22 office move since then.  It is our ordinary course to

23 request these right-to-sue letters from the Attorney

24 General's Office.  Um, we changed firms several years

25 ago.  I apologize that our files are not in the greatest

1    order.

2          We've attempted to locate it.  I'm putting before

3    the Court that I do not -- I cannot recall specifically

4    in this case whether we did or not, but it's just our

5    usual practice to do so.

6          In any event, since they raised it again several

7    months ago, um, we have, in an abundance of caution,

8    obtained a right-to-sue letter from the Attorney

9    General's Office.  There's case law under Title VII that

10   it is possible to cure, even if it wasn't requested

11   earlier.

12         I have a case I can cite to you, *Federal vs. AARP*,

13   770 F. Supp. 2d 118, at 126.  District of D.C., 2011.

14              THE COURT:  What's the cite again?

15              MS. LISS-RIORDAN:  It's 770 F. Supp. 2d 118,

16   at 126, which also cites other case law to the same

17   effect.

18         So, again, had they asked for it in discovery a

19   couple of years ago, had they passed on it in summary

20   judgment other than a footnote where we had multiple,

21   multiple pages of things to respond to, we might have

22   been in a better position to, um, ascertain an

23   absolutely certain answer to that question.  But as it

24   stands right now --

25              THE COURT:  Yeah, I would think the Attorney

1   General would have a copy, if it existed.  But I'm

2   interested in going forward and not going backwards in

3   this case.  Well, I'll think about it.

4           MR. ROSIN:  Your Honor, the idea that we

5   didn't raise it before the Court is contrary to what we

6   put in response to your Honor's order referencing back

7   our summary judgment papers, and if Ms. Liss-Riordan was

8   attempting to obtain a right-to-sue letter or to cure

9   after the fact, we've had no correspondence on that.  It

10  is a plaintiffs' obligation to do that before filing

11  suit.  And if you can cure it after the fact, let's find

12  out when they tried to cure it.  Let's find out what --

13  I haven't even seen a copy of its right-to-sue letter.

14  Despite all these papers being before your Honor and

15  despite us having your Honor's order to appear here

16  today, for a couple of weeks, I haven't received

17  anything from Ms. Liss-Riordan's office about the

18  Attorney General's right-to-sue letter.

19          So, I mean, we're talking about, you know, their

20  failure to do this is, in fact, perhaps an issue the SJC

21  should weigh in on as well.  There may not be clear

22  guidance on that issue.  I don't know if they cite any

23  SJC cases, whether they can later cure that issue, but

24  it's a serious issue.

25          And I don't recall when Ms. Liss-Riordan's office

1   move was, but certainly when a party says, in summary

2   judgment, that you haven't exhausted your administrative

3   remedies, whether it's in the text of it or in a

4   footnote, it's something that you should immediately

5   show that you've exhausted, because it's a threshold

6   defense and it could result in the dismissal of your

7   case.

8          And so there's been a long time for Ms. Liss-

9   Riordan to come forth with that proof.  We've briefed

10  this issue and filed those papers, on summary judgment,

11  back in October of '09, I believe.

12              (Pause.)

13              MR. ROSIN:  When it comes to discovery, your

14  Honor, this is -- because this is a threshold defense

15  and because it's the plaintiff's burden to prove that

16  they've exhausted their administrative remedies, you

17  don't necessarily tip off to them that they haven't done

18  their case correctly, and if they've made an error

19  here --

20              THE COURT:  I believe you could have saved a

21  lot of time.  I mean, if this is a valid defense -- I

22  mean, I haven't focused on this.  I mean, if they have

23  an obligation and it's jurisdictional, you know, to go

24  to the Attorney General first and they didn't, you know,

25  if there's no evidence that they -- if there's no

1  evidence that they did, you know, I would have decided

2  this orally two years ago.

3          MR. ROSIN:  Well, that's correct, your Honor,

4  but then you're still within a period of time where he

5  could go back and cure this issue and refile against

6  you.  We don't want that to happen.

7          THE COURT:  Well, as far as I'm concerned, the

8  law is not a game to say "Got-you."

