SJC-11282

GIOVANI DEPIANTI & others[1] vs.  JAN-PRO FRANCHISING
INTERNATIONAL, INC.


Suffolk.    February 5, 2013.  -  June 17, 2013.

Present:  Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly, &
Lenk, JJ.


Labor, Wages.  Massachusetts Wage Act.  Independent Contractor
    Act.  Contract, Franchise agreement, Employment.  Statute,
    Construction.  Attorney General.  Administrative Law,
    Exhaustion of remedies.


    Certification of a question of law to the Supreme Judicial
Court by the United States District Court for the District of
Massachusetts.


    Shannon Liss-Riordan (Stephen S. Churchill with her) for the
plaintiffs.
    Jeffrey M. Rosin (Christopher M. Pardo with him) for the
defendant.
    Benjamin B. Reed & James C. Rubinger, of Virginia, for
International Franchise Association, amicus curiae, submitted a
brief.
    Catherine Ruckelshaus, of New York, Eunice Hyunhye Cho, of
California, & Audrey Richardson for Brazilian Immigrant Center &
others, amici curiae, submitted a brief.


    LENK, J.  Giovani Depianti, a janitorial cleaning services

franchisee, along with franchisees from other States, filed this

putative class action in the United States District Court for the

District of Massachusetts against the defendant, Jan-Pro

Franchising International, Inc. (Jan-Pro). Depianti alleges,

inter alia, that Jan-Pro misclassified him as an independent

_____

    [1] Hyun Ki Kim, Kyu Jin Roh, Gerardo Vazquez, Gloria Roman,
Juan Aguilar, Nicole Rhodes, Mateo Garduno, Chiara Harris, and
Todor Sinapov.

contractor, see G. L. c. 149, § 148B, and committed various wage law violations.  A judge of the United States District Court for the District of Massachusetts certified the following questions to this court, pursuant to S.J.C. Rule 1:03, as appearing in 382 Mass. 700 (1981):

"[1.]  Whether a plaintiff's failure to exhaust administrative remedies pursuant to [G. L. c. 149, § 150,] by filing a complaint with the Attorney General deprives a court of jurisdiction to consider the plaintiff's claims under [G. L. c. 149, §§ 148, 148B, and 150,] and under [G. L. c. 151, §§ 1 and 1A].

"[2.]  Whether and how to apply the 'right to control test' for vicarious liability to the franchisor-franchisee relationship. . . .

"[3.]  Whether a defendant may be liable for employee misclassification under [G. L. c. 149, § 148B,] where there was no contract for service between the plaintiff and defendant."

We answer the first question, "No."  We answer the second question, "Yes," with further discussion concerning the application of the "right to control test" to the franchisor-franchisee relationship.  We answer the third question, "Yes."[2]

---

[2] We acknowledge the amicus brief of the International Franchise Association, and the amicus brief of Brazilian Immigrant Center, Brazilian Women's Group, Centro Presente, Chelsea Collaborative, Chinese Progressive Association, Lawrence Community Connections, Massachusetts Coalition for Occupational Safety and Health, Massachusetts Immigrant and Refugee Advocacy

1.   Background.   Jan-Pro is a Massachusetts corporation "in the business of operating and franchising comprehensive cleaning and maintenance businesses."   It sells regional rights to use the Jan-Pro brand to so-called "regional master franchisees."   Upon purchasing these rights, regional master franchisees become the exclusive franchisors of the Jan-Pro brand within defined geographic areas.   Regional master franchisees, in turn, sell the right to use the Jan-Pro brand to so-called "unit franchisees," who perform cleaning services for customers.   Unit franchisees are provided with customer accounts by regional master franchisees, though unit franchisees may solicit additional business on their own.   All customer accounts so obtained become the property of regional master franchisees.

Regional master franchisees invoice customers directly and receive payment for cleaning services rendered by unit franchisees.   They deduct certain fees from the gross revenue collected and remit the balance to unit franchisees.   They pay a portion of the fees deducted from the gross revenue to Jan-Pro, in the form of royalties.[3]

Depianti contracted with BradleyMktg Enterprises, Inc. (Bradley), a Jan-Pro regional master franchisee operating in

---

Coalition, Massachusetts Jobs with Justice, Metrowest Worker Center, Project Voice/American Friends Service Committee, and the National Employment Law Project.

[3] In its contracts with its regional master franchisees, Jan-Pro Franchising International, Inc. (Jan-Pro), requires that it be named a third-party beneficiary of all unit franchise agreements.

Massachusetts, to purchase a Jan-Pro unit franchise.[4] He performed cleaning services under the Jan-Pro name from approximately June, 2003, through December, 2006. In 2008, he filed a putative class action against Jan-Pro in the United States District Court for the District of Massachusetts, alleging unfair and deceptive business practices in violation of G. L. c. 93A; misclassification as an independent contractor in violation of G. L. c. 149, § 148B; various wage law violations pursuant to G. L. c. 149, §§ 148 and 150, and G. L. c. 151, §§ 1 and 1A; intentional or negligent misrepresentation; quantum meruit; and unjust enrichment.[5] Depianti's claims of unfair and deceptive business practices and misrepresentation are based in part on alleged conduct of Bradley, not Jan-Pro, and therefore depend on Jan-Pro being held vicariously liable for the conduct of Bradley, its franchisee.[6] By contrast, Depianti's misclassification and wage claims allege direct, rather than vicarious, liability.

