UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GIOVANI DEPIANTI, et al.,      )
    Plaintiffs,             )
                    )
        v.            )      Civ. A. No. 08-10663-MLW
                    )
JAN-PRO FRANCHISING            )
INTERNATIONAL, INC.,           )
    Defendant.             )

MEMORANDUM AND ORDER
CONCERNING SUMMARY JUDGMENT

WOLF, D.J.                                      August 22, 2014

I.    OVERVIEW.................................................. 2

II.   BACKGROUND............................................... 6

    A.    Facts.............................................. 6

    B.    Procedural History................................. 8

III.  MOTIONS TO AMEND AND SUPPLEMENT THE PLEADINGS........... 13

    A.    Plaintiffs' Motion to Amend the Complaint.......... 13

    B.    JPI's Motion to File a Supplemental Answer......... 16

IV.   THE SUMMARY JUDGMENT STANDARD.......................... 19

V.    CROSS-MOTIONS FOR SUMMARY JUDGMENT: COUNTS II AND III.... 21

    A.    Additional Background.............................. 21

    B.    The GCA's Decision Is Preclusive................... 24

    C.    The GCA's Decision Is Consistent with
          Massachusetts Law.................................. 27

VI.   JPI'S MOTION FOR SUMMARY JUDGMENT: COUNTS I AND IV....... 36

    A.    Additional Background.............................. 36

    B.    General Analysis.................................. 39

    C.    Misrepresentation................................. 41

    D.    Unfair and Deceptive Business Practices............ 48

    E.    The Statute of Limitations........................ 61

VII.  JPI'S MOTION FOR SUMMARY JUDGMENT: COUNTS V AND VI....... 63

    A.    Additional Background.............................. 63

    B.    Quantum Meruit...................................... 64
    C.    Unjust Enrichment................................... 68
VIII. ORDER.................................................. 71

I.    OVERVIEW

     This is a putative class action against defendant Jan-Pro Franchising International, Inc. ("JPI"). JPI sits at the top of a three-tiered system of cleaning franchises. It sells the rights to use the "Jan-Pro" name to "regional master franchisees." These regional master franchisees sell the rights to use the Jan-Pro name to "unit franchisees," who perform cleaning services for customers. The regional master franchisees also solicit business for the unit franchisees and manage the process of billing the customers.

     The named plaintiffs are seven unit franchisees from four states. The six-count Amended Complaint (the "Complaint") claims, in essence, that plaintiffs and others similarly situated were misled into entering into agreements that improperly classified them as independent contractors when, as a matter of law, they were employees. Plaintiffs also allege that the terms of the agreements they signed were inherently unfair, and that these terms were systematically breached. Plaintiffs assert claims of unfair and deceptive business practices (Count I); misclassification as independent contractors (Count II),

along with related wage-law violations (Count III); misrepresentation (Count IV); quantum meruit (Count V); and unjust enrichment (Count VI).[1]

The proceedings to date have focused on plaintiff Giovani Depianti of Somerville, Massachusetts. The court certified three questions to be answered by the Massachusetts Supreme Judicial Court (the "SJC"). The SJC has issued its answers to these questions. In addition, concurrent proceedings between the parties in the Georgia state courts have culminated in a decision in JPI's favor.

JPI moves for summary judgment on all counts. Plaintiffs move for summary judgment on Count II only, as to Depianti only. In addition, plaintiffs move to amend their complaint to add new named plaintiffs to the proceedings. JPI also moves to assert preclusion defenses that were not identified in its answer to the Complaint. For the reasons explained in this Memorandum, the court is deciding these motions as follows.

The court is allowing JPI's motion to assert a preclusion defense, in essence because the doctrines concerning preclusion implement important considerations of comity between competent

---

[1]     The regional master franchisees were not named as defendants, apparently because their contracts with the unit franchisees contain mandatory arbitration clauses. See Exhibit Compendium Tab 10, ¶16(A) ("BME-Depianti Contract").

courts. Conversely, because plaintiffs' motion to amend the complaint does not implicate the same considerations, and because it is unduly prejudicial at this late stage of the litigation, this motion is being denied.

Plaintiffs' motion for summary judgment is being denied, and JPI's motion for summary judgment is being allowed in part and denied in part, as follows.

First, the court is entering summary judgment for JPI on Counts II and III of the Complaint, which allege misclassification as independent contractors and related wage-law violations. The Georgia Court of Appeals (the "GCA") has determined that, as a matter of Massachusetts law, JPI is not Depianti's employer. Under the applicable federal doctrines concerning preclusion, the GCA's decision is binding on this court. Moreover, the court concludes that the GCA's decision is consistent with Massachusetts law, as explicated by the SJC.

Counts I and IV of the complaint allege unfair and deceptive business practices under Massachusetts General Laws Chapter 93A ("Chapter 93A") and misrepresentation. JPI is entitled to summary judgment as to some, but not all, of the allegations made in these counts. These counts rely on a theory of vicarious liability, according to which JPI is liable for the conduct of its regional master franchisee in eastern

4

Massachusetts, BradleyMktg Enterprises, Inc. ("BME"). Under Massachusetts law, as developed by the SJC, JPI is liable for BME's conduct if: (a) that conduct was actionable, and (b) JPI controlled, or had a right to control, the specific actionable policy or practice. A reasonable fact finder could find that JPI has the right to control one practice alleged in the Complaint -- the contracts that BME makes with its unit franchisees. Count IV of the Complaint alleges, among other things, that the terms of these contracts are inherently unfair in a manner actionable under Chapter 93A. This part of Count IV is, therefore, surviving summary judgment. JPI will, however, be permitted to argue at a later date that Depianti's surviving 93A claim is barred by the applicable statute of limitations, as this issue has not yet been developed sufficiently. Summary judgment is entering in JPI's favor on the other parts of Count IV and on all of Count I.

JPI is also entitled to summary judgment on Count V of the Complaint, which asserts a claim in quantum meruit. As a matter of law, this claim can only succeed if Depianti expected to be remunerated by JPI, and plaintiffs have conceded that Depianti did not have such an expectation.

This element of expectation to be remunerated is not required under the cause of action asserted in Count VI of the

Complaint, unjust enrichment. JPI's argument for summary judgment on this count is, therefore, not meritorious. However, since unjust enrichment is an equitable doctrine, JPI will be permitted to argue at a later date that Depianti is not entitled to recover under this doctrine because an adequate remedy is available to him at law.

II.  BACKGROUND

    A.  <u>Facts</u>

The following facts are generally not disputed. Factual disputes are discussed separately below.

JPI is a Massachusetts corporation with headquarters in Alpharetta, Georgia. JPI has trademarked the "Jan-Pro" name, and it sells the rights to used this name in specified geographic areas to regional master franchisees.

The regional master franchisees, which are separate corporate entities from JPI, acquire the exclusive rights to sell unit franchises in their respective territories. JPI provides each new regional master franchisee with several days of training. Each regional master franchisee is then provided with sample marketing materials and with electronic templates that may be used for various managerial purposes. Regional master franchisees pay JPI a fee for each unit franchise they sell. They also remit to JPI a percentage of the revenue that

they collect for the cleaning work performed by their unit franchisees.

Regional master franchisees provide their unit franchisees with some initial training. Thereafter, they perform three basic services for the unit franchisees: they solicit cleaning accounts and offer them to the unit franchisees; they bill the customers for work performed by the unit franchisees and collect payment from the customers; and they distribute the revenue to unit franchisees. JPI does not perform these services.

The agreements between JPI and the regional master franchisees provide that the regional master franchisees are independent contractors, not agents or fiduciaries of JPI. JPI visits its regional master franchisees' offices no more than annually. Regional master franchisees are responsible for their own accounting, which JPI does not monitor. They may choose whether or not to advertise and, except for the requirement that they use the Jan-Pro logo, the content of any such advertising.

Unit franchisees may be individuals or corporations. The agreements between the regional master franchisees and each unit franchisee, like the agreements between JPI and each regional master franchisee, state that the unit franchisee is an independent contractor, not an agent or employee of the regional master franchisee. Unit franchisees control their own marketing

7

and bookkeeping. They are permitted to hire employees, and some do so.

Every new unit franchisee is guaranteed, in its agreement with the regional master franchisee, a volume of cleaning accounts worth a specified amount of gross annual billing. The amount specified varies between unit franchisees, and affects the price charged for the unit franchise. If the regional master franchisee fails to provide the required amount of business, the unit franchisee is entitled to a full or partial refund. The contracts between regional master franchisees and unit franchisees permit the regional master franchisees to offer the unit franchisees business anywhere within the regional master franchisee's geographic region. However, regional master franchisees sometimes agree to provide the required amount of business within a more limited area convenient to the unit franchisee.

B.   Procedural History

The instant suit was brought on April 18, 2008. Eleven individual plaintiffs were initially named. Plaintiffs Grasielle Regina Dos Santos, Hyun Ki Kim, Todor Sinapov, and Kyu Jin Roh have since been dismissed by stipulation.

The operative Complaint was filed after the court denied JPI's Motion to Dismiss and Supplemental Motion to Dismiss. See

Nov. 25, 2008 Order.[2] As described earlier, the Complaint asserts claims of unfair and deceptive business practices under Chapter 93A, misclassification as independent contractors and related wage-law violations, misrepresentation, quantum meruit, and unjust enrichment.

With the court's permission, the parties filed cross-motions for summary judgment before class certification was addressed. See Sept. 15, 2009 Order ¶2. JPI sought summary judgment on all claims as to all plaintiffs. Plaintiffs sought summary judgment on Count II with regard to "Massachusetts plaintiffs," namely Depianti. The motions for summary judgment revealed that in the parties' view, the law that governs each claim is the law of the state in which the relevant regional master franchisee is located. See also Apr. 12, 2010 Joint Report (confirming that this is the parties' position). The court decided to focus, at first, on Depianti's claims. See Apr. 13, 2010 Order ¶2; Apr. 16, 2010 Tr. at 4.

The court then certified three questions presented by Depianti's case to be answered by the SJC. See Depianti v. Jan-

---

[2]   The opportunity to file an amended complaint was granted to plaintiffs in part so that they could "make more clear what [JPI] has allegedly done through its agents . . . and what, if anything, it's done independently." Nov. 20, 2008 Tr. at 8. However, plaintiffs have generally declined to do so in subsequent submissions, typically using the label "Jan-Pro" to refer both to JPI and to its regional master franchisees.

<u>Pro Franchising Int'l, Inc.</u>, Civ. A. No. 08-10663, 2012 WL 3835090 (D. Mass. Aug. 31, 2012) ("<u>Depianti Questions</u>"). The first question concerned the court's jurisdiction. A plaintiff asserting a claim of employee misclassification under Massachusetts law is required by statute, Mass. Gen Laws ch. 149, §150, to file a complaint with the Massachusetts Attorney General before bringing suit. Depianti had apparently not satisfied this requirement. However, the court found that JPI had "waived the argument that Depianti failed to exhaust administrative remedies," because the only mention of this argument in JPI's submissions was intentionally inconspicuous. <u>Id.</u> at *2-*3. Accordingly, the SJC was asked "[w]hether a plaintiff's failure to exhaust administrative remedies . . . by filing a complaint with the Attorney General deprives a court of jurisdiction to consider the plaintiff's claims." <u>Id.</u> at *3 (Order ¶1(a)).