9          MR. ROSIN:  Well, your Honor, there's -- you

10  know, aspects of this case have been very gamey on the

11  plaintiffs' side.  Mr. Depianti is only one person in

12  Massachusetts who thinks the Jan-Pro system is wrong,

13  and that's a game in and of itself, when he advances a

14  class action.

15          THE COURT:  Well, I'll think about this,

16  because I think about everything, but, um, you know, I

17  mean, I've looked at this footnote, um --

18          (Pause.)

19          MR. ROSIN:  If you recall, your Honor, also,

20  when we came to you -- before our oral argument on

21  summary judgment, you did express your preliminary view

22  that he didn't have a claim under the statute itself,

23  and so we kind of went off of that when we were doing

24  the entire oral argument.  To be faulted for not raising

25  the argument that was in our brief at the time there

1   would be prejudicial to the defendant.

2          THE COURT:  Well, the footnote says -- well,

3   here's the Footnote 19.  I mean, I -- I had a brilliant

4   law clerk assist me to get ready for the motion for

5   summary judgment and he's gone, but I have his bench

6   memo and that's 97 pages long.  But I don't believe it

7   addresses this issue.  And there's not much he and I,

8   you know, didn't try to figure out that you briefed.

9   But here's the footnote.

10         It says:  "To the extent Counts 2 and 3 are even

11  viable causes of action for Depianti, they're

12  substantially barred by the applicable three-year

13  statutes of limitations of MGL Chapter 148, Section 150,

14  since he has now been performing cleaning work since

15  September of 2007."  And it cites certain statements of

16  fact paragraphs.  "Depianti was also supposed to first

17  file his claim with the Massachusetts Attorney General

18  and at this point Depianti has not come forward with any

19  evidence that he did so."  I mean, there's not even any

20  cite for me to a statute that --

21         MR. ROSIN:  Well, that's the same statute,

22  your Honor, it's Section 150.

23         THE COURT:  Well, it doesn't tell me that.  It

24  could be any statute.

25         MR. ROSIN:  Well, it's the same statute in the

1  footnote, Section 150.

2      And, your Honor, we're dealing with experienced

3  wage-and-hour counsel, very experienced wage-and-hour

4  counsel.  And, in general, if you sit in my shoes you

5  would think that they typically file at the Attorney

6  General's Office first, and they must have done this,

7  because they didn't overlook it, but that they've failed

8  to produce it so far.  And so therefore as soon as I

9  write this in a brief I'm just going to be wasting pages

10  because they're going to come back and say, "Of course

11  we filed this," and so that's what you do when you're in

12  this position and you're writing for ten plaintiffs in

13  twenty pages.  But we raised it right here in response

14  to your Honor's order, right back -- well, right away,

15  right back last year.

16          (Pause.)

17          THE COURT:  But even here, on Page 5:  "The

18  Court-proposed Question 1 is also improper for similar

19  reasons set forth in Note 2 supra" --

20          MR. ROSIN:  As to why there's threshold

21  reasons why claims could be dismissed before

22  certification.

23          THE COURT:  All right.  But you're really

24  talking about Question 2 here, because I clarified it.

25  But this would only apply to Counts 2 and 3, right?

```
 1              MR. ROSIN:  That's correct.
 2              THE COURT:  It says:  "Depianti's claims are
 3   time barred as well as barred for failure to
 4   administratively exhaust his claim under the MICS and
 5   Depianti has not come forth with proof that he did.  See
 6   Docket Entry 66 and 13."
 7          That's the footnote I just read, correct?
 8              MR. ROSIN:  That's correct, your Honor.
 9              THE COURT:  It still doesn't cite a statute
10   for the requirement that the administrative claim --
11   that the claim be administratively exhausted.
12              MR. ROSIN:  It doesn't in that note, your
13   Honor, I know.
14              THE COURT:  Well, you should have said "ID,"
15   "I-D" or something.
16              (Pause.)
17              THE COURT:  Is that provision jurisdictional
18   in your view?
19              MR. ROSIN:  Yes, your Honor.  Judge Gertner
20   recently dismissed claims of class plaintiffs on August
21   28th, 2011 in **North Sea vs. Cambridge Health Alliance**
22   because they failed to come forth with proof that they
23   administratively --
24              THE COURT:  Well, I don't know why you're all
25   telling me about cases, for the first time, when we come
```

1    in here?  I don't think I gave you a page limit on

2    this.  I would study all of this in advance.  I mean,

3    I've just put down something particularly consequential

4    to try to get this out the door.