Jan-Pro sought summary judgment as to all claims, and Depianti moved for partial summary judgment on the

---

[4] Giovani Depianti did not contract directly with Jan-Pro.

[5] The other plaintiffs in the action are residents of other States and therefore allege violations of the statutory and common law of other jurisdictions. Accordingly, the certified questions before us implicate only Depianti's claims.

[6] Prior to filing his action against Jan-Pro, Depianti brought a proceeding against BradleyMktg Enterprises, Inc. (Bradley), before the American Arbitration Association, alleging nearly identical claims. The arbitration proceeding was later settled.

misclassification claim. After a hearing on the parties'
motions, the United States District Court judge stated his
intention to certify the second and third questions, set forth
supra, to this court, and invited comment by the parties.

Jan-Pro thereafter argued that the misclassification claim
should be dismissed, because Depianti neglected to file a
complaint with the Attorney General pursuant to G. L. c. 149,
§ 150 (§ 150),[7] before initiating his action, thereby failing to
exhaust his administrative remedies.[8] The United States District
Court judge determined that Jan-Pro had waived this argument by
not raising it earlier in the litigation. However, pursuant to
his independent obligation to ensure the United States District
Court's jurisdiction, see FW/PBS, Inc. v. Dallas, 493 U.S. 215,
231 (1990), the judge added the first question, set forth supra,
to his certification order, to determine whether Depianti's
failure to file a complaint with the Attorney General before
bringing suit deprived the United States District Court of

---

[7] In relevant part, G. L. c. 149, § 150 (§ 150), states:

"An employee claiming to be aggrieved by a violation of
sections . . . 148 [or] 148B . . . may, 90 days after the
filing of a complaint with the attorney general, or sooner
if the attorney general assents in writing, and within 3
years after the violation, institute and prosecute in his
own name and on his own behalf, or for himself and for
others similarly situated, a civil action for injunctive
relief, for any damages incurred, and for any lost wages and
other benefits."

[8] After Jan-Pro raised this argument, Depianti filed a
complaint with the Attorney General and received a letter
authorizing immediate private suit.

jurisdiction over his misclassification and wage claims.[9]

2. Discussion.  a. Failure to file with the Attorney
General.  The first reported question asks, "Whether a
plaintiff's failure to exhaust administrative remedies pursuant
to [§ 150] by filing a complaint with the Attorney General
deprives a court of jurisdiction to consider the plaintiff's
claims under [G. L. c. 149, §§ 148, 148B, and 150,] and under
[G. L. c. 151, §§ 1 and 1A]."  To this question, we answer, "No."

Pursuant to § 150, an individual alleging a violation of
G. L. c. 149, §§ 148 or 148B, may bring a private civil action
ninety days after filing a complaint with the Attorney General,
or sooner if the Attorney General assents to such suit.[10]  Here,
Depianti neglected to submit a complaint to the Attorney General
before commencing his private action against Jan-Pro.  As stated,
however, the United States District Court judge ruled that
Jan-Pro waived its objection to this procedural defect.
Therefore, Depianti's failure first to file with the Attorney
General is fatal to his misclassification and wage claims only if

---

[9] In his certification order, the United States District
Court judge also welcomed our guidance on "any other questions of
Massachusetts law deemed material to this case."

[10] The procedural requirements of § 150 do not pertain
explicitly to claims brought under G. L. c. 151, §§ 1 and 1A.
However, Depianti's claims under G. L. c. 151, §§ 1 and 1A, are
predicated on his claim of misclassification under G. L. c. 149,
§ 148B.  See G. L. c. 151, §§ 1 and 1A (applying only to
employees and not to independent contractors).  Therefore, as the
judge recognized, Depianti's claims under G. L. c. 151, §§ 1 and
1A, depend on the United States District Court's jurisdiction to
consider his claim of misclassification.

such failure deprives the United States District Court of
jurisdiction.  See FW/PBS, Inc. v. Dallas, supra (Federal court
has independent duty to ensure its own jurisdiction).

In determining whether a procedural defect deprives a court
of jurisdiction to hear a claim, we consider (1) to what extent
the defect interferes with the "accomplishment of the purposes
implicit in the statutory scheme," and (2) to what extent the
opposing party can "justifiably claim prejudice."  Schulte v.
Director of the Div. of Employment Sec., 369 Mass. 74, 79-80
(1975).  Here, Depianti's failure to file a complaint with the
Attorney General before initiating his action neither interfered
with the accomplishment of the purposes implicit in § 150 nor
prejudiced Jan-Pro.