The second question certified by the court concerned Depianti's claims of misrepresentation and unfair and deceptive business practices under Chapter 93A. These claims rely on a theory of vicarious liability, according to which JPI would be held liable for the acts of its regional master franchisee, BME. The SJC was asked to explain "[w]hether and how to apply the

'right to control test' for vicarious liability to the franchisor-franchisee relationship." Id. (Order ¶1(b)).

The third question concerned Depianti's claims of misclassification and wage-law violations. Because there is no direct contractual relationship between JPI and Depianti, the SJC was asked "[w]hether a defendant may be liable for employee misclassification . . . where there was no contract for services between the plaintiff and defendant." Id. (Order ¶1(c)).

On June 17, 2013, the SJC answered the questions certified to it. See Depianti v. Jan-Pro Franchising Int'l, Inc., 990 N.E.2d 1054, 1060-62 (Mass. 2013) ("Depianti Answers"). The SJC's answers were as follows. First, a plaintiff's failure to file a complaint with the Massachusetts Attorney General before bringing suit does not deprive the court of jurisdiction. Id. at 1060-62. Second, as discussed in detail below, a franchisor is vicariously liable for the conduct of its franchisee where "the franchisor controls or has a right to control the specific policy or practice resulting in harm to the plaintiff." Id. at 1064. Third, as discussed below as well, the absence of a contract between two parties does not, itself, preclude liability for misclassification. Id. at 1064-69.

Concurrent to the instant suit, proceedings between JPI and Depianti have taken place in the Georgia state courts. There,

JPI filed suit against Depianti and a unit franchisee from Pennsylvania, Hyun Ki Kim.[3] JPI sought a declaratory judgment that it is not the "employer" of those individuals under the laws of Massachusetts and Pennsylvania, respectively. Depianti moved to dismiss for lack of personal jurisdiction. The trial court denied his motion and issued a certificate of immediate review. Depianti did not file an interlocutory appeal.

The Georgia trial court then allowed Depianti's motion for summary judgment. JPI appealed, and the GCA reversed, finding that, under Massachusetts General Laws ch. 149, §148B (the "Misclassification Statute"), JPI is not Depianti's employer. See Jan-Pro Franchising Int'l, Inc. v. Depianti, 712 S.E.2d 648 (Ga. Ct. App. 2011) ("Depianti Georgia"). Depianti petitioned the Supreme Court of Georgia (the "SCG") for certiorari. At first, the SCG stayed its decision. See Pls.' Jan. 3, 2012 Notice of Suppl. Authority Ex. A. On July 9, 2013, after the SJC had answered the questions that had been certified to it by this court, Depianti's petition for certiorari was denied.

After the SJC and the Georgia courts issued their respective decisions, this court permitted the parties to file supplemental briefing, including a reply and a sur-reply. See

---

[3]     Kim was initially a named plaintiff in the instant case, but the parties have stipulated to the dismissal of his claims.

Sept. 4, 2013 Order. When briefing was complete, on December 6, 2013, the court held a status conference to discuss the pending motions and how this case should proceed. The parties confirmed that their cross-motions for summary judgment are ripe for decision, as are motions by both parties, discussed below, to amend or supplement their pleadings.

III. MOTIONS TO AMEND AND SUPPLEMENT THE PLEADINGS

    A.   <u>Plaintiffs' Motion to Amend the Complaint</u>

Plaintiffs move to file a Second Amended Complaint. By this motion (the "Motion to Amend"), plaintiffs seek to add additional unit franchisees from Massachusetts as new named plaintiffs.

The Motion to Amend was initially motivated by plaintiffs' concern that Depianti's misclassification claim would be barred because he had failed to file a complaint with the Massachusetts Attorney General before bringing suit. <u>See</u> Mot. to Amend Compl. ¶¶4-5. The SJC has since allayed this concern by finding, in response to the first question certified to it by this court, that failure to file a complaint with the Massachusetts Attorney General is not jurisdictional. <u>See</u> <u>Depianti Answers</u>, 990 N.E.2d at 1060-62. However, plaintiffs now wish to make the same proposed amendment in order to avoid the preclusion of

Depianti's claim by the decisions of the Georgia courts. <u>See</u> Pls.' Oct. 8, 2013 Reply Suppl. at 3 & n.2.

JPI opposes the Motion to Amend. It argues, among other things, that the proposed addition of new plaintiffs "at this stage in the case -- where discovery is completed, the merits are ripe for ruling, and plaintiffs had years of notice as to JPI's affirmative defenses -- is far too prejudicial to JPI and far too late." JPI's Opp'n to Pl.'s Mot. to Amend at 3; JPI's Oct. 22, 2013 Sur-Reply Suppl. Submission at 7.

The general rule is that amendment should be allowed "[u]nless there appears to be an adequate reason (e.g., undue delay, bad faith, dilatory motive, futility of amendment, prejudice)." <u>Mirpuri v. ACT Mfg., Inc.</u>, 212 F.3d 624, 628 (1st Cir. 2000) (quoting <u>Glassman v. Computervision Corp.</u>, 90 F.3d 617, 622 (1st Cir. 1996)). The First Circuit has explained that:

> As a case progresses . . . the burden on a plaintiff seeking to amend a complaint becomes more exacting. Scheduling orders, for example, typically establish a cut-off date for amendments . . . . Once a scheduling order is in place, the liberal default rule is replaced by the more demanding "good cause" standard of Fed. R. Civ. P. 16(b). . . . Where the motion to amend is filed after the opposing party has timely moved for summary judgment, a plaintiff is required to show "substantial and convincing evidence" to justify a belated attempt to amend a complaint. . . .
>
> [T]he longer a plaintiff delays, the more likely the motion to amend will be denied, as protracted delay, with its attendant burdens on the opponent and the court, is itself a sufficient reason for the court to

14

> withhold permission to amend. Particularly disfavored
> are motions to amend whose timing prejudices the
> opposing party by "requiring a re-opening of discovery
> with additional costs, a significant postponement of
> the trial, and a likely major alteration in trial
> tactics and strategy."

Steir v. Girl Scouts of the USA, 383 F.3d 7, 12 (1st Cir. 2004)

(citations omitted); see also In re Sonus Networks, Inc. Sec.

Litig., 229 F.R.D. 339 (D. Mass. 2005).

In this case, a Scheduling Order was issued, which established December 12, 2008 as the deadline for any motions to amend the pleadings. See Nov. 21, 2008 Order ¶2. The deadline for the completion of all discovery was September 15, 2009, and all fact discovery was to be completed by June 26, 2009. See Apr. 17, 2009 Electronic Order; May 22, 2009 Electronic Order.

The Motion to Amend was filed on June 6, 2012, approximately 42 months after the deadline established by the Scheduling Order, 33 months after conclusion of all discovery, and 32 months after JPI filed its motion for summary judgment. If the Motion to Amend were allowed, it would prejudice JPI by "requiring a re-opening of discovery with additional costs [and] a significant postponement of the trial." Steir, 383 F.3d at 12 (citing Acosta-Mestre, 156 F.3d at 52). It would also disrupt the progress of this complicated and long-filed case by requiring additional discovery, briefing, and argument.

Moreover, the individuals proposed to be added as named plaintiffs would not be prejudiced by the denial of the Motion to Amend because they may, in any event, file one or more separate suits on their own behalf(s). Cf. In re Sonus Networks, 229 F.R.D. at 346. Plaintiffs' Motion to Amend is, therefore, being denied.

B.  JPI's Motion to File a Supplemental Answer

JPI moves to file a supplemental answer to the Complaint. It seeks, by this motion (the "Motion to Supplement"), to assert a defense of claim preclusion and issue preclusion based on the GCA's decision that JPI is not, as a matter of law, Depianti's employer. Plaintiffs oppose the Motion to Supplement, arguing that JPI's proposed defenses should have been raised at an earlier date. See Pls.' Opp'n to JPI's Mot. to File Suppl. Answer/Affirmative Defenses.

The court may have the discretion to consider the potential preclusive effect of the GCA's decision even if JPI does not file a supplemental answer. "Respect for prior judgments is deeply ingrained in our legal regime," and this value is protected by constitutional and statutory provisions. Newman v. Krintzman, 723 F.3d 308, 310 (1st Cir. 2013) (citing U.S. Const. art. IV, §1; 28 U.S.C. §1738). The rules of claim and issue preclusion serve to "relieve parties of the cost and vexation of

multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." Apparel Art Int'l, Inc. v. Amertex Enterprises Ltd., 48 F.3d 576, 583 (1st Cir. 1995) (quoting Allen v. McCurry, 449 U.S. 90, 94 (1980)). As the Ninth Circuit has recognized, the rules and policies concerning preclusion may be so important as to trump the ordinary pleading rules under certain circumstances. See Jackson v. Hayakawa, 605 F.2d 1121, 1129 (9th Cir. 1979).

In any event, JPI's Motion to Supplement is meritorious. "A motion to supplement the pleadings under Rule 15(d) is addressed to sound discretion of the Court." Structural Sys., Inc. v. Sulfaro, 692 F. Supp. 34, 36 (D. Mass. 1988); 6A Charles Alan Wright et al., Federal Practice and Procedure §1504 (3d ed. 2010) (citing Farmer v. Brennan, 511 U.S. 825, 845 (1994)). The considerations of comity, judicial economy, and consistency that underlie the preclusion rules are important factors in the court's exercise of its discretion. In addition, the Motion to Supplement, unlike plaintiffs' Motion to Amend, is based on developments that occurred during the pendency of this case, namely the decisions of the GCA and the SCG. Consequently, JPI cannot be faulted for failing to include its preclusion defense in its answer to the Complaint. Cf. Grieve v. Tamerin, 269 F.3d

17

149, 154 (2d Cir. 2001); <u>Momand v. Paramount Pictures Distrib.</u> <u>Co.</u>, 6 F.R.D. 222, 223 (D. Mass. 1946).

It is true that JPI did not file its Motion to Supplement until July 24, 2013, long after the GCA had issued its June 23, 2011 decision. However, plaintiffs were put on notice of JPI's intention to rely on the GCA's decision no later than September 21, 2011, when JPI filed a Motion for Stay and/or Reconsideration in Light of the Principles of Res Judicata on the basis of the GCA's decision.[4] In addition, JPI's delay in filing its Motion to Supplement was excusable, to some degree, during two periods of time: until July 9, 2013, because the SCG had not yet denied certiorari, and after August 31, 2012, because a stay was entered in the instant case. In summary, JPI's delay in bringing its Motion to Supplement was limited, and it did not prejudice plaintiffs.

Accordingly, JPI's Motion to Supplement is being allowed. The court is deeming JPI's proposed Amended Answer and Affirmative Defenses to be the operative answer in this case and, as discussed below, the court is deciding JPI's preclusion defense.

---

[4]    Earlier yet, on June 27, 2011, JPI filed a Notice addressing the GCA's decision and requesting a status conference to consider its consequences.

IV.  THE SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A factual dispute, therefore, precludes summary judgment if it is "material" and "genuine." See Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986).