5              MR. ROSIN:  Well, we put it also in our reply

6    brief, your Honor, with a lot of cites including with

7    our --

8              THE COURT:  In which brief?

9              MR. ROSIN:  In our reply brief on the motion

10   that we're currently here to argue.

11             THE COURT:  It is?  That's --

12             MR. ROSIN:  It's on page, um -- we cited the

13   **North Sea** case.  It is on --

14             THE COURT:  The reply brief?  What's the

15   docket number of the reply brief?

16             MR. ROSIN:  Okay.  It's Docket Entry 129,

17   Pages 1 to 2.

18             (Reads.)

19             THE COURT:  Do you want to speak to this?

20             MS. LISS-RIORDAN:  Yes.  Again, your Honor,

21   just to really repeat and reemphasize what I had said

22   before.  It was in a footnote in a motion that was very

23   lengthy, as you recall, with attachments like this and

24   your law clerk's 90-something-page bench memo, he didn't

25   pick up on it.  Obviously it wasn't something they were

```
 1    pressing.
 2         It wasn't -- we weren't -- we weren't put in a
 3    position to ever -- of being asked to provide it, not in
 4    discovery.  One reference to that, a citation in a
 5    footnote, should not be a "got-you" to get us two years
 6    later.  They raised it -- they didn't even really raise
 7    it, I think, in their response to the Court's September
 8    order.  They raised it, really for the first time, in
 9    their reply to -- in their reply brief following the
10    Court's September order.
11         We may have gotten that right-to-sue letter.  We
12    may not have.  I just can't honestly tell you today
13    whether or not -- I don't have it before me today, but I
14    just can tell you it's our office's usual practice to
15    get them, and in an abundance of caution, we obtained
16    one recently.  We have case law saying that you can do
17    that.
18         This really would be trial by ambush to derail
19    this now, all these years later.  We weren't put in the
20    position of having to come forward with it back when we
21    would have been in a better position to do it.
22              THE COURT:  Here, I'm going to give you until
23    noon on Thursday -- and I have a reason for the
24    schedule, you know, to submit something as to (A) why it
25    hasn't been properly raised, but more importantly as to
```

1  jurisdiction.  In other words, if I have -- if it's

2  jurisdictional, I wouldn't have any discretion.  Um,

3  generally speaking, if something affects the Court's

4  jurisdiction, um, it can be raised at any time in the

5  proceeding, and if I lack the authority to decide an

6  issue, I have to recognize that.

7       Now, some things, you know, certain Title VII

8  claims or discrimination claims are supposed to be

9  brought, you know, within 180 days, under certain

10  circumstances, but it's not, as I recall,

11  jurisdictional.  If there's some good reason, it can be

12  waived.

13       But -- so the question is, "Is this

14  jurisdictional?"  You can both brief it by noon on

15  Thursday, "Is it jurisdictional?"  Okay?

16       And this concept -- because it's true.  You cited

17  **Strahan**, but I've written the same thing more recently,

18  but I don't remember where.

19       But, you know, the First Circuit has (A) you know,

20  a lot of authority, and, you know, if somebody raised an

21  argument for the first time in a reply brief, they're

22  not going to decide it.  And I understand that you say

23  you didn't raise it for the first time in the reply

24  brief, that you raised it in a footnote, um, and I have

25  to go back and read all 97 pages.  I did pick it up, but

1     I just didn't focus on it for today.  Because I'll have

2     to think about it.

3          You know, this court and the SJC decide actual

4     cases and controversies and as valuable as it might be

5     generally to have guidance, if it's not material to the

6     outcome of this case, then I can't properly certify the

7     question.  So one more thing to deal with.

8          What else?

9               MR. ROSIN:  Your Honor, we raise a number of

10    other points about the questions relevant to Counts 2

11    and 3.