The purposes implicit in § 150 are twofold.  The first
paragraph of § 150 authorizes, but does not require, the Attorney
General to bring criminal charges for alleged violations of G. L.
c. 149, § 148, the wage statute.  G. L. c. 149, § 150.  The
second paragraph permits an individual alleging violations of
certain employment statutes to bring a private suit for damages,
but requires that such individual first file a complaint with the
Attorney General.  Id.  Thus, § 150 establishes a permissive,
two-tiered framework for enforcement:  it permits both criminal
enforcement of wage violations and private civil enforcement of
wage and other employment violations.  See id.  See also G. L.
c. 149, § 27C (authorizing Attorney General to enforce various
employment statutes, including G. L. c. 149, §§ 148 and 148B, and

G. L. c. 151, §§ 1A and 1B, either civilly or criminally).

The Attorney General's right to enforce G. L. c. 149 and the right of private citizens to enforce provisions of that chapter represent parallel and distinct enforcement mechanisms. See Melia v. Zenhire, Inc., 462 Mass. 164, 172 (2012). The requirement that a plaintiff file a complaint with the Attorney General before bringing a private suit is intended simply to ensure that the Attorney General receives notice of the alleged violations, so that she may investigate and prosecute such violations at her discretion. See Nahigian v. Leonard, 233 F. Supp. 2d 151, 164 (D. Mass. 2002) ("the purpose of Section 150's administrative requirement, rather than giving potential defendants notice and an opportunity to conciliate, seems to be to give the Attorney General notice that a crime [failure to pay wages] may be occurring"). In this way, the statute ensures that private actions for wage violations do not come and go without the Attorney General ever being made aware of the alleged unlawful conduct.

The Massachusetts antidiscrimination statute, G. L. c. 151B, offers a helpful contrast. That statute includes a similarly-worded procedural requirement, permitting aggrieved individuals to bring private actions "at the expiration of ninety days after the filing of a complaint with the [Massachusetts Commission Against Discrimination (MCAD)], or sooner if a commissioner assents in writing." G. L. c. 151B, § 9. However, the filing of a complaint with MCAD triggers mandatory "prompt investigation"

by that agency. G. L. c. 151B, § 5. After such investigation, if MCAD determines that there is probable cause to credit the allegations, it shall "immediately endeavor to eliminate the unlawful practice complained of . . . by conference, conciliation and persuasion." Id. See Melley v. Gillette Corp., 19 Mass. App. Ct. 511, 512 (1985). Where such efforts are unavailing, MCAD is to conduct a hearing on the matter, and may thereafter issue a cease and desist order or an order for affirmative relief, or impose civil penalties. G. L. c. 151B, § 5. If, at the expiration of ninety days after the filing of the complaint with MCAD, the complainant elects to bring a civil action for damages, "any complaint before the commission shall then be dismissed without prejudice, and the petitioner shall be barred from subsequently bringing a complaint on the same matter before the commission." G. L. c. 151B, § 9.

The purpose implicit in the antidiscrimination statute is to "resolve claims of discrimination with fairness and efficiency" via a "comprehensive remedial process." Ryan v. Holie Donut, Inc., 82 Mass. App. Ct. 633, 639 (2012). In essence, the statute grants MCAD exclusive jurisdiction over claims of discrimination for ninety days, so that it may attempt to resolve such claims with greater flexibility and efficiency than may be had in a judicial forum. Therefore, where an individual brings a private suit pursuant to G. L. c. 151B without first filing with MCAD, the accomplishment of the purpose implicit in the statutory scheme is significantly obstructed. See Schulte v. Director of

the Div. of Employment Sec., supra at 80.  For this reason,
Massachusetts courts correctly have held that the filing
requirement in the antidiscrimination statute is jurisdictional
and that "[r]esort to the courts is not available for a complaint
of discrimination within the jurisdiction of the MCAD unless the
person claiming to have been the object of unlawful
discrimination first makes a timely complaint to that agency."
Cherilla v. Phoenix Technologies Ltd., 32 Mass. App. Ct. 919, 919
(1992).

Section 150 stands in stark contrast to the
antidiscrimination statute.  It does not provide a comprehensive
remedial scheme to resolve claims outside a judicial forum.
Rather, § 150 authorizes two types of actions that may come
before a court, one brought by the Attorney General, the other by
individual plaintiffs.  See G. L. c. 149, § 150.  Further, unlike
the filing requirement in the antidiscrimination statute, the
filing requirement in § 150 triggers no mandatory agency
investigation or administrative adjudicatory action.  While the
filing requirement in the antidiscrimination statute operates as
the necessary first step in a comprehensive remedial scheme, the
filing requirement in § 150 operates merely to ensure that the
Attorney General receives notice of potential employment
violations.

Accordingly, we hold that failure to file a complaint with
the Attorney General before initiating a private suit for alleged
employment violations does not interfere with the accomplishment

of the statutory purposes of § 150 to a substantial degree, at least where the Attorney General is notified of the suit during its pendency. See Schulte v. Director of the Div. of Employment Sec., supra. In such circumstances, the purposes implicit in the statutory scheme are effectively served, as the Attorney General may yet pursue enforcement action against the employer, even if the Attorney General was made aware of the alleged violations somewhat later than is anticipated under the statute. Moreover, a defendant cannot plausibly claim prejudice by the tardiness of the plaintiff's filing, at least where, as here, the plaintiff's suit would not have been time barred under the three-year limitations period included in G. L. c. 149, § 150, had he first filed with the Attorney General and waited ninety days before bringing suit against the defendant. See Schulte v. Director of the Div. of Employment Sec., supra. For these reasons, we conclude that Depianti's failure first to file a complaint with the Attorney General does not deprive the United States District Court of jurisdiction to consider his claims under G. L. c. 149, §§ 148, 148B, and 150, and G. L. c. 151, §§ 1 and 1A.

b. Vicarious liability. The second reported question asks, "Whether and how to apply the 'right to control test' for vicarious liability to the franchisor-franchisee relationship." To this question, we answer "Yes," with the proviso that a court applying the "right to control test" in such circumstances should consider whether the defendant had the right to control the particular instrumentality of the plaintiff's asserted harm.