A fact is "material" if, in light of the relevant substantive law, "it has the potential of determining the outcome of the litigation." Maymi v. Puerto Rico Ports Auth., 515 F.3d 20, 25 (1st Cir. 2008); Martinez-Rodriguez v. Guevara, 597 F.3d 414, 419 (1st Cir. 2010). "Only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

To determine if a factual dispute is "genuine," the court must assess whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Chadwick v. WellPoint, Inc., 561 F.3d 38, 43 (1st Cir. 2009) (quoting Anderson, 477 U.S. at 248); Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009). In making this determination, the court must "constru[e] the record in the light most favorable to

19

the non-moving party," Douglas v. York Cnty., 433 F.3d 143, 149 (1st Cir. 2005), and "tak[e] all reasonable inferences in [the non-moving party's] favor," id. at 145; see also Montalvo v. Gonzalez-Amparo, 587 F.3d 43, 46 (1st Cir. 2009). The record must not be scrutinized piecemeal. Rather, it must be "taken as a whole." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Kelly v. Cort Furniture, 717 F. Supp. 2d 120, 122 (D. Mass. 2010). Evidence submitted in inadmissible form may be considered only if it could be presented in a form that would be admissible at trial. See Federal Rule of Civil Procedure 56(c)(2); Gorski v. New Hampshire Dep't of Corr., 290 F.3d 466, 475-76 (1st Cir. 2002); Vazquez v. Lopez-Rosario, 134 F.3d 28, 33 (1st Cir. 1998).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). However, the moving party's burden "may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325. Summary judgment is, therefore, mandated "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322; Gorski, 290 F.3d at 475-76; Smith v. Stratus Computer, Inc., 40 F.3d 11, 12 (1st Cir. 1994).

V.   CROSS-MOTIONS FOR SUMMARY JUDGMENT: COUNTS II AND III

A.   Additional Background

Count II of the Complaint alleges that JPI misclassified Depianti, as well as the other plaintiffs, as an independent contractor, when he was, as a matter of law, an employee. Count III alleges that, as a result, JPI violated wage statutes applicable to employees.

These claims are governed by the Misclassification Statute, which is intended "to protect employees from being deprived of the benefits enjoyed by employees through their misclassification as independent contractors." Mass. Delivery Ass'n v. Coakley, 671 F.3d 33, 37 (1st Cir. 2012) (quoting Somers v. Converged Access, Inc., 911 N.E.2d 739, 749 (Mass. 2009)). The Misclassification Statute provides that, for the purpose of various wage and employment laws:

> an individual performing any service . . . shall be considered to be an employee . . . unless: --
>
>    (1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and

(2) the service is performed outside the usual course of the business of the employer; and,

(3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

Mass. Gen. Laws ch. 149, §148B(a). The Misclassification Statute calls for a two-step analysis: "First, 'an individual performing any service' is presumed to be an employee. Second, the statute lays out three indicia of an independent contractor relationship, all three of which must be established to rebut the presumption of employment." Depianti Answers, 990 N.E.2d at 1066-67 (citations omitted). "The failure of the employer to prove all three criteria set forth above suffices to establish that the individual in question is an employee." Somers, 911 N.E.2d at 747 (citing cases).

The GCA applied the Misclassification Statute in accordance with these principles. It began with the presumption that Depianti is an employee, stating that "[u]nder Massachusetts law, the putative employer has the burden to overcome a rebuttable presumption that 'any person performing services for another is an employee unless the employer meets the three prong test'" defined by the Misclassification Statute. Depianti Georgia, 712 S.E.2d at 650 (quoting Chaves v. King Arthur's Lounge, Inc., No. 07-2505, 2009 WL 3188948 (Mass. Sup. Ct.

22

Suffolk July 20, 2009)). The GCA then examined each of the Misclassification Statute's three conditions, and found that the evidence established each beyond genuine dispute. The GCA, therefore, concluded that on the record before it, "JPI is not Depianti's employer" under the Misclassification Statute. Id. at 652. Accordingly, the GCA held that JPI was entitled to summary judgment. Id. As noted earlier, on July 9, 2013, Depianti's petition for certiorari to the SCG was denied.

JPI contends that the GCA's decision precludes plaintiffs' argument that JPI is Depianti's employer as a matter of law, and that summary judgment should, therefore, enter against Depianti on Counts II and III. See JPI's Sept. 24, 2013 Suppl. Submission at 8, 10. Plaintiffs argue, in response, that the court should not follow the GCA's decision, but instead should apply Massachusetts law, and specifically the SJC's decision in Depianti Answers, on its own. See Pls.' Aug. 27, 2013 Suppl. at 4. Plaintiffs also argue that Depianti may yet prevail in the proceedings conducted in Georgia, because he expects to have an opportunity to appeal the Georgia trial court's denial of his motion to dismiss for lack of personal jurisdiction. See Pls.' Oct. 8, 2013 Reply Suppl. at 2 & n.1.[5]

_____

[5]    Plaintiffs also contend that if Depianti's claims are precluded, the court should allow the Motion to Amend, thereby adding other Massachusetts unit franchisees as named plaintiffs.

B.   <u>The GCA's Decision Is Preclusive</u>

As discussed earlier in a different context, the doctrines that grant preclusive force to prior decisions of other competent courts are "deeply ingrained in our legal regime," <u>Newman</u>, 723 F.3d at 310. These doctrine draw on considerations of comity between jurisdictions, conservation of judicial resources, and consistency of judicial decisions. <u>See</u> <u>Apparel Art</u>, 48 F.3d at 583. The statutory basis for the federal preclusion doctrines is 28 U.S.C. §1738, which provides that:

> The records and judicial proceedings of any court of any . . . State . . . shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

"[U]nder §1738's full-faith-and-credit mandate, federal courts must give preclusive effect to a state-court judgment if the state court itself would. In other words, we must accept that state's rules for deciding the effect of the judgment . . . ." <u>Newman</u>, 723 F.3d at 310 (citations omitted); <u>Garcia-Monagas v. De Arellano</u>, 674 F.3d 45, 50 (1st Cir. 2012); <u>In re Sonus Networks, Inc.</u>, 499 F.3d 47, 56 (1st Cir. 2007). "When a federal court considers the preclusive effect of an earlier

---

See Pls.' Reply Suppl. at 3 & n.2. For the reasons explained earlier, the Motion to Amend is being denied.

24

state court judgment, it must apply that state's preclusion principles . . . even when the new case poses a quintessentially federal question." Goldstein v. Galvin, 719 F.3d 16, 22 (1st Cir. 2013). The question whether the GCA's decision in Depianti Georgia is preclusive in the current case is, therefore, governed by Georgia law.

The general rule under Georgia law is that "judgment is not final as long as there is a right to appellate review." Greene v. Transport Ins. 313 S.E.2d 761 (Ga. Ct. App. 1984) (quoting Lexington Developers v. O'Neal Const. Co., 238 S.E.2d 770, 771 (Ga. App. Ct. 1977). Thus, in Georgia, "the fact that a prior court judgment has been appealed suspends the operation of any preclusive effect pending the appeal." CS-Lakeview At Gwinnett, Inc. v. Retail Dev. Partners, 602 S.E.2d 140, 142 (Ga. Ct. App. 2004). Georgia law differs, in this respect, from Massachusetts law and from federal law, in which "a trial court judgment is final and has preclusive effect regardless of the fact that it is on appeal." O'Brien v. Hanover Ins. Co., 692 N.E.2d 39, 44 (Mass. 1998) (citing S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co., 740 F.2d 1011, 1018–19 (D.C. Cir. 1984)); In re Sonus Networks, Inc. S'holder Derivative Litig., 422 F. Supp. 2d 281, 290 n.5 (D. Mass. 2006).

The GCA ruled in Depianti Georgia that JPI is entitled to summary judgment, and the SCG declined to review that ruling. Proceeding from Georgia's general rule alone, however, it would appear that Depianti Georgia is not preclusive if any judgment against Depianti may yet, as plaintiffs contend, be appealed on personal jurisdiction grounds.[6]

Nevertheless, "[t]he courts of Georgia . . . have clarified that when a trial judge certifies an interlocutory order for immediate appeal, the order becomes final for purposes of both appealability and preclusion." Cmty. State Bank v. Strong, 651 F.3d 1241, 1265 (11th Cir. 2011) (citing Culwell v. Lomas & Nettleton Co., 248 S.E.2d 641, 642 (Ga. 1978); Walker v. Robinson, 207 S.E.2d 6, 7 (Ga. 1974); Gresham Park Cmty. Org. v. Howell, 652 F.2d 1227, 1242 n.43 (5th Cir. 1981)). In the current case, the Georgia trial court issued a Certificate of Immediate Review concerning its order finding that it has personal jurisdiction over Depianti. See JPI's Sept. 24, 2013

---

[6] At the December 6, 2013 status conference, Depianti reported that he intends to file an appeal from the Georgia trial court's final judgment, on personal jurisdiction grounds, soon after that conference. JPI expressed the view that this appeal could no longer be taken. The court has not been informed whether Depianti has filed an appeal or whether any such appeal has been resolved. However, for the reasons explained above, this information is not material to the instant decision.

Suppl. Submission Ex. A. This ruling, therefore, became final for preclusion purposes under Georgia's preclusion law.[7]

Accordingly, the court is required to adopt the GCA's ruling in Depianti Georgia that "JPI is not Depianti's employer with respect to the [Misclassification Statute]." 712 S.E.2d at 652. Therefore, the court is entering summary judgment against Depianti on his misclassification claim (Count II) and on the claims of wage-law violations (Count III), which are premised on a finding of misclassification.

C.    The GCA's Decision Is Consistent with Massachusetts Law

The court's obligation to accord "full faith and credit" to the GCA's decision in Depianti Georgia is, as noted earlier, rooted in a "[r]espect for prior judgments" that is "deeply ingrained in our legal regime," and that serves important values of comity, judicial economy, and consistency. See 28 U.S.C. §1738; Newman, 723 F.3d at 310; Apparel Art, 48 F.3d at 583. Accordingly, it is not necessary for the court to conduct an independent examination of the merits of the GCA's decision. Cf. Goldstein, 719 F.3d at 22. Nevertheless, the court has

_____

[7]    Plaintiffs' present contention that Depianti Georgia is not preclusive is undermined, to some degree, by the fact that they previously argued that the Georgia trial court's entry of summary judgment in Depianti's favor was preclusive. See Pls.' Aug. 16, 2010 Notice of Suppl. Authority at 2.

considered the merits and finds that Depianti Georgia appears to be consistent with Massachusetts law, in general, and with the SJC's decision in Depianti Answers, in particular.

The GCA ruled that the three conditions established by the Misclassification Statute are satisfied because of, in essence, the following reasons. First, the GCA found that Depianti is "free from [JPI's] control and direction" essentially because, on "undisputed facts," BME "makes its own hiring and firing decisions without control by JPI," "holds the accounts serviced by Depianti," "pays Depianti," and "invoices customers serviced by Depianti." 712 S.E.2d at 651. The GCA found that JPI "participates in none of this activity" and, therefore, that "Depianti's performance of cleaning services is not controlled by JPI." Id.