12         One of the ones that we haven't talked about yet

13    today is Prong 2 of the independent contractor statute.

14    Your Honor asked for guidance that would help your Honor

15    decide Question 1, if you need to decide that question.

16    But Question 2 we have no guidance from the SJC on

17    either, on Prong 2, which is Jan-Pro Franchising

18    International in the same and usual course of business

19    as Depianti.

20              THE COURT:  Well, you see, that seems to me to

21    be a factual question.  You want me to -- if I

22    understand it right, what you're saying is that Jan-Pro

23    International is in the business of selling franchises

24    and Depianti is in the business of cleaning offices so

25    Prong 2's not met.  Is that the issue?

1          MR. ROSIN:  That's correct.

2          THE COURT:  Well, I don't see how the SJC's

3     going to help me on that?

4          MR. ROSIN:  Okay.  I just wanted to raise it

5     --

6          THE COURT:  Well, that seemed to me, you know

7     -- and I'm just thinking.  It's not the only thing I'm

8     doing today and when I issued the decision.  Um, I've

9     also been working on -- and you'll probably see it in

10    the newspapers, and say, "Oh, that's what he was talking

11    about."  But, um -- so I want to make sure I understand

12    the question.

13         But based on the amount of thought I've given it,

14    that strikes me as a factual issue, you know, "What's

15    the business of JPI?"  They say they're in the business

16    of selling franchises, but is this all, you know, a sort

17    of a ruse to insulate themselves from this kind of

18    liability, that they're really in the cleaning

19    business?  So that's my -- well, how do the parties

20    respond to that?

21         MR. ROSIN:  Well, the parties have motions for

22    summary judgment on that issue.  Um, my sister's

23    argument is that they're in the same line of business,

24    um, as a matter of law based on the precedent of these

25    other cases that we say aren't like our case.  Um, and

```
 1    we say there are factual, um, nondisputes -- undisputed

 2    facts between the parties that make it so that it should

 3    be ruled in our favor.  And I defer to your Honor's

 4    discretion on that.

 5              THE COURT:  Yeah -- though, when I issued my

 6    order in September, I felt that, you know, the guidance

 7    on the issue as I've articulated it, um, you know, would

 8    be helpful and maybe dispositive because if there's --

 9    you know, if there's no contract between DPI -- because

10    -- as there is no contract between Depianti and Jan-Pro,

11    the SJC says the Attorney General's wrong, there always

12    has to be a contract between the parties, then whether

13    they're in the same business or not is irrelevant, isn't

14    it?

15              MR. ROSIN:  You have to prove -- it's your

16    burden as a so-called "employer" to prove each prong.

17              THE COURT:  Oh, the employer has to prove each

18    prong?

19              MR. ROSIN:  Right.  So my sister's argument is

20    that you don't even need to look at Prongs 1 and 3, you

21    can just rule on Prong 2 alone.

22         So when your Honor mentioned -- and this is the

23    other point on that first question, that question your

24    Honor proposed, your second question about the one

25    relevant to Counts 2 and 3, and you say there's no
```

```
 1   contract between them.
 2        Um, are you referring to a written contract, an
 3   oral contract, an implied contract, or you're assuming
 4   the word to, um, encompass all?
 5             THE COURT:  I'm asking -- I think -- look, you
 6   tell me.  But I think it's your contention that there's
 7   no contract of any kind.
 8             MR. ROSIN:  That's correct.  That's correct.
 9   And the question would be "Do you need to have a
10   contract of some kind, um, whether it be express,
11   implied, oral or written, in order to be" --
12             THE COURT:  Well, I don't know that it could
13   be an implied contract.  I mean, I don't know what an
14   "implied contract" is, at the moment.
15             MR. ROSIN:  Sometimes parties argue that a
16   handbook is an implied contract.  That's the example
17   that readily comes to mind.
18             THE COURT:  I see.
19        So you would like me to add what?
20             MR. ROSIN:  Well, we proposed a second
21   question, um, but if your Honor does not think it would
22   be helpful to your resolution of the case, then we would
23   withdraw that.
24             THE COURT:  Well, but it -- you don't have to
25   withdraw anything.
```

```
 1          So the question you're talking about would be a

 2     third question from me?

 3               MR. ROSIN:  Well, I would assume you would --

 4     well, yes, your Honor, that's correct.

 5               THE COURT:  It's in addition to the two

 6     questions, if I still ask those two questions.  "Can JPI

 7     be held liable to Depianti under Chapter 148(b)(A)(ii)

 8     where JPI's business does not consist of cleaning

 9     customer accounts while Depianti's business does consist

10     of cleaning customer accounts?"

11          I might take out "where" for this purpose, if I

12     went with this, and put "if," in other words, because I

13     haven't made that factual determination.  But that's why

14     you want it because it goes to the --

15               MR. ROSIN:  The second prong.

16               (Pause.)

17               THE COURT:  And you have to prove all three,

18     right?

19               MR. ROSIN:  That's correct.

20               (Pause.)

21               THE COURT:  Is there a reason, if I'm sending

22     questions over, that I shouldn't send that one, too?

23               MS. LISS-RIORDAN:  Well, again, it just seems

24     pretty case-specific to me here.  They're going to make

25     the argument that JPI does something different than what
```