Pursuant to his G. L. c. 93A and misrepresentation claims, Depianti seeks to hold Jan-Pro vicariously liable for alleged conduct of Bradley. Generally, vicarious liability may be imposed where "the relation of master and servant existed at the time the plaintiff was injured, whereby the . . . act of the servant was legally imputable to the master" (alteration in the original). Cowan v. Eastern Racing Ass'n, 330 Mass. 135, 141 (1953), quoting Khoury v. Edison Elec. Illumination Co., 265 Mass. 236, 238 (1928). The test to establish the existence of such a relationship is whether the alleged master had "power of control or direction" over the alleged servant. Kapp v. Ballantine, 380 Mass. 186, 195 (1980). See Asia, Employment Relation: Common-Law Concept and Legislative Definition, 55 Yale. L. J. 76, 81 (1945) (emphasis on control is "in harmony with the notion of fault"). "It is not necessary that there be any actual control by the alleged master to make one his servant or agent, but merely a right of the master to control." Cowan v. Eastern Racing Ass'n, supra, quoting Khoury v. Edison Elec. Illumination Co., supra.

This test is "not easily transferable to the franchise relationship." Kerl v. Dennis Rasmussen, Inc., 273 Wis. 2d 106, 125 (2004) (Kerl). Franchisors, such as Jan-Pro, license their trademarks and brand identities to franchisees, such as Bradley. Under Federal law, a franchisor is required to maintain control and supervision over a franchisee's use of its mark, or else the franchisor will be deemed to have abandoned its mark under the

abandonment provisions of the Lanham Act, 15 U.S.C. § 1064(5)(A)
(2006). Mini Maid Servs. Co. v. Maid Brigade Sys., Inc., 967
F.2d 1516, 1519 (11th Cir. 1992). However, the controls that
franchisors are required to maintain under the Lanham Act are not
intended "to create a [F]ederal law of agency . . . [or to]
saddle the licensor with the responsibilities under [S]tate law
of a principal for his agent." Oberlin v. Marlin Am. Corp., 596
F.2d 1322, 1327 (7th Cir. 1979), citing Smith v. Cities Serv. Oil
Co., 346 F.2d 349 (7th Cir. 1965); and Murphy v. Holiday Inns,
Inc., 216 Va. 490 (1975). Cf. Torres v. Goodyear Tire & Rubber
Co., 867 F.2d 1234, 1236-1237 (9th Cir. 1989) (tire company not
vicariously liable for conduct of tire manufacturer that licensed
company's mark, despite significant quality controls retained by
company). Broadly extending the "right to control test" for
vicarious liability to the franchisor-franchisee relationship,
where franchisors are obligated to maintain certain controls,
could have the undesirable effect of penalizing franchisors for
complying with Federal law. See Note, The Law of Franchisor
Vicarious Liability: A Critique, 1993 Colum. Bus. L. Rev. 89, 99
(1993). For this reason, the "right to control test" should be
applied to the franchisor-franchisee relationship in such a way
as to ensure that liability will be imposed only where the
conduct at issue properly may be imputed to the franchisor. See
Cowan v. Eastern Racing Ass'n, supra, quoting Khoury v. Edison
Elec. Illumination Co., supra.

 In Kerl, supra, the Supreme Court of Wisconsin addressed an

analogous situation.  There, Robin Kerl and her fiancé, David
Jones, were shot by Harvey Pierce, Kerl's former boy friend.  Id.
at 111.  Kerl was seriously injured, and Jones was killed.  Id.
At the time, Pierce was a work-release inmate at a nearby jail,
employed at a franchise restaurant operated by the defendant,
Dennis Rasmussen, Inc. (DRI).  Id.  Pierce had left work without
permission prior to the shooting.  Id.  Jones's estate and Kerl
sued DRI, alleging negligent supervision of Pierce.  Id.  They
also named DRI's franchisor as a defendant, on a theory of
vicarious liability.  Id.

The Kerl court held that "the marketing, quality, and
operational standards commonly found in franchise agreements are
insufficient to establish the close supervisory control or right
of control necessary to demonstrate the existence of a
master/servant relationship for all purposes or as a general
matter."  Id. at 113.  Accordingly, the court applied a modified
version of the "right to control test," concluding that a
franchisor may be held vicariously liable for the conduct of its
franchisee only if the franchisor controls or has a right to
control "the daily conduct or operation of the particular
'instrumentality' or aspect of the franchisee's business that is
alleged to have caused the harm."  Id. at 129.  Because the
franchisor did not control or have a right to control DRI's
supervision of its employees, the court concluded that the
franchisor was not vicariously liable for DRI's negligent
supervision.  Id. at 135.