Next, the GCA found that Depianti's services are "performed outside [JPI's] usual course of the business" because "JPI's usual business was establishing a trademark and cleaning system that was then licensed to regional franchisees like BME." Id. JPI had established, according to the GCA, that "its usual course of business was not to compete with unit franchisees for cleaning contracts," but rather to "create[] a business model that it licensed to regional franchisees." Id. JPI "did not market cleaning services to clients, it did not invoice clients

28

for cleaning services, it did not collect payment from clients for cleaning services." Id. at 651-52.

Finally, the GCA determined that Depianti is "customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed," because of "essentially the same reasons" -- namely, because "JPI does not limit or control the scope of Depianti's services or the continuation of his business . . . Depianti has established a business separate from JPI, and Depianti operates that business without intervention by JPI." Id. at 652

These reasons are discrete from the SJC's holdings in Depianti Answers. The only issue concerning Depianti's misclassification claim addressed in Depianti Answers was the "limited question . . . whether a contract between the parties is a necessary element of a claim under [the Misclassification Statute]." Depianti Answers, 990 N.E.2d at 1065. In its answer to this question, the SJC explained that the Misclassification Statute "contains no language limiting its application to circumstances where the putative employer and the putative employee have entered into a contract together," id. at 1067, and that this statute serves a "broad remedial purpose," namely "to protect workers by classifying them as employees, and

29

thereby grant them the benefits and rights of employment, where the circumstances indicate that they are, in fact, employees." Id. at 1066-67 (quoting Taylor v. Eastern Connection Operating, Inc., 988 N.E.2d 408, 410 (Mass. 2013)). Accordingly, the SJC concluded that "the lack of a contract for service between the putative employer and putative employee does not itself preclude liability under [the Misclassification Statute]." Id. at 1069.

The GCA's decision in Depianti Georgia is not undermined by this limited holding. The GCA did not rely on the absence of a contract between the parties in finding that Depianti is not JPI's employee. Rather, its reasons, as summarized earlier, were rooted in the general fabric and specific characteristics of the relationship between JPI and Depianti. The SJC, for its part, clarified that its holding in Depianti Answers does not necessarily imply that JPI is Depianti's employer. The SJC stated that it was not "in any way suggesting that Depianti was working as an employee of [JPI]," 990 N.E.2d at 1068, adding:

> In concluding that an entity like [JPI] can be liable under [the Misclassification Statute], without a contract between itself and the employee, we should not be understood as suggesting that [JPI] is in fact liable. We take no position on the question whether the necessary predicates for liability can be established here . . . .

30

Id. at 1069 n.16. The SJC, thus, recognized that its decision could be consistent with a determination that the "necessary predicates for liability" are not met in this case.

Plaintiffs argue that given the SJC's holding that a defendant may be liable for misclassification even if there is no contract between the putative employer and employee, "this case is now no different in substance from other cases in which [JPI]'s competitors have been held to have misclassified the workers that perform the cleaning services for those companies." Pls.' Aug. 27, 2013 Suppl. at 2 (citing Awuah v. Coverall N. Am., Inc., 707 F. Supp. 2d 80 (D. Mass. 2010); De Giovanni v. Jani-King Int'l, Inc., Civ. A. No. 07-10066-MLW (D. Mass. June 6, 2012)). This argument is not accurate. Rather, Depianti Georgia is also consistent with other cases decided in this district, under Massachusetts law, concerning more or less comparable circumstances.

Plaintiffs' argument ignores a potentially crucial difference between JPI and some of its competitors: the three-tiered structure of JPI's business model. In Awuah, for example, the court (Young, D.J.) entered summary judgment for the plaintiffs, workers who had performed cleaning services as franchisees for Coverall, the defendant. The court found that Coverall had not satisfied the second prong of the

31

Misclassification Statute, namely the requirement that the worker's service be "performed outside the usual course of the business of the employer." The court based its conclusion primarily on the facts that:

> Coverall trains its franchisees and provides them with uniforms and identification badges. Coverall contracted with all customers, with limited exceptions, until May 2009, and Coverall is the party billing all customers for the cleaning services performed. Finally, Coverall receives a percentage of the revenue earned on every cleaning service. These undisputed facts establish that Coverall sells cleaning services, the same services provided by these plaintiffs.

Awuah, 707 F. Supp. 2d at 84 (citations to the record omitted). Unlike Coverall, JPI did not, on the facts found by the GCA, train Depianti, provide him with equipment, or bill the customers to whom Depianti provided cleaning services. As the GCA noted, many of these tasks were, in fact, performed by BME. See Depianti Georgia, 712 S.E.2d at 652 ("were the comparison between BME and Depianti, we might conclude that Depianti 'wears BME's hat,' because . . . BME holds the customer accounts, invoices customers, receives customer payments, and even provides backup employees"). Accordingly, the reasoning of Awuah

does not imply that JPI, like Coverall, should be considered to be Depianti's employer.[8]

This court's decisions in the De Giovanni case also do not undermine the GCA's reasoning in Depianti Georgia. The plaintiffs in De Giovanni, who also performed janitorial services, brought suit against three defendants: Jani-King International, Kani-King Incorporated, and Jani-King of Boston. In a June 6, 2014 oral decision, this court found that the De Giovanni plaintiffs were entitled to summary judgment on the "usual course of the business" prong of the Misclassification Statute. Summary judgment was entered against all three defendants. The court explained that although, in principle, there may be material differences between the various defendants, summary judgment was appropriate as to all three because "they chose to brief the issue as if the three

---

[8]     The Awuah court also stated, paraphrasing prior cases, that "franchising is not in itself a business, rather a company is in the business of selling goods or services and uses the franchise model as a means of distributing the goods or services to the final end user without acquiring significant distribution costs." 707 F. Supp. 2d 84. Even assuming that this statement characterizes all franchisors, it does not necessarily imply that JPI is in the business of selling the same services provided by Depianti. Rather, in the context of JPI's particular business model, JPI may be understood to be in the business of setting up "unit franchisees" (like Depianti) -- and to be using the franchising mechanism to perform this service through (regional master) franchisees like BME.

defendants were similarly situated." De Giovanni v. Jani-King Int'l, Inc., 968 F. Supp. 2d 447, 450 (D. Mass. 2013).

Defendants subsequently sought reconsideration, arguing that Jani-King International and Jani-King Incorporated may not be liable even if Jani-King of Boston is. The court found that this argument had been waived. Id. at 450. However, the court again recognized that distinctions between the different defendants may, in principle, be material, and scheduled an opportunity to reconsider certain facets of this issue at a later date. Id. at 455. Subsequently, the De Giovanni parties reached a settlement agreement, which was approved by the court. See De Giovanni v. Jani-King Int'l, Inc., Civ. A. No. 07-10066-MLW (D. Mass. Aug. 8, 2014).

Thus, this court did not determine, in De Giovanni, that a franchisor whose franchisees are themselves franchisors, like JPI, is legally indistinguishable from its intermediate franchisees. The entry of summary judgment against the three defendants in De Giovanni was, rather, a result of those parties' own decision to litigate that case as if they represent a single party.

At their core, Awuah and De Giovanni indicate that a franchisor is, as a matter of law, the employer of franchisee-plaintiffs who perform cleaning services if the franchisor

34

"sells cleaning services, the same services provided by the[] plaintiffs." Awuah, 707 F. Supp. 2d at 84. The franchisor in Awuah did, according to the Awuah court's findings, itself sell cleaning services. Id. In the De Giovanni case, the business of one or more of the defendants was selling cleaning services, and the three defendants failed to distinguish among themselves. See De Giovanni, 968 F. Supp. 2d at 450.

These decisions do not mean that every franchisor whose franchisees perform cleaning services -- or whose franchisees' franchisees perform cleaning services -- itself sells cleaning services, and is therefore the employer of those franchisees as a matter of law. The essence of the GCA's findings in Depianti Georgia is that JPI's "usual course of business was not to compete with unit franchisees for cleaning contracts," since JPI "did not market cleaning services to clients, it did not invoice clients for cleaning services, it did not collect payment from clients for cleaning services," instead limiting its activities to "creat[ing] a business model that it license[s] to regional franchisees." 712 S.E.2d at 651-52.

In summary, the GCA's decision in Depianti Georgia is not only binding on this court, for the preclusion reasons described earlier. It also represents a sound application, to the facts undisputed before the GCA, of Massachusetts law, as developed by

35

the SJC and as applied in more or less comparable cases decided in this district.

VI.  JPI'S MOTION FOR SUMMARY JUDGMENT: COUNTS I AND IV

    A.  Additional Background

    Counts I and IV of the Complaint assert claims of, respectively, unfair and deceptive business practices and misrepresentation. Plaintiffs' allegations, which are detailed below, are based on the conduct of JPI's regional master franchisees, BME in Depianti's case. Plaintiffs claim that the regional master franchisees "act as agents" of JPI, and that JPI is, therefore, vicariously liable for their actions. See Complaint ¶17. JPI disputes the contention that it is vicariously liable for the regional master franchisees' conduct. See Mem. Supp. JPI's Mot. Summ J. at 5-11; JPI's Sept. 24, 2013 Suppl. Submission at 11-12. In addition, JPI argues that plaintiffs, including Depianti, have not been actionably harmed by their respective regional master franchisees. See Mem. Supp. JPI's Mot. Summ J. at 13-14.

    The question of when a franchisor like JPI is vicariously liable for the conduct of a franchisee like BME, under Massachusetts law, was the subject of the second question certified by this court to the SJC. More specifically, the SJC was asked "[w]hether and how to apply the 'right to control

36

test' for vicarious liability to the franchisor-franchisee relationship." Depianti Questions, 2012 WL 3835090, at *3 (Order ¶1(b)). The SJC began its analysis of this question from the basic principle that:

> Generally, vicarious liability may be imposed where "the relation of master and servant existed at the time the plaintiff was injured, whereby the . . . act of the servant was legally imputable to the master." The test to establish the existence of such a relationship is whether the alleged master had "power of control or direction" over the alleged servant. "It is not necessary that there be any actual control by the alleged master to make one his servant or agent, but merely a right of the master to control."

Depianti Answers, 990 N.E.2d at 1062 (citations omitted). The SJC explained, however, that this general test is "not easily transferable to the franchise relationship." Id. at 1063 (quoting Kerl v. Dennis Rasmussen, Inc., 682 N.W.2d 328, 337 (Wis. 2004)). The reason for this difficulty is that under federal trademark law, franchisors risk losing trademark protection if they do not "maintain control and supervision over a franchisee's use of its mark." Id. (citing 15 U.S.C. §1064(5)(A); Mini Maid Servs. Co. v. Maid Brigade Sys., Inc., 967 F.2d 1516, 1519 (11th Cir. 1992)). Courts have explained, however, that the trademark-law requirement of "control and supervision" is not intended "to create a federal law of agency . . . [or to] saddle the licensor with the responsibilities

under state law of a principal for his agent." Id. (quoting Oberlin v. Marlin Am. Corp., 596 F.2d 1322, 1327 (7th Cir. 1979)).

In order to "ensure that liability will be imposed only where the conduct at issue properly may be imputed to the franchisor," id., the SJC adopted a modified version of the "right to control test" known as the "instrumentality test." This test was defined by, among other courts, the Wisconsin Supreme Court in Kerl. According to the SJC:

> The Kerl court held that "the marketing, quality, and operational standards commonly found in franchise agreements are insufficient to establish the close supervisory control or right of control necessary to demonstrate the existence of a master/servant relationship for all purposes or as a general matter." Accordingly, the court applied a modified version of the "right to control test," concluding that a franchisor may be held vicariously liable for the conduct of its franchisee only if the franchisor controls or has a right to control "the daily conduct or operation of the particular 'instrumentality' or aspect of the franchisee's business that is alleged to have caused the harm."