1    Depianti does.  Obviously we contend they do the same

2    thing.

3          You know, just the way a traditional cleaning

4    company that uses employees has managers in the office

5    who set the policies and get the customers and then

6    cleaners out in the field doing the work, that's the

7    same relationship that JPI has with cleaners like

8    Depianti.  So I'm just not -- that just seemed like a

9    rather fact-laden question to send to the SJC.

10         But, um -- the reason I was going to say that I

11   especially do think your Question 2 that you propose is

12   especially pertinent and would be a very good thing to

13   certify to the SJC is because I think it's relevant to

14   the arguments the defendant's making in this case, so it

15   would be helpful to this case.

16         It also addresses a broader issue that is arising

17   on -- well, very frequently in this area of law from

18   which we could all benefit from an SJC ruling on, which

19   is that even outside this so-called "franchisor-

20   franchisee situation" and in a lot of wage-an-hour cases

21   you see the bigger parent company, um, disclaiming an

22   employment relationship with the workers actually doing

23   the work because they have some sort of intermediary

24   structure that actually contracts with the workers and

25   we're seeing it all over the place in wage-and-hour law,

1    and it would be very helpful to get a ruling on that.

2              THE COURT:  Yeah, I -- I mean, the

3    requirements to certify under SJC Rule 1, Note 3, you

4    know, are that -- essentially it has to be undecided and

5    it has to be important in this particular case.  But

6    part of -- but that's discretionary with me, and part of

7    what influenced me was it's important -- I perceive

8    these questions to be important in this case and also

9    genuinely important.  But, as I said, I have to have

10   jurisdiction and I have to have a live case or

11   controversy and I don't think I can impose on the SJC to

12   what would not be a question important to deciding this

13   case as well as important to other possible cases.

14             MR. ROSIN:  Your Honor --

15             THE COURT:  Well, let me finish.  So that's

16   why I want you to do this briefing.  And my schedule is

17   such that it's important that I get it and get a chance

18   to look at it this week.  And so -- I mean, I don't want

19   to be unreasonable and turn you inside out, but there

20   are essentially discrete questions, some of which you've

21   each already looked at, you just haven't conferred about

22   them.  I mean, did I give you a reasonable schedule?

23             MR. ROSIN:  Yes, your Honor.

24             THE COURT:  Okay.  Yes?  I don't want you to

25   stay up all night for two nights looking for this.  I

1    think you can do this.  And that would be helpful to me

2    to get it this week.  Go ahead.

3              MR. ROSIN:  Thank you.

4         The one point I wanted to mention is that where

5    there's these other relationships the AG's advisory

6    says, "Look, don't go setting up sham entities and sham

7    situations to evade the wage-hour law," and while those

8    questions might be important in those contexts and

9    consistent with the AG's advisory, what I think is

10   undisputed here, and your Honor commented on yourself,

11   is that Bradley Marketing, JPI's regional master

12   franchisee, is not a sham entity, there's not evidence

13   to say that they're a sham and that you pierced the

14   corporate veil here.  And we briefed that extensively as

15   well.