The "instrumentality" test adopted by the Kerl court accords with the approach of the majority of courts that have considered vicarious liability in the context of the franchise relationship. See, e.g., Hong Wu v. Dunkin' Donuts, Inc., 105 F. Supp. 2d 83, 88 (E.D.N.Y. 2000) ("the franchisor typically is found to be vicariously liable only in situations where it exercised considerable control over the franchisee and the specific instrumentality at issue in a given case"); VanDeMark v. McDonald's Corp., 153 N.H. 753, 763 (2006) (no vicarious liability for attack on franchisee's employee where franchisor had no authority to control franchisee's security operations); Pizza K, Inc. v. Santagata, 249 Ga. App. 36, 38-39 (2001) (no vicarious liability for collision caused by franchisee's delivery driver where franchisor had no supervisory authority over franchisee's employees).

Today we join these courts in concluding that a franchisor is vicariously liable for the conduct of its franchisee only where the franchisor controls or has a right to control the specific policy or practice resulting in harm to the plaintiff. This test best serves the primary justification for the imposition of vicarious liability -- namely, that liability should be imposed where a servant's conduct reasonably may be imputed to its master. See Cowan v. Eastern Racing Ass'n, supra, quoting Khoury v. Edison Elec. Illumination Co., supra; Asia, Employment Relation: Common-Law Concept and Legislative

Definition, supra.[11]

   c. Misclassification. The third reported question asks,
"Whether a defendant may be liable for employee misclassification
under [G. L. c. 149, § 148B (independent contractor statute),]
where there was no contract for service between the plaintiff and
defendant."[12]  To this question, we answer, "Yes."

---

[11] It is important to note that "instrumentality" in this
context is to be understood broadly, as the particular practice
of the franchisee that led to the plaintiff's injury.  In Kerl v.
Dennis Rasmussen, Inc., 273 Wis. 2d 106, 135 (2004), the
instrumentality of the harm was identified as the franchisee's
supervision of its employees.  The franchisor was held not
vicariously liable, because it did not have authority to control
such supervision.  Id.  Here, Depianti alleges that Bradley made
certain representations as to monthly income, available volume of
customer accounts, and anticipated hourly rates of pay.  He also
alleges that certain conduct by Bradley constituted systemic
breach of its contract with Depianti.  These would appear to be
the "instrumentalities" at issue, and the assessment of Jan-Pro's
vicarious liability would then turn on whether Jan-Pro controlled
or had a right to control Bradley in connection with such
representations and conduct.

[12] General Laws c. 149, § 148B, states, in relevant part:

   "(a) For the purpose of this chapter and chapter 151,
an individual performing any service, except as authorized
under this chapter, shall be considered to be an employee
under those chapters unless:--

   "(1) the individual is free from control and direction
in connection with the performance of the service, both
under his contract for the performance of service and in
fact; and

   "(2) the service is performed outside the usual course
of the business of the employer; and,

   "(3) the individual is customarily engaged in an
independently established trade, occupation, profession or
business of the same nature as that involved in the service
performed.

   ". . ."

This certified question arises within the context of pending
cross motions for summary judgment as to Jan-Pro's liability for
employee misclassification under the independent contractor
statute.  In contrast to his G. L. c. 93A and misrepresentation
claims against Jan-Pro, which allege vicarious liability by
virtue of Bradley's conduct, here Depianti maintains that Jan-Pro
is directly liable for its own violation of the independent
contractor statute.  In essence, Depianti claims that Jan-Pro
itself misclassified Depianti as an independent contractor by
designing and implementing the multi-tiered franchise structure
that labels Depianti a franchisee, or independent contractor,
rather than an employee, and by imposing this structure, through
which it maintains control over a network of cleaning workers,
upon "master franchisees" such as Bradley and "unit franchisees"
such as Depianti.[13]  Jan-Pro appears to have taken the position

_____

"(d) Whoever fails to properly classify an individual
as an employee according to this section and in so doing
fails to comply, in any respect, with chapter 149, or
section 1, 1A, 1B, 2B, 15 or 19 of chapter 151, or chapter
62B, shall be punished and shall be subject to all of the
criminal and civil remedies, including debarment, as
provided in section 27C of this chapter. . . ."

[13] In this regard, Depianti alleges, inter alia, that
"Jan-Pro has developed the methods, procedures, and products
which it requires its [regional master franchisees] to use in
selling cleaning franchises and directing the work of [unit
franchisees]," that the contracts between regional master
franchisees and unit franchisees are "standard form contracts
that are developed and written by Jan-Pro," that "Jan-Pro
janitors must conduct their cleaning services according to the
procedures that Jan-Pro dictates in its training program," that
"Jan-Pro retains the right to enforce provisions of [the
contracts between regional master franchisees and unit

in the United States District Court that, as a matter of law, and
irrespective whether it can establish the indicia of an
independent contractor relationship set forth in G. L. c. 149,
§ 148B (a), it cannot be held liable under the statute because it
has no contract with Depianti.

It is within this context that we consider the limited
question certified to us, which we understand as asking only
whether a contract between the parties is a necessary element of
a claim under G. L. c. 149, § 148B.[14]  We conclude that the lack
of a contract between the parties does not itself, without more,
preclude liability under the independent contractor statute.