Id. (quoting Kerl, 682 N.W.2d at 332, 340). The SJC added that "[t]he 'instrumentality' test adopted by the Kerl court accords with the approach of the majority of courts that have considered vicarious liability in the context of the franchise relationship." Id. at 1064 (citing cases). It concluded that "a franchisor is vicariously liable for the conduct of its

franchisee only where the franchisor controls or has a right to control the specific policy or practice resulting in harm to the plaintiff." Id.

B.   General Analysis

As explained earlier, plaintiffs' Complaint alleges that JPI is liable for the acts of its regional master franchisees, such as BME, because those regional master franchisees "act as agents" of JPI. See Complaint ¶17. Plaintiffs allege generally that JPI "maintains the right to control" the conduct of the regional master franchisees, and that JPI also "exerts such actual control." Id. Plaintiffs note that both JPI and its regional master franchisees use the brand name "Jan-Pro," that they are "part of a franchise organization," and that the regional master franchisees use methods, standards, and procedures developed by JPI. Id. ¶¶18-21.

Plaintiffs also make more specific allegations concerning the relationship between JPI and its regional master franchisees. They allege that JPI "retains the right to enforce provisions of its franchise agreements," that it is permitted to "directly oversee the work" of any unit franchisee, and that it is a "beneficiary" of the agreements between each regional master franchisee and its unit franchisees. Id. ¶¶28-29. More narrowly, the Complaint asserts that JPI imposes policies that

govern any advertising and promotional materials used by the regional master franchisees, and that such materials are subject to JPI's review and approval before they can be used. Id. ¶22. Finally, according to the Complaint, JPI has the right to approve all terminations of unit franchisees. Id. ¶55.

Under the legal framework delineated by the SJC in Depianti Answers, JPI is not vicariously liable for the conduct of its regional master franchisees, including BME, merely because of the general degree of influence inherent in a typical franchisor-franchisee relationship. Rather, in order to establish that JPI is vicariously liable, plaintiffs must prove that JPI "controls or has a right to control the specific policy or practice resulting in harm." Depianti Answers, 990 N.E.2d at 1064.[9]

_____

[9]     The Complaint also alleges that JPI is liable directly, not vicariously, "to the extent that it has taken over direct oversight of certain cleaning franchises." Complaint ¶51. Plaintiffs have since conceded, however, that JPI "has never taken direct oversight over any unit franchise." Pls.' Statement of Facts Opp'n to JPI's Mot. Summ. J. at 20 (Def.'s Statement of Facts Supp. Mot. Summ. J. ¶40 is "not disputed").

One other assertion in the Complaint arguably concerns direct liability: plaintiffs allege that JPI requires that regional master franchisees sell a minimum annual quota of unit franchises, and that this requirement causes regional master franchisees to engage in misrepresentations and in unfair practices. See Complaint ¶¶53-54. Such a quota is, in fact, included in JPI's contracts with BME. See Exhibit Compendium Tab 2A, §§4.5-4.6 ("JPI-BME Contract"). However, there is no evidence in the record that could reasonably support the

Therefore, in order for Counts I and IV to survive summary judgment as to Depianti, the evidence in the summary judgment record must be sufficient to create a genuine dispute as to two sets of allegations: (a) that specific policies or practices to which Depianti was subjected were actionable as misrepresentations or as unfair and deceptive businesses practices; and (b) that JPI either controlled these policies or practices or had the right to control them.

C.   Misrepresentation

A plaintiff in an action for misrepresentation is required to prove: (a) that "the defendant made a false representation of a material fact"; (b) that "the plaintiff relied upon the representation as true and acted upon it"; and (c) that the plaintiff's reliance was "to his damage." Kennedy v. Josephthal & Co., 814 F.2d 798, 805 (1st Cir. 1987) (quoting Danca v. Taunton Savings Bank, 385 Mass. 1, 8, 429 N.E.2d 1129, 1133

conclusion that any actionable injuries to Depianti were causally connected to this quota. The evidence relevant to this issue consists primarily of the deposition testimony of Jeff Bradley, BME's owner since 2006. Bradley testified that BME has met its quota every year, that it does not take active steps to solicit new unit franchisees, and that it sometimes turns down prospective unit franchisees. See Deposition Compendium Tab E at 16, 27, 49 ("Bradley Dep."). In addition, JPI's President and CEO, Richard Kissane, testified that JPI never exercises the sanctions that it is permitted, but required, to exercise if regional master franchisees do not meet their quotas of new unit franchisees. See Deposition Compendium Tab A at 32-33, 84-86, 125-26 ("Kissane Dep.").

(Mass. 1982)). A representation of fact is "material" if "a reasonable man would attach importance [to it] in determining his choice of action in the transaction in question." Zimmerman v. Kent, 575 N.E.2d 70, 74-75 (Mass. App. Ct. 1991) (quoting Rogen v. Ilikon Corp., 361 F.2d 260, 266 (1st Cir. 1966)).

A plaintiff alleging misrepresentation must prove that his reliance on the defendant's representation was reasonable. Kennedy, 814 F.2d at 805 (citing Saxon Theatre Corp. v. Sage, 200 N.E.2d 241, 244-45 (Mass. 1964)). However, he is not required to prove that the defendant actually intended to deceive him, or even that the defendant knew his statement to be false -- "provided the thing stated is not merely a matter of opinion, estimate, or judgment, but is susceptible of actual knowledge." Nickerson v. Matco Tools Corp., 813 F.2d 529, 530 (1st Cir. 1987) (quoting Powell v. Rasmussen, 243 N.E.2d 167, 168 (Mass. 1969)); Snyder v. Sperry & Hutchinson Co., 333 N.E.2d 421, 428 (Mass. 1975).[10]

The Complaint alleges that Depianti, along with the other plaintiffs, was harmed by essentially two misrepresentations.

_____

[10]  Because, under cases like Nickerson, Powell, and Snyder, the defendant's intent need not be proven, it is not necessary for present purposes to analyze the cause of action sometimes defined separately as "negligent misrepresentation." See Nota Const. Corp. v. Keyes Associates, Inc., 694 N.E.2d 401, 405 (Mass. App. Ct. 1998); Logan Equip. Corp. v. Simon Aerials, Inc., 736 F. Supp. 1188, 1199-1200 (D. Mass. 1990).

Cf. <u>Depianti Answers</u>, 990 N.E.2d at 1064 n.11. Both alleged misrepresentations concern the requirement that the regional master franchisee "furnish to [the unit franchisee] . . . customer account(s) . . . amounting to [a fixed sum] gross volume per year." BME-Depianti Contract ¶1(A). In Depianti's case, the amount of "gross volume per year" promised in the contract was $100,000. <u>Id.</u>

The first misrepresentation alleged in the Complaint is that, when plaintiffs were considering whether to become unit franchisees, they were misled to believe that sufficient business was available "to provide the monthly income [promised] in their agreements." Complaint ¶34. In truth, according to the Complaint, the accounts under the regional master franchisee's control were insufficient to satisfy the promised volume of work. <u>Id.</u> The second purported misrepresentation allegedly occurred after plaintiffs had become unit franchisees. Plaintiffs allege that they were then misinformed about "the number of hours per week that will be required to service the accounts offered" to them, in order to "induce [plaintiffs] to accept the accounts toward their guaranteed level of income." <u>Id.</u> ¶41.

Plaintiffs have offered no evidence indicating that the latter form of misrepresentation occurred with respect to

Depianti. An affidavit submitted by Depianti makes no mention of such conduct. See Pls.' Statement of Facts Opp'n to JPI's Mot. Summ. J. Ex. 16 ("Depianti Aff."). In addition, Depianti did not discuss any such misrepresentations at his deposition. See Deposition Compendium Tab J ("Depianti Dep."). Plaintiffs insist that the record supports the contention that "the time estimated to service [cleaning] accounts" was not accurate, relying on Depianti's testimony "that the accounts were underbid." Pls.' Sur-Reply in Opp'n to Def.'s Mot. Summ. J. at 5. It is true that, as discussed below, Depianti testified that he "felt he should have gotten more money" for his work. See Depianti Dep. at 164-65. He did not, however, assert that BME or anyone else had misrepresented to him the amount of time that any cleaning tasks would require. There is, therefore, no evidence that could lead a reasonable fact finder to conclude that such misrepresentations were made.

The misrepresentation allegedly made earlier in time, when Depianti was considering whether to become a unit franchisee, is better supported in the summary judgment record. As noted above, Depianti was promised by contract that he would be furnished accounts worth $100,000 of "gross volume per year." BME-Depianti Contract ¶1(A). Similarly, Depianti asserts that John Bradley, BME's owner until 2006, "told [Depianti that he] was guaranteed

44

to earn at least $100,000 per year." Depianti Aff. ¶2. A reasonable fact finder could find that these promises implied a representation that BME had the capacity to meet the obligations it was taking on toward Depianti.

Depianti asserts, in his affidavit, that in reality, the accounts provided to him by BME during the years 2003-2007, except for a two-month period, amounted to an income of approximately $3,000 per month. Id. ¶¶5-9. After October, 2007, the gross monthly income generated by these accounts dropped to $1,000. Id. ¶11. This evidence tends to support the inference that the representations made to Depianti concerning the amount of business that would be available to him were false. In addition, Jeff Bradley, BME's owner since 2006 (and John Bradley's son), indicated at deposition that the volume of available cleaning accounts plays only a limited role in BME's decision as to whether to sell a franchise to a prospective unit franchisee. See Bradley Dep. at 51-55. A reasonable fact finder could arguably conclude, therefore, that BME's representations to Depianti concerning the volume of work that would be available to him were false.[11]

---

[11]   The representations allegedly made to Depianti may also be viewed as "a matter of opinion, estimate, or judgment," Nickerson, 813 F.2d at 530 (quoting Powell, 243 N.E.2d at 168), concerning the volume of cleaning accounts that BME would provide to Depianti in the ensuing months. "Statements of

As discussed earlier, JPI, as opposed to BME, can be held liable for BME's conduct only if it "controls or has a right to control the specific policy or practice resulting in harm," in this case the representations made to potential unit franchisees. See Depianti Answers, 990 N.E.2d at 1064. BME's representation that it could provide Depianti with cleaning accounts worth $100,000 annually was taken from a menu of "franchise plans" of different sizes used by JPI's regional master franchisees. This menu was provided to the regional master franchisees by JPI, and was included in the "Uniform Franchise Offering Circular" provided to prospective unit franchisees. See Bradley Dep. at 61; Exhibit Compendium Tab 21, at 6. The menu of franchise plans includes plans ranging in annual gross revenue from $5,000 to $200,000. Id.