16             THE COURT:  But that's --

17             MR. ROSIN:  So I wanted to make that point

18   while we're talking about whether this question will

19   have a broader impact, we should always keep in mind

20   what the SJC could say that is totally irrelevant to

21   this case.  And so we've tried to reframe the question

22   to avoid that.

23        We put in the point about joint employment.  Um,

24   we've rephrased them, maybe talked about the contract

25   and we added in "for performance of service."  You know,

we tried to add a few words to contemplate that.  That's

what our proposed Question 1, or an amendment to your

Question 2, would do.  We don't want to have the SJC

answer a question that isn't helpful here.

THE COURT:  All right.

MS. LISS-RIORDAN:  Your Honor, if I could just

address briefly the language the defendants were

opposing that there is no joint employment claim against

JPI.

I went back and looked over our summary judgment

briefing.  We have joint employment arguments throughout

our summary judgment briefing.  We cited the *Zeng* case.

We cited the *Bay State* case.  We have a lot of briefing

on that.  They relied -- the defendants relied on one

snippet of something I said in the oral argument in

April of 2010 in which I said, "We don't need to, you

know, take it out of context, we don't need to allege

joint employment against JPI and Bradley," meaning we

don't have Bradley in this case, in this case we're

going after JPI, who we call "Jan-Pro," and there are

different ways to get there under Massachusetts law.

There's agency, as we talked about in our brief.

There's joint employment.  There's just the mere fact

that under the Massachusetts wage law if you perform

services in the usual course of business for an alleged

1    employer, um -- if you perform services within the

2    alleged employer's usual course of business, you are an

3    employee and, um, that's strictly construed, and there

4    are no special contracts that are allowed by defendants

5    to evade liability under that.  There are a lot of ways

6    to get there.

7         Um, so I guess I -- so I oppose defendant's

8    proposed Question 1.  It's just fact-laden and biased to

9    their statement of the case.  It's just not correct --

10             THE COURT:  Yeah, I'm -- I'm -- if this issue

11   is still in the case, if I have jurisdiction, um, then

12   I'm inclined to agree with you.  But I guess I won't

13   know -- you won't know what I finally think until I sign

14   something.

15             MR. ROSIN:  And, your Honor, just to respond

16   to that.  Your Honor also commented on Page 7 of the

17   transcript from the summary judgment hearing --

18             THE COURT:  Well, let me see the transcript.

19             (Pause.)

20             MR. ROSIN:  The summary judgment hearing of

21   April 16th, 2011, Page 7 at the top:  "There also

22   doesn't appear to me to be sufficient evidence to permit

23   a finding of liability under the doctrines of apparent

24   authority and joint employment."

25             THE COURT:  All right.  I was giving you my

```
 1    tentative views.

 2              MR. ROSIN:  Okay.  I just wanted to highlight

 3    that before we rested on that issue.

 4              (Pause.)

 5              THE COURT:  Well, I intended -- I wasn't sure

 6    that a hearing was needed, but I thought, you know, it

 7    would bring everything into sharp focus, I would give

 8    you an answer, and I would send something to the SJC

 9    very soon.  Now you've got some more briefing to do, so

10    I'll keep working on it.

11              MR. ROSIN:  Thank you, your Honor.

12              THE COURT:  Anything further for today?

13              MS. LISS-RIORDAN:  Nothing, your Honor.

14              MR. ROSIN:  Nothing, your Honor.  Thank you.

15              THE COURT:  Thank you.  The Court is in

16    recess.

17              (Adjourned, 4:00 p.m.)

18

19

20

21

22

23

24

25
```

1                    C E R T I F I C A T E

2

3

4          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5    do hereby certify that the foregoing record is a true

6    and accurate transcription of my stenographic notes

7    before Chief Judge Mark L. Wolf, on Tuesday, April 24,

8    2012, to the best of my skill and ability.

9

10

     /s/ Richard H. Romanow 04-26-12
11   _____
     RICHARD H. ROMANOW   Date
12

13

14

15

16

17

18

19

20

21

22

23

24

25