The nub of the parties' dispute as to whether a contract
between them is a necessary element of a claim for
misclassification under G. L. c. 149, § 148B, derives from
language contained in G. L. c. 149, § 148B (a) (1). This language
requires that an independent contractor be "free from control and
direction in connection with the performance of the service, both
under his contract for the performance of service and in fact."

---

franchisees] directly and may directly oversee the work of any
[unit franchisee]," and that "Jan-Pro reserves the right to
terminate any account assigned to [unit franchisees] and to
cancel the entire franchise agreement."

[14] Accordingly, we neither analyze the elements necessary to
maintain a claim under G. L. c. 149, § 148B, nor consider the
application of the statute to franchise arrangements such as the
one here.  While the parties in their briefs discuss the presence
or absence of record support for the three-pronged statutory
indicia of an independent contractor relationship, see G. L.
c. 149, § 148B (a), such matters are not before us and we do not
evaluate the adequacy of the record for summary judgment
purposes.

G. L. c. 149, § 148B. The parties dispute the import of the reference to a putative employee's "contract for the performance of service" and, specifically, whether it contemplates, as a prerequisite for holding a putative employer liable for misclassification under the independent contractor statute, that there be a contract between the putative employer and the putative employee. Depianti argues that nothing in the language of the independent contractor statute restricts the statute's application to circumstances where the parties have entered into a contract together, and that it would counter the legislative intent to read such a restriction into the statute. Jan-Pro contends that the language of G. L. c. 149, § 148B (a) (1), indicates that the Legislature presumed a contractual relationship between the parties, and that we should therefore require such a relationship as a prerequisite to application of the independent contractor statute.

"Where the meaning of a statute is not plain from its language, familiar principles of statutory construction guide our interpretation." DiFiore v. American Airlines, Inc., 454 Mass. 486, 490 (2009) (DiFiore). We seek to interpret the statute "according to the intent of the Legislature ascertained from all the words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." Indus. Fin. Corp. v. State Tax

Comm'n, 367 Mass. 360, 364 (1975), quoting Hanlon v. Rollins, 286
Mass. 444, 447 (1934). "In addition, our respect for the
Legislature's considered judgment dictates that we interpret the
statute to be sensible, rejecting unreasonable interpretations
unless the clear meaning of the language requires such an
interpretation." DiFiore, supra at 490-491. See Commonwealth v.
Dodge, 428 Mass. 860, 865 (1999), quoting Beeler v. Downey, 387
Mass. 609, 616 (1982) ("we must read the statute in a way to give
it a sensible meaning").

Generally, remedial statutes such as the independent
contractor statute are "entitled to liberal construction."
Batchelder v. Allied Stores Corp., 393 Mass. 819, 822 (1985).
See Terra Nova Ins. Co. v. Fray-Witzer, 449 Mass. 406, 420 (2007)
(statute is remedial where it is "intended to address misdeeds
suffered by individuals," rather than to punish public wrongs).
Employment statutes in particular are to be liberally construed,
"with some imagination of the purposes which lie behind them."
Lehigh Valley Coal Co. v. Yensavage, 218 F. 547, 553 (2d Cir.
1914), cert. denied, 235 U.S. 705 (1915). See, e.g., Boston v.
Commonwealth Employment Relations Bd., 453 Mass. 389, 391 (2009).

The purpose of the independent contractor statute is "to
protect workers by classifying them as employees, and thereby
grant them the benefits and rights of employment, where the
circumstances indicate that they are, in fact, employees."
Taylor v. Eastern Connection Operating, Inc., ante 191, 198
(2013). We previously have recognized the importance of proper

classification of employees. See <u>Somers</u> v. <u>Converged Access,</u>
<u>Inc</u>., 454 Mass. 582, 593 (2009) ("Misclassification not only
hurts the individual employee; it also imposes significant
financial burdens on the Federal government and the Commonwealth
in lost tax and insurance revenues. Moreover, it gives an
employer who misclassifies employees as independent contractors
an unfair competitive advantage over employers who correctly
classify their employees and bear the concomitant financial
burden"). See also Advisory 2008/1, Attorney General's fair
labor and business division (detailing deleterious effects of
employee misclassification).

The independent contractor statute establishes a framework
for determining whether a worker is an employee or an independent
contractor. First, "an individual performing any service" is
presumed to be an employee. G. L. c. 149, § 148B (<u>a</u>). Second,
the statute lays out three indicia of an independent contractor
relationship, all three of which must be established to rebut the
presumption of employment. G. L. c. 149, § 148B (<u>a</u>) (1)-(3).
The statute contains no language limiting its application to
circumstances where the putative employer and the putative
employee have entered into a contract together.

In light of the statute's broad remedial purpose, "it would
be an error to imply . . . a limitation where the statutory
language does not require it." <u>Psy-Ed Corp</u>. v. <u>Klein</u>, 459 Mass.
697, 708 (2011). See <u>General Elec. Co</u>. v. <u>Department of Envtl</u>
<u>Protection</u>, 429 Mass. 798, 803 (1999) (court will not read words

into statute). Limiting the statute's applicability to circumstances where the parties have contracted with one another would undermine the purpose of the statute, see <u>Taylor</u> v. <u>Eastern Connection Operating, Inc.</u>, <u>supra</u>, as such limitation would permit misclassification where a putative employer, otherwise liable under the statute, is insulated from such liability by virtue of an arrangement permitting it to distance itself from its employees. Cf. <u>Cumpata</u> v. <u>Blue Cross Blue Shield of Mass., Inc.</u>, 113 F. Supp. 2d 164, 168 (D. Mass. 2000) ("The Wage Act is meant to protect employees from the dictates and whims of shrewd employers").