BME's alleged misrepresentation was essentially its selection of the $100,000 franchise plan as a plan available to

---

opinion or judgment relating to future events . . . may be actionable where the defendant misrepresents his actual present intent to perform a future act." Logan Equip. Corp, 736 F. Supp. at 1199-1200 (citing Barrett Associates, Inc. v. Aronson, 190 N.E.2d 867, 868 (Mass. 1963)). "[L]ack of present intent to perform is a question of fact susceptible to proof like any question of fact, including resort to circumstantial evidence." 20 Atlantic Ave. Corp. v. Allied Waste Industries, Inc., 482 F. Supp. 2d 60, 63 (D. Mass. 2007) (citing Bolen v. Paragon Plastics, Inc., 754 F. Supp. 221, 226 (D. Mass. 1990)). A reasonable fact finder could find, based on the evidence discussed above, that BME misrepresented its intent to perform at the time it contracted with Depianti.

Depianti. There is no evidence in the summary judgment record that could reasonably support the conclusion that JPI controlled, or had a right to control, BME's decisions concerning the plan(s) offered to prospective unit franchisees. The contract between JPI and BME provides that BME has "sole responsibility for . . . the sale of franchises" in its territory. See JPI-BME Contract §4.25. Jeff Bradley averred that BME "decides for itself . . . whether to sell a unit franchise to a particular person." Exhibit Compendium Tab 2, ¶8 ("Bradley Aff."). Bradley also testified that BME was free to offer franchise plans that deviated from JPI's standard menu, and that such deviations did not require JPI's approval. See Bradley Dep. at 61-62. This information was confirmed by Richard Kissane, JPI's President and CEO. See Kissane Dep. at 27, 116-17. The testimony of Bradley and Kissane was not controverted. In addition, while, as mentioned earlier, JPI required that BME sell a minimum number of unit franchises per year, no such requirement was imposed concerning the volume of the unit franchisees' franchise plans. See JPI-BME Contract §§4.5-4.6.

In summary, the only alleged misrepresentation that a reasonable fact finder could find made to Depianti was the misrepresentation that BME would be able to provide him with $100,000 worth of annual cleaning work. No reasonable fact

47

finder could find that JPI controlled, or had a right to control, this instrumentality of BME's operations. JPI is, therefore, entitled to summary judgment on Depianti's misrepresentation claim. See Depianti Answers, 990 N.E.2d at 1064.

D.   Unfair and Deceptive Business Practices

Count Four of the Complaint asserts a claim for unfair and deceptive business practices under Chapter 93A. Chapter 93A provides, in part, that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Ch. 93A §2. Chapter 93A "is broad in scope and does not catalogue the type of conduct falling within its prohibition." Cummings v. HPG Int'l, Inc., 244 F.3d 16, 25 (1st Cir. 2001). The First Circuit has explained the manner in which Chapter 93A has been interpreted by the Massachusetts courts:

> Litigation under [Chapter] 93A is rampant, but a common refrain has developed. "The objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." In other words, a chapter 93A claimant must show that the defendant's actions fell "within at least the penumbra of some common-law, statutory, or other established concept of unfairness," or were "immoral, unethical, oppressive or unscrupulous," and resulted in "substantial injury . . . to competitors or other businessmen."

48

Quaker State Oil Refining Corp. v. Garrity Oil Co., 884 F.2d 1510, 1513 (1st Cir. 1989) (quoting PMP Associates, Inc. v. Globe Newspaper Co., 321 N.E.2d 915, 917 (Mass. 1975)) (other citations omitted); Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 69 (1st Cir. 2009).

Courts assessing Chapter 93A claims are required to focus "on the nature of challenged conduct and on the purpose and effect of that conduct." Mass. Employers Ins. Exch. v. Propac-Mass, Inc., 648 N.E.2d 435, 438 (Mass. 1995); Commercial Union Ins. Co. v. Seven Provinces Inc. Co., 217 F.3d 33, 40 (1st Cir. 2000). Additional consideration may be given to the "equities between the parties," to "what a defendant knew or should have known," and to "a plaintiff's conduct, his knowledge, and what he reasonably should have known." Swanson v. Bankers Life Co., 450 N.E.2d 577, 580 (Mass. 1983).

An action under Chapter 93A may be brought by "[a]ny person . . . who has been injured by another person's use or employment of" an unfair or deceptive practice. See Ch. 93A §9(1). Thus, a Chapter 93A claim requires a "causal connection" between the defendant's unfair or deceptive practice and the plaintiff's injury. See Hershenow v. Enter. Rent-A-Car Co. Of Boston, Inc., 840 N.E.2d 526, 532 (Mass. 2006); Kohl v. Silver Lake Motors, Inc., 343 N.E.2d 375, 379 (Mass. 1976).

49

Plaintiffs allege that they were subject to essentially four unfair or deceptive practices. Cf. Depianti Answers, 990 N.E.2d at 1064 n.11. First, plaintiffs allege that they were regularly provided cleaning accounts that are geographically distant from one another and, therefore, unreasonably inconvenient. See Complaint ¶43. Next, according to plaintiffs, the cleaning accounts that they serviced were regularly "underbid," so that the income that plaintiffs received for their work was less than the fair value of that work. See Complaint ¶50. Third, plaintiffs allege that cleaning accounts were frequently taken away from them unjustifiably, after those accounts were counted against the amount of cleaning business guaranteed to them by contract. Allegedly, these accounts were then "churned" to other unit franchisees, so that the regional master franchisee could appear to have provided multiple unit franchisees with the required amount of cleaning business. Id. ¶46.

Finally, plaintiffs allege that their contracts with the regional master franchisees were inherently unfair, essentially because they provided for the deduction of excessive fees from the gross income generated by plaintiffs' cleaning services. Id. ¶49. According to plaintiffs, the franchise agreements that they signed were written in misleading, "highly technical and

confusing language," which is difficult for plaintiffs to understand, especially since many of them are immigrants who are not fluent in English. Id. ¶¶30-33.

JPI argues that plaintiffs' allegations cannot support a claim under Chapter 93A because they "amount[] to a simple breach of contract claim." JPI's Sept. 24, 2013 Suppl. Submission at 11. This argument is not meritorious. "[I]t is correct that a breach of contract alone does not amount to an unfair act or practice under [Chapter] 93A." Propac-Mass, 648 N.E.2d at 438 (citing Whitinsville Plaza, Inc. v. Kotseas, 390 N.E.2d 243, 251 (Mass. 1979)). However, breaches of contract, especially if they are systematic or coercive, may violate Chapter 93A if they reach the requisite level of "rascality" and oppressiveness. See Quaker State Oil, 884 F.2d at 1513; Propac-Mass, 648 N.E.2d at 438; Anthony's Pier Four, Inc. v. HBC Associates, 583 N.E.2d 806, 821 (Mass. 1991). Moreover, plaintiffs' Chapter 93A allegations are not limited to purported breaches of contract. Rather, plaintiffs claim, in essence, that the business model offered to prospective unit franchisees was structured in an inherently unfair manner. The following paragraphs, therefore, examine, as to each unfair practice alleged by plaintiffs, whether the summary judgment record sufficiently supports the conclusion that that practice

51

occurred, and whether it sufficiently supports the conclusion that JPI controlled that practice or had a right to do so.

Plaintiffs have provided no evidence that could reasonably support the conclusion that Depianti was provided with geographically inconvenient accounts. Depianti does not complain about such a practice in his affidavit, and he did not do so at deposition. Indeed, plaintiffs' detailed Statement of Facts apparently abandons the claim that the accounts offered to Depianti were geographically inconvenient, although they sustain this claim as to other plaintiffs. See Pls.' Statement of Facts Opp'n to JPI's Mot. Summ. J. ¶¶72-74.

In contrast, the summary judgment record includes evidence that tends to support the contentions that Depianti suffered from underbidding of his cleaning accounts and from unjustifiable termination of those accounts. Depianti testified at deposition that he "felt he should have gotten more money" for the work he did on "[a]ll the accounts [he] had." Depianti Dep. at 165. He asserted that he had reached this conclusion by "talk[ing] to the people working over there," namely at the locations he serviced. Id. Depianti explained:

> [F]or example, I'm going to give you a name over here.
> Medford Pediatrics, when I started over there, the
> person cleaning up that before the account, he was
> $1,500, the Medford Pediatrics pay Coverall. And John
> Bradley give the price for $947.

Id. In addition, Jeff Bradley testified that when BME determines the price it will bid for a given cleaning account, it does not take into account its competitors' prices, because it is "not interested in local competition." Bradley Dep. at 46.

Depianti also testified at length about the accounts that he had serviced and that were terminated, in his view, without justification. See Depianti Dep. at 116, 124-28, 132, 147-48. In his affidavit, Depianti states:

> In September of 2005 I was offered a job cleaning Welch's . . . . In November of 2005 John Bradley's son, operations manager Jeffrey Bradley, took away the Welch account. He did not provide an explanation. I went to the account to drop off a magnetic key card and learned that no one had a problem with my service. . . .
>
> From August to October of 2007 the managers . . . took away 6 of my 8 accounts. I was told that the customers were unhappy with my service, which I do not believe was true. I was never even given a reason as to why I was losing some accounts. For example, I worked at Rick's Auto Body and John Bradley took away the account from me without an explanation.

Depianti Aff. ¶¶6, 8, 10. A reasonable fact finder could conclude, based on this evidence, that Depianti suffered both from underbidding and from unjustifiably terminated accounts.[12]

---

[12]    Jeff Bradley asserts in an affidavit that "many of Depianti's accounts . . . canceled service based on dissatisfaction with Depianti's cleaning service." Bradley Aff. ¶12. Attached to Bradley's affidavit are letters of complaint from some of Depianti's account holders. Id. Tab 2B. A

However, the record does not contain evidence sufficient to permit a reasonable fact finder to conclude that JPI controlled, or had a right to control, the specific policies and practices relevant to BME's alleged underbidding and unjustifiable account termination. First, according to the contract between JPI and BME, JPI does not have the right to control BME's bidding decisions: the contract states that "[n]othing in this agreement shall be construed to prevent [BME] from freely setting its own prices and discounts for services and products that it may render or sell." JPI-BME Contract ¶15.1. The available evidence also indicates beyond genuine dispute that JPI does not control BME's account bidding in practice. JPI provides its regional master franchisees with an electronic worksheet, known as "EZ-bid," that is intended to facilitate bidding. However, all of the relevant evidence in the record indicates that EZ-bid is used by BME only occasionally, at BME's discretion, along with other methods. According to Jeff Bradley, "JPI does not get involved in, and BME decides for itself . . . contracting with customers, pricing accounts . . . BME priced the accounts offered to Depianti, and does all of its pricing proposals, based on its own analysis and without any help from anyone at

---

reasonable fact finder could, nevertheless, credit Depianti's version of events.

JPI." Bradley Aff. ¶¶7, 10; <u>see also</u> Bradley Dep. at 35-37, 45; Kissane Dep. at 119, 121 (EZ-bid provides a "guideline").

Next, the summary judgment record would not permit a reasonable fact finder to conclude that JPI controlled, or had a right to control, BME's decisions concerning whether to terminate any of Depianti's cleaning accounts. No evidence in the record indicates that JPI was actually involved in such decisions. At deposition, Jeff Bradley described the practices that BME employs in its decisions whether to take cleaning accounts away from unit franchisees. JPI is not involved in these practices. <u>See</u> Bradley Aff. 70-72. Bradley also states, in his affidavit, that "JPI does not get involved in, and BME decides for itself," decisions concerning matters such as "managing the unit franchise relationship, contracting with customers, . . . customer complaints about cleaning services, . . . [and] how to determine whether a unit franchisee's franchise plan has been fulfilled." Bradley Aff. ¶¶7-8.