As stated, Jan-Pro contends that the mention of a contract in G. L. c. 149, § 148B (a) (1), indicates that the Legislature intended the independent contractor statute to apply only where the parties have contracted with one another. Subsection (a) (1) delineates the first of the three factors that must be established to rebut the presumption of employment: "the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact." G. L. c. 149, § 148B (a) (1). While the use of the conjunctive "and" rather than the disjunctive "or" between the phrases "under his contract for the performance of service" and "in fact" arguably suggests that the Legislature presumed a contractual relationship between the parties, we conclude that such language "reflects nothing more than the Legislature's failure to imagine the possibility"

that an entity that did not contract with the plaintiff would be the agent of misclassification. DiFiore, supra at 497. Such language does not reflect any legislative intent to allow an employer to insulate itself from liability for misclassification by causing or creating another entity to contract with its employees. See id. In light of the purpose of the independent contractor statute, see Taylor v. Eastern Connection Operating, Inc., supra, and given that remedial statutes are "entitled to liberal construction," Batchelder v. Allied Stores Corp., supra, we understand G. L. c. 149, § 148B (a) (1), to indicate merely that a putative employer's control and direction over a putative employee's performance is to be assessed both under the terms of the putative employee's contract for service, if any, as well as in fact.

Further, G. L. c. 149, § 148, the wage statute, declares that "[n]o person shall by a special contract with an employee or by any other means exempt himself" from the obligation to pay lawful wages to employees (emphasis added). See Awuah v. Coverall N. Am., Inc., 460 Mass. 484, 492 (2011). The enactment of this provision indicates that the Legislature "was cognizant, in general, of the risk that employers or other persons may seek to find ways, through special contracts or other means, to attempt to avoid compliance . . . and intended to thwart such schemes." DiFiore, supra.[15]

---

[15] The wage statute, G. L. c. 149, § 148, extends protections only to employees, and not to independent

In DiFiore, supra, we addressed a nearly identical provision in the context of G. L. c. 149, § 152A, the tips statute, which prohibits an employer from imposing a "service charge" on customers and not remitting such charge to its employees.  G. L. c. 149, § 152A (d).  See G. L. c. 149, § 152A (g) ("No employer or person shall by a special contract with an employee or by any other means exempt itself from this section").  There, we held that the defendant airline could not escape the requirements of the tips statute "by entering into a contract with a service entity . . . under which the service entity would employ the service employees, waitstaff employees, and service bartenders, and agree to pay to or share with the airline or restaurant the service charge billed to customers."  DiFiore, supra at 494.  We held that "[t]his would be precisely the type of special contract prohibited by [G. L. c. 149, § 152A (g),] because it would provide a means to exempt the airline or restaurant from its obligations under the [tips statute]."  Id.  "To allow such an 'end run' around the [tips statute] would contravene the express purpose of the [statute], namely to protect gratuity payments given to, or intended for, service employees . . . and would nullify § 152A (g) of the [tips statute], which specifically

---

contractors.  Therefore, where an employer arranges for its employees to be misclassified as independent contractors, in contravention of G. L. c. 149, § 148B, such arrangement violates the provision in G. L. c. 149, § 148, declaring that "[n]o person shall by a special contract with an employee or by any other means exempt himself" from the obligation to pay lawful wages to employees.

forbids this type of a maneuver 'by special contract . . . [or] any other means.'"  Id. at 496, citing Newton-Wellesley Hosp. v. Magrini, 451 Mass. 777, 784 (2008), and Wolfe v. Gormally, 440 Mass. 699, 704 (2004).

The instant case is directly analogous.  Assuming without in any way suggesting that Depianti was working as an employee of Jan-Pro,[16] and not as an independent contractor, Jan-Pro's contractual arrangement with Bradley, if enforceable, would provide a means for Jan-Pro to escape its obligation, as an employer, to pay lawful wages under the wage statute, G. L. c. 149, § 148.  To allow such an "end run" around G. L. c. 149, § 148, would contravene the express purpose of the statute and would nullify the provision therein that specifically forbids this type of arrangement "by a special contract with an employee or by any other means."  G. L. c. 149, § 148.  See DeFiore, supra.  See also Advisory 2008/1, Attorney General's fair labor and business division (Attorney General "will enforce [G. L. c. 149, § 148B,] against entities that allow, request or contract with corporate entities such as [Limited Liability Corporations] or S corporations that exist for the purpose of avoiding [G. L.

---

[16] In concluding that an entity like Jan-Pro can be liable · under G. L. c. 149, § 148B, without a contract between itself and the employee, we should not be understood as suggesting that Jan-Pro is in fact liable.  We take no position on the question whether the necessary predicates for liability can be established here, a matter involving determinations as to the summary judgment record that are solely within the purview of the United States District Court.

c. 149, § 148B]").[17]

In sum, we conclude that the lack of a contract for service between the putative employer and putative employee does not

---

[17] To the extent that the dissent maintains that the statute has no application where the parties have neither an independent contractor nor an employment relationship, we do not disagree. Our conclusion today, in accordance with the limited scope of the question certified to us, is merely that the absence of a contract between the parties does not alone preclude liability under G. L. c. 149, § 148B.