A fact finder also could not reasonably conclude that JPI has a right to control BME's decisions concerning whether to terminate a unit franchisee's work on a given account. The most pertinent provision in the contract between JPI and BME states that BME "agrees to be solely responsible for the relations with any unit franchisees." JPI-BME Contract §4.13. Other provisions

state: (a) that JPI has the right "to enforce any provision of any unit franchise agreement" if BME fails to do so after receiving written notice from JPI; (b) that, if JPI receives recurring complaints from a customer, it is permitted to "assume the rights and obligations" under a contract with that customer; and (c) that JPI has "the right to establish company policies and/or procedures pertaining to the operation of [BME's] franchised business, the terms of this Agreement, or the business of any unit franchisee." Id. §§4.13, 4.15, 4.28, 14.4. Under these provisions, only extraordinary circumstances permit JPI to intervene in BME's ordinary course of business. The last of these provisions also gives JPI the right to establish what are essentially "the marketing, quality, and operational standards commonly found in franchise agreements." Depianti Answers, 990 N.E.2d at 1063 (quoting Kerl, 682 N.W.2d at 332). Such standards, the SJC has held, "are insufficient to establish the close supervisory control or right of control necessary to demonstrate the existence of a master/servant relationship for all purposes or as a general matter." Id. In all, the record would not permit a reasonable fact finder to conclude that JPI has a right to control "the daily conduct or operation" of BME's decisions to terminate unit franchisees' cleaning accounts, or that it exercises such control. See id.; Kerl, 682 N.W.2d at 340

(a general right to impose operational requirements does not generate vicarious liability); Coworx Staffing Servs., LLC v. Coleman, 22 Mass. L. Rptr. 166 (Super. Ct. 2007) (same).

The final unfair or deceptive practice of which plaintiffs complain concerns the alleged inherent unfairness of Depianti's unit franchise agreement. More specifically, plaintiffs contend that the contract provides for the deduction of excessive fees from the gross revenue generated by Depianti's work. See Complaint ¶49. Cases under Massachusetts law indicate that excessive contractual fees can, at least in some circumstances, give rise to liability under Chapter 93A. See De Giovanni v. Jani-King Int'l, Inc., 262 F.R.D. 71, 84 (D. Mass. 2009) (determining, in a decision to certify a class action, that "a fact-finder can determine for all class members whether the amount or types of fees charged by [the defendant] are inherently unfair under Chapter 93A"); Karasavas v. Gargano, 31 Mass. L. Rptr. 624 (Super. Ct. 2014) (excessive fees charged by an attorney violated Chapter 93A); Fredette v. Allied Van Lines, Inc., 66 F.3d 369, 376 (1st Cir. 1995) (successive fees imposed in addition to an apparently all-inclusive price could be actionable under Chapter 93A).

Depianti's contract obligates him to pay "a monthly royalty equal to eight percent (8%) of the month gross revenues for the

preceding month," as well as "a monthly management fee of five [percent] (5%) of [his] 'gross' monthly billings for the preceding month." BME-Depianti Contract ¶7(D),(E). Additional fees become due if Depianti purchases additional business on top of the accounts guaranteed to him by the original contract, if he performs non-recurring cleaning assignments, or if he requests BME's help in negotiating a new contract with a prospective customer. Id. ¶7(B), (E), (F).

Depianti testified at deposition that the deductions taken by BME were higher than he expected them to be. See Depianti Dep. at 54-56. Other than that testimony, there is little evidence in the record to indicate whether the fees charged by BME were fair or unfair. Ordinarily, the dearth of such evidence could present grounds for summary judgment against Depianti, because a defendant may establish entitlement to summary judgment "by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. However, JPI has not, in its detailed submissions, argued that the terms of Depianti's contract were fair, and plaintiffs have, accordingly, not been put on notice that evidence concerning the unfairness of the contract must now be presented. The court is, therefore, finding, for present purposes, that the existing evidence would permit a reasonable

fact finder to conclude that Depianti's contract was unfair to a degree sufficient to generate liability under Chapter 93A. Cf. De Giovanni, 262 F.R.D. at 84.[13]

Once again, JPI may only be held liable for any unfairness that inhered in Depianti's contract if JPI controls, or has a right to control, this "instrumentality" of BME's business. The testimony of Kissane and of Jeff Bradley described earlier indicates that BME is largely independent of JPI in its business decisions, including decisions related to contracting with new unit franchisees. See Kissane Dep. at 47-54; Bradley Aff. ¶¶7-8. In addition, Bradley testified that BME "can and do[es] make changes to the franchisee agreement," and that it does not need JPI's approval to do so. See Bradley Dep. at 62-63. Consequently, it is, questionable whether a reasonable fact finder could determine that JPI actually controlled the contracts that BME offered to its prospective unit franchisees.

However, a reasonable fact finder could find that JPI has the right to control these contracts. JPI's contract with BME provides that:

---

[13]    The court reaches this conclusion independently of the report of Steven Cumbow submitted by plaintiffs, see Pls.' Statement of Facts Opp'n to JPI's Mot. Summ. J. Ex. 14, which JPI has moved to strike.

> All franchise agreements utilized by [BME] shall be the unit franchise agreement currently used by [JPI] o[r] the agreements which are prepared by [BME] and approved by [JPI].
>
> In the event that [BME] desires to change, modify, adjust or amend the terms of the franchise agreement . . . [BME] shall submit said requested changes in writing to [JPI] no less than thirty (30) days prior to the date said change, modification, adjustment or amendment shall be implemented. [JPI] reserves the right to deny the change, modification, adjustment or amendment and may recommend additional changes or modifications. No such change shall materially affect the terms and condition of this Agreement.

JPI-BME Contract ¶¶14.1-14.2. Because BME is prohibited, by contract, from making any "material" changes to JPI's standard unit franchisee contract, and because JPI is permitted to deny any changes proposed by BME, a reasonable fact finder could conclude -- indeed, would be required to conclude -- that JPI has the right to control the contracts that BME offers to its franchisees.

In summary, based on the evidence in the summary judgment record, a reasonable fact finder could conclude that Depianti has been subject to unfair "underbidding" and to unfair terminations of his cleaning accounts, but could not conclude that JPI controls, or has the right to control, the pertinent instrumentalities of BME's business. In addition, a reasonable a reasonable fact finder could conclude that Depianti's contract with BME was inherently unfair, and also that JPI has the right

to control the instrumentality of BME's business concerning its contracts with its unit franchisees. For these reasons, the court is denying JPI's motion for summary judgment -- subject to a qualification discussed below -- with regard to the part of Count IV alleging that the terms of Depianti's contract with BME were inherently unfair, and allowing this motion with regard to all other parts of Count IV.

      E.   The Statute of Limitations

In addition to its arguments on the merits of Depianti's claims in Counts I and IV, JPI contends that these claims are barred by the applicable statutes of limitations. These statutes establish a three-year limitations period for actions in tort and a four-year limitations period for actions under Chapter 93A. See Mem. Supp. JPI's Mot. Summ J. at 13 (citing Mass. Gen. Laws ch. 260, §§2A, 5A); JPI's Sept. 24, 2013 Suppl. Submission at 11. As explained earlier, the one allegation among those made in Counts I and IV that is surviving summary judgment is the allegation, under Chapter 93A, that the terms of Depianti's contract were inherently unfair.

The instant suit was filed on April 18, 2008. JPI's argument that Depianti's Chapter 93A claim is time-barred assumes that the period of limitations began running on June 12, 2003, the date on which Depianti signed his contract with BME.

See Mem. Supp. JPI's Mot. Summ J. at 13. However, "in Massachusetts a [Chapter 93A] cause of action accrues when the plaintiff learns or reasonably should have learned that it has been harmed as a result of defendant's conduct." Hays v. Mobil Oil Corp., 736 F. Supp. 387, 396 (D. Mass. 1990) (citing Olsen v. Bell Telephone Laboratories, Inc., 445 N.E.2d 609, 611-12 (Mass. 1983)).

It is possible that some or all of the harms that Depianti allegedly suffered were discovered, or were reasonably discoverable, by April 18, 2004, and are, therefore, barred by the four-year statute of limitations. However, because JPI focused its statute of limitations argument on the date on which Depianti signed his contract, it has not made arguments or offered evidence concerning the time at which Depianti's harms were discovered or were reasonably discoverable. Plaintiffs have, correspondingly, not addressed any such arguments or evidence.

The question of when Depianti's harms might have been discovered or reasonably discoverable is not necessarily straightforward in the circumstances of this case. As plaintiffs assert to be true concerning many of JPI's unit franchisees, English is not Depianti's first language. See Complaint ¶31; Depianti Dep. at 54. Moreover, plaintiffs allege, and JPI has

62

not specifically denied, that the agreements signed by unit franchisees like Depianti are "written exclusively in English, in highly technical and confusing language, with misleading section headings and provisions regarding waivers of important rights buried within the agreement." Complaint ¶30.

Against this backdrop, and making all reasonable inferences in Depianti's favor, the court concludes that JPI has not shown beyond genuine dispute that Depianti learned of the harms he alleges, or that he should reasonably have learned of those harms, by April 18, 2004. Therefore, the court does not now find that Depianti's remaining claim is time-barred. The instant decision will not, however, prevent JPI from arguing at a later date, when additional evidence has been presented, that the statute of limitations does, indeed, apply.

VII. JPI'S MOTION FOR SUMMARY JUDGMENT: COUNTS V AND VI

A.   Additional Background

Counts V and VI of the Complaint seek recovery in quantum meruit and unjust enrichment, respectively. Plaintiffs argue, in essence, that "[b]y misclassifying [plaintiffs] as independent contractors, and by improperly requiring them to pay [JPI's] ordinary business expenses, the company has been unjustly enriched." Pls. Opp'n to JPI's Mot. for Summ. J. at 16-17. The parties have not suggested that Counts V and VI are affected by

the litigation in the Georgia courts or by the SJC's decision in Depianti Answers.

Quantum meruit and unjust enrichment are closely related doctrines that involve "fine distinctions." Bisbano v. Strine Printing Co., 737 F.3d 104, 108 n.2 (1st Cir. 2013). The parties do not attempt to distinguish between these doctrines in their submissions. JPI argues that these claims require plaintiffs to show that they reasonably expected compensation from JPI, and that plaintiffs, including Depianti, "admittedly had no dealings with [JPI] and admittedly did not expect compensation from the defendant." See Mem. Supp. JPI's Mot. Summ. J. at 3-5. Plaintiffs disagree, arguing that quantum meruit and unjust enrichment permit a plaintiff to recover if "one person obtains money that in equity and good conscience belongs to another," and that an "'expectation of compensation' rather than the source of the compensation . . . must be shown." Pls.' Sur-Reply in Opp'n to Def.'s Mot. Summ. J. at 13-14 (citing Friberg-Cooper Water Supply Corp. v. Elledge, 197 S.W.3d 826 (Tex. App. 2006); Starkey, Kelly, Blaney & White v. Estate of Nicolaysen, 796 A.2d 238 (N.J. 2002)).