This is borne out by the hypothetical situation that the dissent outlines. There, company A contracts with company B for services, and company B enters into arrangements with third parties to perform the work it undertook under its contract with company A. We agree that ordinarily, in such circumstances, company A would not be liable for misclassification of the third-party workers. This is because ordinarily, in such circumstances, company B would be the agent of any misclassification. However, here Depianti alleges that Jan-Pro, and not Bradley, designed and implemented the contractual framework under which he was misclassified as an independent contractor. See note 13, supra. The lack of a contract between Depianti and Jan-Pro does not itself preclude liability. Where a party is the agent of misclassification, it may be directly liable under G. L. c. 149, § 148B, even where it utilizes a proxy to make arrangements with its employees. Nothing we say today, then, is at odds with the law of corporate disregard.

In suggesting that there can be no liability under the statute absent some sort of "work arrangement" between the parties, the dissent's focus seems to be upon aspects of the statute other than the language giving rise to the limited question certified to us, see G. L. c. 149, § 148B (a) (1), which asks only if a contract between the parties is a necessary element of a claim brought under the statute. The dissent instead appears to be concerned with what it means to "perform[] any service," see G. L. c. 149, § 148B (a), and who has responsibility for employee classification where such service is performed. See G. L. c. 149, § 148B (d) ("Whoever fails to properly classify an individual as an employee according to this section . . . shall be punished . . ."). We have not been asked to address these questions and we do not do so. See note 14, supra.

itself preclude liability under G. L. c. 149, § 148B.

3. Conclusion. For the reasons stated, we answer the first certified question, "No," and the third certified question, "Yes." We answer the second certified question, "Yes," and add that a court applying the "right to control test" to the franchisor-franchisee relationship is to focus on whether the franchisor had the right to control the particular instrumentality of the harm.

The Reporter of Decisions is directed to furnish attested copies of this opinion to the clerk of this court. The clerk in turn will transmit one copy, under the seal of the court, to the clerk of the United States District Court for the District of Massachusetts, as the answer to the questions certified.

CORDY, J. (dissenting in part).  I concur with the court's
answers and analysis with respect to the first two certified
questions.  I disagree on the third certified question.  It seems
to me that whether a defendant may be liable for employee
misclassification under G. L. c. 149, § 148B (§ 148B), depends
first and foremost on whether there is a work arrangement of some
type between the defendant and the person claiming
misclassification.  If there is a work arrangement (i.e., some
form of an agreement of pay for services), our law makes it quite
clear that regardless of how the parties characterize that
arrangement, it will be presumed to be an employer-employee
relationship unless the party receiving the services can
establish the presence of the three statutory factors set out in
§ 148B.

In the absence of a work arrangement between the parties, be
it a written or oral, implicit or explicit, contract, agreement,
or understanding, § 148B simply does not apply.  If corporation A
contracts with corporation B to manage a facility to certain
specifications, and corporation B enters into arrangements with
third parties to perform the work it had undertaken under that
contract, § 148B would plainly apply to the relationship between
corporation B and the persons it has engaged to do the work, but
not between those persons and corporation A.  The only exceptions
to such an obvious conclusion would arise if corporation B was

set up by corporation A specifically for the purpose of evading the independent contractor law, or if corporation A were otherwise found to be the alter ego of corporation B, such that the corporate veil between them would be properly pierced and the work arrangement entered into by corporation B thereby attributed to corporation A. The factors to be considered in whether to disregard the deeply ingrained observance of corporate form are set out in Attorney Gen. v. M.C.K., Inc., 432 Mass. 546, 555 n.19 (2000). I see no evidence of legislative intent in § 148B to change the body of law that governs the liability of such distinct entities.

# Supreme Judicial Court for the Commonwealth of Massachusetts
## John Adams Courthouse
One Pemberton Square, Suite 1400, Boston, Massachusetts 02108-1724
Telephone 617-557-1020, Fax 617-557-1145

United States District Court
Sarah Allison Thornton, Clerk
1 Courthouse Way
Boston, MA 02210

RE:  No. SJC-11282

    **GIOVANI DEPIANTI & others**
        **vs.**
    **JAN-PRO FRANCHISING INTERNATIONAL, INC.**


NOTICE OF DECISION


A decision by the Supreme Judicial Court was issued in the
above-captioned case on this date.  The text of the decision will
be available for approximately two weeks at www.massreports.com.

Susan Mellen, Clerk

Dated: June 17, 2013

Depianti

vs.

Jan-Pro Franchising International, Inc.

Certified Copy of the Opinion

OF THE

Supreme Judicial Court

---

*Reporter of Decisions.*

*Commonwealth of Massachusetts.*

*Boston,* June 17 2013

I certify the annexed to be a true copy of the opinion of the Supreme Judicial Court in the case of

Depianti, vs. Jan-Pro Franchising International, Inc.

decided on the Seventeenth day of June 2013