B. Quantum Meruit

The term "quantum meruit" has at least two meanings in cases under Massachusetts law. In one sense, quantum meruit is

"not a cause of action," <u>J.A. Sullivan Corp. v. Commonwealth</u>, 494 N.E.2d 374, 377 (Mass. 1986), but rather a "measure of damages" based on "[t]he reasonable value of services provided." <u>Incase Inc. v. Timex Corp.</u>, 488 F.3d 46, 54 (1st Cir. 2007); <u>Black's Law Dictionary</u> 1276 (8th ed. 2004). This measure of damages may be properly awarded where, for example, a plaintiff has "in good faith substantially perform[ed] a contract" but cannot recover on a contractual claim. <u>See</u> <u>J.A. Sullivan</u>, 494 N.E.2d at 378; <u>Newfield House, Inc., v. Mass. Dept. of Pub. Welfare</u>, 651 F.2d 32, 38 (1st Cir. 1981). In this sense of the term, quantum meruit cannot itself provide a basis for recovery by Depianti or by any other plaintiff. <u>See</u> <u>De Giovanni</u>, 262 F.R.D. at 84.

However, the term quantum meruit is also used to denote a specific basis for recovery:

> In Massachusetts, the elements of a quantum meruit recovery are: (1) the plaintiff conferred a reasonable benefit upon the defendants; (2) defendants accepted the services with the reasonable expectation of compensating the plaintiff; and (3) the plaintiff provided the services with the reasonable expectation of receiving compensation.

<u>Backman v. Smirnov</u>, 751 F. Supp. 2d 304, 314 (D. Mass. 2010) (citing <u>Bolen v. Paragon Plastics, Inc.</u>, 747 F. Supp. 103, 106-07 (D. Mass. 1990)); <u>Smilow v. Sw. Bell Mobile Systems, Inc.</u>, 323 F.3d 32, 38-39 (1st Cir. 2003); <u>Rosano-Davis, Inc. v.</u>

65

_Sastre_, 840 N.E.2d 66, at *2 (Mass. Ct. App. 2005) (table). Under this theory of recovery, the "reasonable benefit" bestowed by the plaintiff must be "measurable." _Bolen_, 747 F. Supp. at 106; _Comm. Aluminum Corp. v. Baldwin Corp._, 980 F. Supp. 598, 607 (D. Mass. 1997). The plaintiff is not required to show that "the defendant subjectively . . . expected to pay the plaintiff," but rather that "a reasonable person in [the defendant's] position would have expected to pay for the services accepted." _Mass Cash Register_, 901 F. Supp. at 421; _Bolen_, 747 F. Supp. at 107.

It is questionable whether the summary judgment record would permit a reasonable fact finder to find that Depianti conferred a measurable benefit on JPI, or that a reasonable person in JPI's position would have expected to pay for Depianti's services. _See Bolen_, 747 F. Supp. at 106-07; _Comm._ _Aluminum Corp._, 980 F. Supp. at 607; _Mass Cash Register_, 901 F. Supp. at 421. More significantly, however, plaintiffs' admissions establish that the third element of a quantum meruit action is not satisfied in this case.

Plaintiffs agree, in their papers, that "[n]one of the Plaintiffs ever had contact with or have spoken with anyone at JPI," and that Depianti himself "had no knowledge JPI existed when [he] purchased [his] franchise[]." Pls.' Statement of Facts

Opp'n to JPI's Mot. Summ. J. at 20 (Def.'s Statement of Facts Supp. Mot. Summ. J. ¶¶36-38 are "not disputed"). Crucially, plaintiffs concede that the unit franchisees, including Depianti, "do not expect compensation from JPI." Id. at 24 (same for Def.'s Statement of Facts Supp. Mot. Summ. J. ¶165); Pls.' Sur-Reply in Opp'n to Def.'s Mot. Summ. J. at 14 (plaintiffs "did not expect compensation specifically from the corporate entity named Jan-Pro Franchising International"). Because Depianti's quantum meruit claim can succeed only if he reasonably expected to be compensated by JPI for his services, see Backman, 751 F. Supp. 2d at 314; Bolen, 747 F. Supp. at 107, and because Depianti admittedly did not have such an expectation, JPI is entitled to summary judgment on Count V.

JPI is also entitled to summary judgment on Depianti's quantum meruit claim for another, related reason. Under Massachusetts law, recovery in quantum meruit "is denied if the plaintiff conferred a benefit expecting compensation from one person, but then seeks restitution from a second person." Bolen, 747 F. Supp. at 107 (citing La Chance v. Rigoli, 91 N.E.2d 204, 205 (Mass. 1950)). Depianti, like the other plaintiffs, performed his services pursuant to a contract that was not with JPI, but rather with his regional master franchisee, BME. The contract that Depianti signed with BME provided that BME would

invoice the customers' accounts, would collect payment from them, and would pay Depianti the amount owed him. <u>See</u> BME-Depianti Contract ¶3(B)(3). Depianti must, therefore, "look for payment to the one to whom credit was extended when the work was done." <u>La Chance</u>, 91 N.E.2d at 205. He "is not entitled to restitution from [JPI] merely because of the [alleged] failure of performance by [BME]." <u>Bolen</u>, 747 F. Supp. at 107 (quoting Restatement (Second) of Restitution §110). In essence, the quantum meruit cause of action is inappropriate because, when Depianti provided his services, he expected to be compensated for them by BME.

C. <u>Unjust Enrichment</u>

As noted earlier, unjust enrichment is closely related to quantum meruit. More specifically, "[q]uantum meruit is a species of unjust enrichment." <u>Bisbano</u>, 737 F.3d at 108 n.2 (citing <u>ConFold Pac., Inc. v. Polaris Indus., Inc.</u>, 433 F.3d 952, 957-58 (7th Cir. 2006)). The elements of the more general action of unjust enrichment "[i]n Massachusetts . . . are 'unjust enrichment of one party and unjust detriment to the other party.'" <u>Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.</u>, 412 F.3d 215, 234 n.7 (1st Cir. 2005) (quoting <u>Bushkin Assocs., Inc. v. Raytheon Co.</u>, 906 F.2d 11, 15 (1st Cir. 1990)).

Under this more general cause of action, Depianti is not required to have had a reasonable expectation he would be compensated by JPI for his services. The argument presented by JPI for summary judgment on Count VI is, therefore, not correct.

Plaintiffs' unjust enrichment claim is based on the same conduct that underlies their claims of employee misclassification and of unfair or deceptive business practices under Chapter 93A. See Pls. Opp'n to JPI's Mot. for Summ. J. at 17. As explained earlier, one part of Depianti's Chapter 93A claim is surviving summary judgment -- his allegation that the terms of his contract with BME are inherently unfair. To the extent that Depianti's unjust enrichment claim arises from this allegation, Depianti will not be permitted to recover for unjust enrichment, because "[w]here plaintiff has an adequate remedy at law, equity will not consider a claim for unjust enrichment." Taylor Woodrow Blitman Const. Corp. v. Southfield Gardens Co., 534 F. Supp. 340, 347 (D. Mass. 1982); Santagate v. Tower, 833 N.E.2d 171, 176 (Mass. App. Ct. 2005).

However, JPI has not argued that a remedy in unjust enrichment is unavailable to Depianti because of the availability of an adequate legal remedy. Consequently, the parties' submissions have not clarified whether Depianti's unjust enrichment claim is, in fact, coterminous with the

surviving element of his Chapter 93A claim. In addition, "[b]ecause procedural law allows alternative contentions, parties to a civil action involving . . . an array of factual and legal theories . . . may be allowed to defer choice at least until late stages of proceedings in the trial court. For example, both plaintiffs and defendants in a civil case may be allowed to maintain alternative contentions at least until the evidence is closed." Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1555 (1st Cir. 1994); Rodriguez-Suris v. Montesinos, 123 F.3d 10, 20 (1st Cir. 1997); see also Lass v. Bank of Am., N.A., 695 F.3d 129, 140 (1st Cir. 2012) (upholding the practice of pursuing, at least at the pleading stage, both legal and overlapping equitable claims).[14]

For these reasons, while Depianti will not ultimately be permitted to recover on both legal and equitable claims arising

---

[14] Other decisions are split as to whether unjust enrichment claims should be dismissed because of corresponding claims at law. Compare Vieira v. First Am. Title Ins. Co., 668 F. Supp. 2d 282, 295 (D. Mass. 2009) (allowing the equitable claim to proceed), In re Celexa & Lexapro Mktg. & Sales Practices Litig., 751 F. Supp. 2d 277, 297 (D. Mass. 2010) (same), and Smith v. Jenkins, 626 F. Supp. 2d 155, 170-71 (D. Mass. 2009) (same), rev'd on other grounds, 732 F.3d 51 (1st Cir. 2013), with Ruggers, Inc. v. United States, 736 F. Supp. 2d 336, 342 (D. Mass. 2010) (dismissing the equitable claim), Watkins v. Omni Life Sci., Inc., 692 F. Supp. 2d 170, 179 (D. Mass. 2010) (same), and Reed v. Zipcar, Inc., 883 F. Supp. 2d 329, 334 (D. Mass. 2012) (same), aff'd, 527 F. App'x 20 (1st Cir. 2013).

from the same facts, the court is not now finding that Depianti's unjust enrichment claim is barred by the availability of an adequate remedy at law. The question of which remedy or remedies may ultimately be available to Depianti will be determined at a later date. Cf. Backman, 751 F. Supp. 2d at 314-15 (deferring until after trial decision on an argument that Chapter 93A claims are derivative of common law claims).

VIII. ORDER

In view of the foregoing, it is hereby ORDERED that:

1.   Plaintiffs' Motion to Amend Complaint (Docket No. 145) is DENIED.

2.   JPI's Motion to File Supplemental Answer/Affirmative Defenses Identifying Claim Preclusion (Res Judicata) and Issue Preclusion (Collateral Estoppel) as Additional Defenses (Docket No. 165) is ALLOWED. JPI's Proposed Amended Answer and Affirmative Defenses (Docket No. 165-1) shall be deemed to be the operative answer to the Complaint.

3.   Plaintiffs' Motion for Partial Summary Judgment (Docket No. 68) is DENIED.

4.   JPI's Motion for Summary Judgment (Docket No. 65) ("JPI's Motion") is ALLOWED in part and DENIED is part, as follows:

71

a)   JPI's Motion is ALLOWED as to Counts I, II, III, and V.

b)   JPI's Motion is DENIED as to the element of Count IV alleging that the terms of Depianti's contract with BME were inherently unfair, without prejudice to consideration at a later date of an argument that this claim is barred by the applicable statute of limitations.

c)   JPI's Motion is ALLOWED as to all other element of Count IV.

d)   JPI's Motion is DENIED as to Count VI, without prejudice to consideration at a later date of an argument that no relief may be granted to Depianti under this equitable count because an adequate remedy is available to him at law.

5.   On January 13, 2010, JPI filed a Motion to Strike Steven Cumbow's Supposed Expert Report from the Summary Judgment Record (Docket No. 81). To the extent that this motion has not yet been decided, it is MOOT, because the court has not found Mr. Cumbow's report to be material to the instant decision.

                                    /s/ Mark L. Wolf
                          _____
                          UNITED STATES DISTRICT JUDGE